## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-CV-21649-BLOOM/Elfenbein

**DAVID PEYTON**,
*Individually and as a Shareholder*
*of Nexxt Gen Corporation*,

      Plaintiff,

  v.

**DAVID E. MARTINEZ**,
*Individually and as a Shareholder*
*of Nexxt Gen Corporation*,

      Intervenor Plaintiff,

  v.

**ERIC K. GRANT**, *et al.*,

      Defendants,

  v.

**DAVID PEYTON**, *et al.*,

      Intervenor Defendants,

  v.

**NEXXT GEN CORPORATION**, *et al.*,

      Counter Claimant,

  v.

**DAVID PEYTON**,
*Individually and as a Shareholder*
*of Nexxt Gen Corporation*,

      Counter Defendant.

_____/

## REPORT AND RECOMMENDATION ON
## MOTION FOR CONTEMPT AND MOTION FOR SANCTIONS

**THIS CAUSE** is before the Court on two motions: (1) Intervenor-Plaintiff David Martinez

and Plaintiff/Intervenor-Defendant David Peyton's Joint Expedited Motion for Contempt Against Defendant/Intervenor-Defendant Eric Grant (the "Motion for Contempt"), ECF No. [52]; and (2) Intervenor-Plaintiff David Martinez's Motion for Rule 11 Sanctions Against Defendant/Intervenor-Defendant Eric Grant and his Counsel (the "Motion for Sanctions"), ECF No. [53]. The Honorable Beth Bloom referred both motions to me for a Report and Recommendation.[1]  *See* ECF No. [54]; ECF No. [70].  For the reasons explained below, I **RECOMMEND** that the Motion for Contempt, **ECF No. [52]**, be **GRANTED IN PART and DENIED IN PART** and that the Motion for Sanctions, **ECF No. [53]**, be **DENIED WITHOUT PREJUDICE**.

## I.    BACKGROUND[2]

This action arises out of a business relationship between Eric Grant ("Grant"), David Martinez ("Martinez"), and David Peyton ("Peyton").  *See* ECF No [28] at 3; ECF No [32] at 6; ECF No [42] at 2; ECF No [43] at 3; ECF No. [57] at 2.  As summarized in Grant's Response to the Motion for Contempt, the action "is based on a shareholder dispute between" Grant, Martinez, and Peyton, who are the "three alleged shareholders of Nexxt Gen Corporation."  *See* ECF No. [57] at 2.  The substance of the shareholder dispute is not relevant to either the Motion for

---

[1] Judge Bloom also referred to me for a Report and Recommendation two other motions: (1) Defendants/Counter-Plaintiffs' Motion to Strike Affirmative Defenses of David Peyton or for a More Definite Statement, ECF No. [56]; and (2) Defendant/Counter-Plaintiff Eric Grant's Verified Expedited Motion to Appoint Receiver, ECF No. [104]. *See* ECF No. [70]; ECF No. [108]. Those motions will be addressed in a separate report and recommendation.

[2] The Court takes the details it provides in this Section from the Parties' pleadings where the detail is undisputed and from the evidence presented at the evidentiary hearing that occurred on September 6 and 9, 2024 where the detail was disputed and required a factual finding.  *See* ECF No. [94]; ECF No. [98]; ECF No [99]; ECF No. [101]; Hr'g Tr. Sept. 6, 2024; Hr'g Tr. vol. 1, Sept. 9, 2024 (testimony of Eric Grant); Hr'g Tr. vol. 2, Sept. 9, 2024 (closing arguments); *see also Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1304 (11th Cir. 1991) (requiring a hearing on motion for contempt); *Didie v. Howes*, 988 F.2d 1097, 1105 n.8 (11th Cir. 1993) (implying that a hearing is necessary on a motion for sanctions when there are "contradictory statements in the various motions and responses").

Contempt or the Motion for Sanctions.

What is relevant is the procedural history of the case, which is as follows. Peyton initiated the action on April 29, 2024 by filing a Verified Complaint and Petition for Preliminary Injunction against Grant. *See* ECF No. [1]; ECF No. [4]. On June 6, 2024, Peyton "individually and on behalf of Nexxt Gen Corporation, in his capacity as a shareholder," filed an Amended Verified Complaint and Petition for Preliminary Injunction against both Grant and Nexxt Gen Corporation ("Nexxt Gen"). *See* ECF No. [28] at 1. That same day, Martinez entered the action by filing an Intervenor Complaint, "individually, and derivatively on behalf of" Nexxt Gen, against Nexxt Gen's "shareholders and current members" Peyton and Grant. *See* ECF No. [32] at 2.

During a June 6 hearing before Judge Bloom, Grant, Martinez, and Peyton "agree[d] to refer the case for a settlement conference," *see* ECF No. [31], and Judge Bloom referred the case to me for that purpose, *see* ECF No. [33]. I conducted the settlement conference on June 14 and 17, 2024. *See* ECF No. [35]; ECF No. [36]. Although the "Parties did not settle the case," they did "stipulate[] as to how Nexxt Gen Corporation will continue to operate while litigation is ongoing." *See* ECF No. [36]. "The terms of the stipulation were read into the record," and the "Parties were ordered to reduce the stipulation to written form by June 24, 2024" for my review. *See* ECF No. [36]. The Parties complied with that Order, *see* ECF No. [40]; ECF No. [41], and I approved the written stipulation (the "Joint Stipulation") on July 2, 2024, *see* ECF No. [47]. At that time, I noted the Joint Stipulation "governs how Nexxt Gen Corporation will continue to operate while litigation is ongoing and is consistent with the Parties' agreement during the June 17, 2024 Settlement Conference." *See* ECF No. [47].

Meanwhile, the litigation continued. On June 26, 2024, Grant and Nexxt Gen answered both Peyton's Amended Complaint and Martinez's Intervenor Complaint. *See* ECF No. [42]; ECF

No. [43].  Grant and Nexxt Gen also brought six counterclaims against Peyton.  *See* ECF No. [42] at 25–32.  Peyton answered those counterclaims on July 18, 2024.  *See* ECF No. [48].

About two weeks later, on August 2, 2024, Martinez (individually, and derivatively on behalf of Nexxt Gen) and Peyton (individually) filed the joint Motion for Contempt.  *See* ECF No. [52].  In the Motion for Contempt, they seek "a holding" that Grant "is in contempt" of the Joint Stipulation.  *See* ECF No. [52] at 2.  They contend that "Grant has failed to fully comply with the Joint Stipulation," which has prevented them from being "involved in the decisions regarding the daily operations of Nexxt" Gen, having "signatory authority" in Nexxt Gen's "financial accounts," being "able to access QuickBooks to ascertain the transactions taking place daily," and ensuring that someone is "functioning as the 'primary administrator' of Nexxt" Gen.  *See* ECF No. [52] at 2.  Because of those issues, Martinez and Peyton do not "have a full picture" of Nexxt Gen's "financial standing to be able to properly litigate this case and to save the company from financial failure."  *See* ECF No. [52] at 3.  In relief, they request findings that Grant "violated the Joint Stipulation" and is "in contempt of court," an injunction preventing Grant "from taking any action in contravention of the Joint Stipulation," and money damages.  *See* ECF No. [52] at 7.

A few days later, on August 6, 2024, Martinez individually and derivatively on behalf of Nexxt Gen filed the Motion for Sanctions against Grant, Grant's lawyer, and the law firm representing Grant.  *See* ECF No. [53].  In the Motion for Sanctions, Martinez requests that "the Court impose Rule 11 sanctions because Defendant's Answer to Martinez's Intervenor Complaint" and "his Answer to Plaintiff's Amended Complaint" assert "defenses that are not well grounded in law or fact" and "without having conducted a reasonable inquiry into the underlying facts."  *See* ECF No. [53] at 2.  Martinez also encourages the Court to impose sanctions under its "inherent powers" because Peyton and his counsel acted "in bad faith."  *See* ECF No. [53] at 19.

4

On September 6 and 9, 2024, the Court held an evidentiary hearing on the Motion for Contempt (the "Hearing"). *See* ECF No. [64]; ECF No. [94]; ECF No. [98]. At the Hearing, the Court heard testimony from Grant, Martinez, and Peyton, along with arguments from each Party's counsel. *See* Hr'g Tr. Sept. 6, 2024; Hr'g Tr. vol. 1–2, Sept. 9, 2024. The Court also admitted into evidence more than 20 exhibits spanning more than 200 pages. *See* ECF No. [99]; ECF No. [101]. The Motion for Contempt is now ripe for review.

## II.   LEGAL STANDARDS

### A.   Civil Contempt

"Contempt of court is the disregard of judicial authority." *Popular Bank of Fla. v. Banco Popular de Puerto Rico*, 180 F.R.D. 461, 465 (S.D. Fla. 1998); *see also Ga. Power Co. v. NLRB*, 484 F.3d 1288, 1291 (11th Cir. 2007) (defining "civil contempt" as the "willful disregard of the authority" of the court). When a party fails to comply with an order of the court, the court "may use the remedy of a citation of contempt to enforce" that order. *See Combs v. Ryan's Coal Co.*, 785 F.2d 970, 980 (11th Cir. 1986). The court's power to use a citation of civil contempt to compel compliance with its directives comes both from the court's inherent authority, *see Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) (noting that courts "have embraced an inherent contempt authority as a power necessary to the exercise of all others" (citations and quotation marks omitted)); *Popular Bank*, 180 F.R.D. at 465 ("The court's power to enforce compliance with its lawful orders is inherent."), and from the Federal Rules of Civil Procedure, *see* Fed. R. Civ. P. 70(e) (noting a court may hold a "disobedient party in contempt").

For purposes of civil contempt, it does not matter whether the flouted order was issued after an adversary proceeding, *see Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1526 (11th Cir. 1992) (discussing a civil contempt finding made after

a party failed to obey an order made "following a bench trial"), or "pursuant to a consent decree," *see Combs*, 785 F.2d at 980.  Either way, "[c]ivil contempt proceedings may be employed to coerce a contemnor into compliance with the court's order and to compensate a complainant for losses sustained."[3]  *Popular Bank*, 180 F.R.D. at 465.

"A party seeking civil contempt bears the initial burden of proving by clear and convincing evidence that the alleged contemnor has violated an outstanding court order." *Wellington Precious Metals*, 950 F.2d at 1529.  "The clear and convincing evidence must establish that: (1) the allegedly violated order was valid and lawful; (2) the order was *clear and unambiguous*; and (3) the alleged violator had the ability to comply with the order." *Ga. Power Co.*, 484 F.3d at 1291 (emphasis in original).  "In determining whether a party is in contempt of a court order, the order is subject to reasonable interpretation, though it may not be expanded beyond the meaning of its terms absent notice and an opportunity to be heard." *Id.* (citation omitted). Courts must "construe any ambiguities or uncertainties in such a court order in a light favorable to the person charged with contempt." *Id.*

"Once a prima facie showing of a violation has been made, the burden of production shifts to the alleged contemnor, who may defend his failure on the grounds that he was unable to comply." *Wellington Precious Metals*, 950 F.2d at 1529.  That is because, "[w]here compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action." *United States v. Rylander*, 460 U.S. 752, 757 (1983); *see also Combs*, 785 F.2d

---

[3] The animating purpose behind a contempt sanction, and "the character of the relief itself," determine whether it is civil or criminal. *See Bagwell*, 512 U.S. at 828–29 (quotation marks omitted). A "contempt sanction is considered civil if it is remedial, and for the benefit of the complainant." *Id.* at 827 (quotation marks omitted); *see also id.* (defining "civil contempt sanctions" as "those penalties designed to compel future compliance with a court order," which "are considered to be coercive and avoidable through obedience"); *Serra Chevrolet, Inc. v. Gen. Motors Corp.*, 446 F.3d 1137, 1147 (11th Cir. 2006).  In contrast, a contempt sanction is criminal if it "is punitive, to vindicate the authority of the court."  *See Bagwell*, 512 U.S. at 828 (quotation marks omitted).

at 983 ("[I]t is improper to impose contempt sanctions of any sort if the alleged contemnor is not able to satisfy the court's directives."). But to "succeed on the inability defense, the alleged contemnor must go beyond a mere assertion of inability and establish that he has made in good faith all reasonable efforts to meet the terms of the court order he is seeking to avoid." *Wellington Precious Metals*, 950 F.2d at 1529 (citation and quotation marks omitted). This is a "high standard" that courts "construe . . . strictly." *See Combs*, 785 F.2d at 984. "Even if the efforts" a party "did make were substantial, diligent or in good faith, the fact that he did not make all reasonable efforts" would prevent him from "rebut[ting] the prima facie showing of contempt." *See id.* (cleaned up).

If "the alleged contemnor" makes "a sufficient showing," however, the "burden shifts back to the initiating party" to prove "ability to comply." *Wellington Precious Metals*, 950 F.2d at 1529; *see also Combs*, 785 F.2d at 984 (noting that the party seeking to show contempt "retains the ultimate burden of proof"). The court's "focus in a civil contempt proceeding is not on the subjective beliefs or intent of the alleged contemners in complying with the order, but whether in fact their conduct complied with the order at issue." *Ga. Power Co.*, 484 F.3d at 1291 (quotation marks omitted). While due process requires "a hearing in which the alleged contemnor may explain why the court should not make a contempt finding," *see Watkins*, 943 F.2d at 1304, that hearing can be an ordinary civil proceeding. *See Serra Chevrolet*, 446 F.3d at 1147 ("Civil contempt may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard").

If, after hearing from the alleged contemnor, the court decides to impose civil contempt sanctions, they may be "compensatory" or "coercive." *See Watkins*, 943 F.2d at 1304. When a court chooses "to impose sanctions designed to ensure compliance, the sanctions cannot be any

greater than necessary to ensure such compliance." *Id.* "When fashioning a sanction to secure compliance, a district court should consider the character and magnitude of the harm threatened by continued contumacy and the probable effectiveness of any suggested sanction in bringing about the result desired." *Id.* (quotation marks omitted).

**B.  Sanctions Under Federal Rule of Civil Procedure 11**

Federal Rule of Civil Procedure 11 "deters attorneys and litigants from clogging federal courts with frivolous filings." *Huggins v. Lueder, Larkin & Hunter, LLC*, 39 F.4th 1342, 1344 (11th Cir. 2022).  In relevant part, Rule 11 provides:

> By presenting to the court a pleading, written motion, or other paper — whether by signing, filing, submitting, or later advocating it — an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> > (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> >
> > (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
> >
> > (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> >
> > (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b).  "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."  Fed. R. Civ. P. 11(c)(1).

"Rule 11 is intended to deter claims with *no* factual or legal basis at all; creative claims,

coupled even with ambiguous or inconsequential facts, may merit dismissal, but not punishment." *Davis v. Carl*, 906 F.2d 533, 538 (11th Cir. 1990) (emphasis in original); *see also Donaldson v. Clark*, 819 F.2d 1551, 1556 (11th Cir. 1987) (noting that Rule 11 "is intended to reduce frivolous claims, defenses or motions and to deter costly meritless maneuvers, thus avoiding unnecessary delay and expense in litigation" (quotation marks omitted)). "Rule 11 sanctions are designed to discourage dilatory or abusive tactics and help to streamline the litigation process by lessening frivolous claims or defenses." *Donaldson*, 819 F.2d at 1556 (quotation marks omitted). Indeed, "the imposition of sanctions pursuant to Rule 11 is meant to deter attorneys from violating the rule." *Id.*

"Rule 11 sanctions are proper '(1) when a party files a pleading that has no reasonable factual basis; (2) when the party files a pleading that is based on legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; or (3) when the party files a pleading in bad faith for an improper purpose.'" *Almeida v. Bennet Auto Supply, Inc.*, 335 F.R.D. 463, 465 (S.D. Fla. 2020) (quoting *Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996)). "In this circuit, a court confronted with a motion for Rule 11 sanctions first determines whether the party's claims are objectively frivolous — in view of the facts or law — and then, if they are, whether the person who signed the pleadings should have been aware that they were frivolous; that is, whether he would have been aware had he made a reasonable inquiry." *McGreal*, 87 F.3d at 1254. "If the attorney failed to make a reasonable inquiry, then the court must impose sanctions despite the attorney's good faith belief that the claims were sound." *Id.*

When evaluating a motion for Rule 11 sanctions, courts use "an objective standard." *See Donaldson*, 819 F.2d at 1556. They look for "reasonableness under the circumstances," which is

a standard "more stringent than the original good-faith formula" that used to apply to Rule 11. *See id.* (quotation marks omitted). Courts must "avoid using the wisdom of hindsight" and instead "test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." *See id.* (quotation marks omitted). "What constitutes a reasonable inquiry may depend on such factors as how much time for investigation was available to the signer and whether he had to rely on a client for information as to the facts underlying the pleading, motion, or other paper; whether the pleading, motion, or other paper was based on a plausible view of the law; or whether he depended on forwarding counsel or another member of the bar." *Id.* (alteration adopted, citation omitted).

"Although sanctions are warranted when the claimant exhibits a deliberate indifference to obvious facts, they are not warranted when the claimant's evidence is merely weak but appears sufficient, after a reasonable inquiry, to support a claim under existing law." *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998). And while the timing of sanctions rests in the district judge's discretion, Rule 11 sanctions "normally will be determined at the end of litigation." *Id.* at 523; *see also* Fed. R. Civ. P. 11 advisory committee's note to 1983 amendment ("[I]t is anticipated that in the case of pleadings the sanctions issue under Rule 11 normally will be determined at the end of the litigation."). That is in part because, though "Rule 11 does not mandate a hearing," this Circuit "envision[s] that a trial or other pretrial hearing would give the district court a basis to rule on a sanctions motion," particularly when the parties' factual recitations "are starkly contradictory" and the discovery conducted to that point is "sporadic" and "marginal." *See Didie*, 988 F.2d at 1105.

Indeed, "Rule 11 should not be used to raise issues as to the legal sufficiency of a claim or defense that more appropriately can be disposed of by a motion to dismiss, a motion for judgment on the pleadings, a motion for summary judgment, or a trial on the merits." *Bigford v. BESM, Inc.*,

No. 12-61215-CIV, 2012 WL 12886184, at *2 (S.D. Fla. Oct. 12, 2012).  When discovery has not yet been completed, "any request for a determination that" a party "lacks sufficient evidence to prove" his "case is premature."  *Id.*; *see also Almeida*, 335 F.R.D. at 466–67; *Doe v. Roe*, No. 17-23333-CIV, 2019 WL 1316041, at *2 (S.D. Fla. Mar. 12, 2019); *Thomas v. Evans*, 880 F.2d 1235, 1243 n.11 (11th Cir. 1989); *Wheeler v. Lake Rousseau Resort, LLC*, No. 5:20-CV-172-OC-30PRL, 2021 WL 3501097, at *1 (M.D. Fla. Feb. 8, 2021); *Rodriguez v. Goff*, No. 3:20CV5946-MCR-HTC, 2022 WL 1222671, at *1 (N.D. Fla. Feb. 2, 2022).  Parties should not ask "the Court to adjudicate the disputed core claims of" a case "in the context of a sanctions motion. This is not the preferred method of proceeding."  *Bigford*, 2012 WL 12886184, at *2; *see also Doe*, 2019 WL 1316041, at *2 (denying a Rule 11 motion as premature because it required the court "to resolve questions of fact, weigh evidence, and make credibility determinations," which was "not appropriate" so early in the proceedings).

## III.   DISCUSSION

### A.  Motion for Contempt

In the Motion for Contempt, Martinez and Peyton contend that Grant "has failed to fully comply with the Joint Stipulation."  ECF No. [52] at 2.  Specifically, they argue that the Joint Stipulation required Grant to perform at least four actions that he still has not: (1) make all decisions that impact Nexxt Gen's daily operations by a two-thirds vote of Grant, Martinez, and Peyton; (2) add Martinez and Peyton as signatories on Nexxt Gen's financial accounts; (3) give Martinez and Peyton "viewing" access to Nexxt Gen's credit cards and QuickBooks; and (4) make Samantha Martinez the "primary administrator" of Nexxt Gen.[4]  *See* ECF No. [52] at 2.

In his Response to the Motion for Contempt (the "Response"), Grant contends that he has

---

[4] Martinez and Peyton argue Grant had until July 29, 2024 to complete items (2), (3), and (4). *See* ECF No. [52] at 2.

"made all reasonable efforts to comply" with the "terms and the spirit" of the Joint Stipulation and that "any deviations were not his doing nor within his control." *See* ECF No. [57] at 2.  He argues Martinez and Peyton "have created certain ambiguities in the Joint Stipulation to attempt to include provisions that were not part of" the document and that he "cannot be expected" to complete. *See* ECF No. [57] at 3.  He also argues Martinez and Peyton "are acting in violation of the spirit of the Joint Stipulation and are committing corporate waste and misconstruing the terms of the Joint Stipulation." *See* ECF No. [57] at 3.

In their Reply in support of the Motion for Contempt (the "Reply"), Martinez and Peyton contend that Grant continues to violate the Joint Stipulation, including by: again removing their access to Nexxt Gen's bank accounts; unilaterally moving large sums of money out of Nexxt Gen accounts and paying large vendor bills; unilaterally withholding or delaying payments from Martinez, Peyton, and subcontractors; unilaterally paying himself a salary; and unilaterally terminating Nexxt Gen employees.  *See* ECF No. [63] at 3.  They argue that the Joint Stipulation, which Grant participated in crafting and approving, is not ambiguous and that they are not committing waste.  *See* ECF No. [63] at 3–6.

Evaluating a motion for contempt is a three-step, burden-shifting process.  *See Ga. Power Co.*, 484 F.3d at 1291.  At the first step, the party seeking the contempt finding must show clear and convincing evidence that the alleged contemnor violated a valid, lawful, clear, and unambiguous order.  *Id.*; *see also Wellington Precious Metals*, 950 F.2d at 1529.  If the moving party meets that threshold, the burden shifts to the alleged contemnor at the second step to show that he was unable to comply with the order despite making all reasonable efforts.  *See Wellington Precious Metals*, 950 F.2d at 1529.  If the alleged contemnor meets that high standard, the burden shifts back to the moving party at the third step to prove the alleged contemnor had the ability to

comply with the order.  *Id.*; *see also Combs*, 785 F.2d at 984; *Ga. Power Co.*, 484 F.3d at 1291.

Starting with the first step, the Court must initially determine whether Grant violated any provision of the Joint Stipulation.  To do so, the Court will take each provision in turn.[5]

### 1.  Joint Stipulation Provision (a) – Two-thirds Vote on Certain Business Decisions

Subsection (a) of the Joint Stipulation modified section 8(c) of the shareholder agreement, ECF No. [28] at 48, to require Grant, Martinez, and Peyton to use a two-thirds vote for any "decisions which impact the daily operations of the company defined in subsections (ii), (vi), (ix), (x), (xi), (xii) and (xiv)."  *See* ECF No. [99-11] at 1.  As an initial matter, while Martinez and Peyton argued at the Hearing that subsection (a) of the Joint Stipulation effectively modified the shareholder agreement to require a two-thirds vote on any decision related to running Nexxt Gen, *see* Hr'g Tr. vol. 2, 7, Sept. 9, 2024, that is not what subsection (a) did.  By its plain and unambiguous language, subsection (a) modified the shareholder agreement to require a two-thirds vote *only* for those provisions it specifically enumerated: (ii), (vi), (ix), (x), (xi), (xii), and (xiv). So the Court's task is to evaluate whether Grant violated the two-thirds vote requirement for any of those seven provisions.

Based on their briefs and the evidence presented at the Hearing, the Parties do not appear to be disputing subsections (ix), (x), (xi), or (xii).  *See* Hr'g Tr. vol. 2, 46–48, Sept. 9, 2024.  The Court therefore focuses on subsections (ii), (vi), and (xiv).

### a.  Shareholder Agreement subsection 8(c)(ii)

Subsection 8(c)(ii) of the shareholder agreement pertains to "[p]ayment of compensation to officers, including reimbursement of expenses."  *See* ECF No. [28] at 48.  Martinez and Peyton assert in their briefs that Grant violated this provision by paying himself a salary and by delaying

---

[5] Because no party argues that there has been a violation of subsection (b) of the Joint Stipulation, the Court does not address that subsection.

and hindering reimbursement of their expenses. *See* ECF No. [63] at 3. At the Hearing, they added a third asserted violation: that Grant has failed to pay them the salaries they approved by a two-thirds vote after the Joint Stipulation went into effect. *See* Hr'g Tr., 17–22, Sept. 6, 2024; Hr'g Tr. vol. 2, 29, Sept. 9, 2024.

In his hearing testimony, Grant acknowledged that, since the Joint Stipulation went into effect, he has continued to receive a salary of about $10,000 each month from Nexxt Gen's bank accounts, but Martinez and Peyton have not received salaries. *See* Hr'g Tr. vol. 1, 38–43, Sept. 9, 2024. Grant agreed that the only money Martinez and Peyton have received from Nexxt Gen since the Joint Stipulation went into effect are expense payments, one of which Peyton disbursed to himself after Grant denied it due to incomplete supporting documentation. *See* Hr'g Tr., 49, 62–63, 71, Sept. 6, 2024; Hr'g Tr. vol. 1, 43, Sept. 9, 2024; Hr'g Tr. vol. 2, 28–29, Sept. 9, 2024. And Grant testified that his own salary had been "unapproved" by Martinez and Peyton in a post-Joint Stipulation vote. *See* Hr'g Tr. vol. 1, 42–43, Sept. 9, 2024.

Grant also testified that Martinez had been ousted from Nexxt Gen in October 2021 and lost access to some of Nexxt Gen's systems then. *See* Hr'g Tr. vol. 1, 14, 28, 130–31, Sept. 9, 2024. He testified that Peyton resigned in March 2024, *see* Hr'g Tr. vol. 1, 131–32, Sept. 9, 2024, though he admitted he did not offer any documentary evidence to show Peyton resigned and did not cut off Peyton's access to Nexxt Gen systems after the purported resignation, s*ee* Hr'g Tr. vol. 1, 137–39, Sept. 9, 2024. Grant testified that Peyton gave himself the title of chief technology officer, along with "a lot" of others, and that Grant was not consulted about the decision. *See* Hr'g Tr. vol. 1, 135, Sept. 9, 2024. He added that he did not object to Peyton holding that title or to Martinez holding the title of chief operations officer, but he testified that having those titles did not "mean that they are an officer of the company." *See* Hr'g Tr. vol. 1, 143, Sept. 9, 2024. During

closing, Grant argued there was no evidence that Peyton and Martinez had "been voted in as officers" of Nexxt Gen, even by themselves under the new two-thirds requirement of the Joint Stipulation. *See* Hr'g Tr. vol. 2, 40, Sept. 9, 2024.

In his own hearing testimony, Peyton confirmed that he and Grant had ousted Martinez from Nexxt Gen in October 2021. *See* Hr'g Tr., 36, 48, Sept. 6, 2024. But Peyton did not testify that he resigned from Nexxt Gen at any time. *See generally* Hr'g Tr., 5–91, Sept. 6, 2024. During closing, Peyton argued that he "has been working for Nexxt Gen this entire time," that there was "no resignation," and that "because he never resigned, he was always the chief technology officer; there didn't need to be a shareholder vote to put him back to chief technology officer because he still had that title going back years." *See* Hr'g Tr. vol. 2, 56–57, Sept. 9, 2024.

Martinez also confirmed during his testimony that he was cut out of Nexxt Gen in October 2021. *See* Hr'g Tr., 132, Sept. 6, 2024. He testified that, since the Joint Stipulation went into effect, there had not been a formal vote making him and Peyton Nexxt Gen officers but that they already "had those titles from before." *See* Hr'g Tr., 134–35, Sept. 6, 2024. Since the Joint Stipulation, they exchanged "a couple of emails" about Martinez being the chief operations officer, and they represented in introductions to Nexxt Gen "customers" and "resources" that Martinez had that role. *See* Hr'g Tr., 134–35, Sept. 6, 2024. During closing, Martinez argued that those instances of him and Peyton "holding" Martinez "out as the chief operating officer" were "tantamount to a two-thirds vote" or to them "effectively electing each other to their positions." *See* Hr'g Tr. vol. 2, 57, Sept. 9, 2024.

Based on that testimony, the Court finds that Grant violated subsection 8(c)(ii) of the shareholder agreement as modified by the Joint Stipulation. The as-modified provision required any decisions about the payment of compensation to officers to be made by a two-thirds vote. *See*

ECF No. [28] at 48; ECF No. [99-11] at 1. Peyton testified at the Hearing that he and Martinez voted, post-Joint Stipulation, to pay themselves salaries. *See* Hr'g Tr., 17–22, Sept. 6, 2024. Their two votes constitute the two-thirds vote subsection 8(c)(ii) now requires, so Nexxt Gen was obligated under the Joint Stipulation to pay a salary at least to Peyton.

That is because, although Grant testified that Peyton resigned in March 2024, no other documentary or testimonial evidence supports that assertion. In fact, Peyton argued in closing that he had not resigned. Faced with those differing positions, the Court must make a credibility determination about which one to accept. Because Grant did not submit any other evidence to corroborate his assertion that Peyton resigned, and because Grant did not remove Peyton's access to Nexxt Gen's systems after his alleged resignation — which is unlike what happened when Martinez was removed from the company in 2021 and had his access revoked — the Court credits Peyton's position that he did not resign from Nexxt Gen.

As a result, Peyton was still Nexxt Gen's chief technology officer when he and Martinez voted to pay themselves salaries. Grant admitted that he has not paid them. *See* Hr'g Tr. vol. 1, 38–43, Sept. 9, 2024. That failure to pay a salary to Peyton is a violation of subsection (a) of the Joint Stipulation, as it modified subsection 8(c)(ii) of the shareholder agreement[6].

The same is true of Grant's continued payment of his own salary. Grant testified that his salary was originally authorized and paid before the Joint Stipulation took effect, and that it has not changed since the Joint Stipulation took effect. *See* Hr'g Tr. vol. 1, 123, Sept. 9, 2024. But the fact that Grant's salary was pre-existing does not protect it from a two-thirds vote changing it after the Joint Stipulation took effect. And according to Grant's own testimony, Martinez and

---

[6] The Court finds that the failure to pay Martinez a salary is not a violation of this provision. Because Martinez was removed from Nexxt Gen in 2021, a shareholder vote was needed to restore him to the chief operations officer position. No such vote occurred, and the Court does not find Peyton and Martinez's representation to customers that Martinez held that role is an adequate substitute for the required vote.

Peyton voted post-Joint Stipulation to "unapprove[]" Grant's salary, *see* Hr'g Tr. vol. 1, 42–43, Sept. 9, 2024, which aligns with the assertion in their Reply that "Grant unilaterally paid himself a salary which was not approved by" them, *see* ECF No. [63] at 3.  Pursuant to subsection 8(c)(ii) as modified by the Joint Stipulation, Grant no longer had authorization to pay himself a salary after Martinez and Peyton voted to disapprove it.  Thus, Grant's continued payment of his own salary is a violation of subsection (a) of the Joint Stipulation, as it modified subsection 8(c)(ii) of the shareholder agreement.

Because Martinez and Peyton produced clear and convincing evidence that Grant violated the Joint Stipulation as to subsection (a) (modifying subsection 8(c)(ii)), Grant is in contempt unless he can show that he was unable to comply with that provision despite making all reasonable efforts.  *See Ga. Power Co.*, 484 F.3d at 1291; *Wellington Precious Metals*, 950 F.2d at 1529.  He has not done so.  Grant offered no testimony to explain why Nexxt Gen did not pay Peyton the salary he and Martinez authorized by two-thirds vote, and the only testimony he offered to justify his continued payment of his own salary after it was unapproved was that it predated the Joint Stipulation.  That is not enough to meet the high standard required for a successful inability defense.  *See Combs*, 785 F.2d at 984.  Accordingly, the Court finds that Grant is in contempt for violating subsection (a) of the Joint Stipulation, as it modified subsection 8(c)(ii) of the shareholder agreement.[7]

### b.  Shareholder Agreement subsection 8(c)(vi)

Subsection 8(c)(vi) of the shareholder agreement provides that all Nexxt Gen's funds "be deposited in its name in such checking account or accounts as shall be designated by the Board" and requires that all "transactions above $5000.00 therefrom" be "made upon checks required to

---

[7] The Court does not find the delayed payment of Martinez and Peyton's expenses to be a violation of the Joint Stipulation.

be signed by both David Peyton and Eric Grant excluding all financial transactions executed by the finance department for Corporation operations." *See* ECF No. [28] at 48.  Martinez and Peyton assert in their briefs that Grant violated this provision by unilaterally making "payments to vendors and subcontractors in excess of $5,000." *See* ECF No. [63] at 3.  At the Hearing, they argued Grant also violated that provision by paying himself a salary of more than $10,000 each month. *See* Hr'g Tr. vol. 1, 40–43, Sept. 9, 2024.

As noted above, Grant admitted in his own hearing testimony that, since the Joint Stipulation went into effect, he has continued to receive a salary of about $10,000 each month from Nexxt Gen's bank accounts.  *See* Hr'g Tr. vol. 1, 38–43, Sept. 9, 2024.  But Grant also testified that he and Samantha Dominguez, an employee of one of Grant's other companies, were the "finance department" of Nexxt Gen. *See* Hr'g Tr. vol. 1, 116, Sept. 9, 2024.  According to Grant, part of the finance department's job was to handle payroll, and he approved his own salary as head of the finance department.  *See* Hr'g Tr. vol. 1, 117, 123–24, Sept. 9, 2024.

During closing, Martinez and Peyton argued that "there is no finance department." *See* Hr'g Tr. vol. 2, 57–61, Sept. 9, 2024.  Upon questioning from the Court, however, they conceded that the phrasing of this provision is likely ambiguous, given the uncertainty about what the finance department is and who serves in it.  *See* Hr'g Tr. vol. 2, 57–61, Sept. 9, 2024.  Although the Court is not convinced the evidence supports a conclusion that Nexxt Gen actually has a designated finance department, the Court finds that the provision is ambiguous.  And the law in this Circuit is clear that courts must "construe any ambiguities or uncertainties" in "a light favorable to the person charged with contempt."  *Ga. Power Co.*, 484 F.3d at 1291; *see also Wellington Precious Metals*, 950 F.2d at 1529.

Because subsection (a) of the Joint Stipulation, as it modified subsection 8(c)(vi) of the

shareholder agreement, is ambiguous, Martinez and Peyton have not carried their burden to show by clear and convincing evidence that Grant violated a valid, lawful, clear, and unambiguous order. *See Ga. Power Co.*, 484 F.3d at 1291. As a result, the Court need not address the other two steps of the contempt analysis. Instead, the Court finds that Grant did not violate subsection (a) of the Joint Stipulation, as it modified subsection 8(c)(vi) of the shareholder agreement, and is not in contempt of that provision.[8]

### c.  Shareholder Agreement subsection 8(c)(xiv)

Subsection 8(c)(xiv) of the shareholder agreement pertains to "[t]he entry into any service contract or other agreement for debted goods or services in the amount of $2000.00 or more." *See* ECF No. [28] at 48. Martinez and Peyton did not make any assertions directed at this provision in their briefs, but at the Hearing, they argued that Grant violated it by hiring an accountant and paying her more than $19,600 as of August 2024. *See* Hr'g Tr. vol. 1, 97–98, Sept. 9, 2024; Hr'g Tr. vol. 2, 61, Sept. 9, 2024.

In his own hearing testimony, Grant testified that the accountant's contract was "preexisting" because he hired her in March or April 2024, which was before the Joint Stipulation went into effect. *See* Hr'g Tr. vol. 1, 94–95, 99–101, Sept. 9, 2024. Grant testified that, when he hired the accountant, he was the only owner and shareholder of Nexxt Gen because neither Martinez nor Peyton worked for the company. *See* Hr'g Tr. vol. 1, 101–02, Sept. 9, 2024. And while Peyton's counsel argued to the Court in closing that Martinez and Peyton had testified that the accountant "had not yet been hired" when the Joint Stipulation became effective, *see* Hr'g Tr.

---

[8] Peyton and Martinez also argued, at least initially, that payments to an accountant Grant hired to do Nexxt Gen's taxes and bookkeeping violate this provision. But they later receded from that position when the Court pointed out that the accountant was hired in March or April 2024, when Martinez was not associated with Nexxt Gen and Grant contended Peyton had resigned. *See* Hr'g Tr. vol. 2, 61–62, Sept. 9, 2024. Even if they had not receded from that position, the Court would not find that payments to the accountant violate this provision, for the reason explained below. *See infra* Section III.A.1.c.

vol. 2, 61–62, Sept. 9, 2024, the hearing transcripts do not contain any such testimony, *see generally* Hr'g Tr., Sept. 6, 2024; Hr'g Tr. vol. 1, Sept. 9, 2024; Hr'g Tr. vol. 2, Sept. 9, 2024. Instead, Martinez and Peyton's declarations indicate that they contacted the accountant on June 18, 2024 to inquire about her services and get the engagement letters Nexxt Gen signed with her firm, and that on June 20, 2024, she "confirm[ed]" Grant had hired her to do taxes for Nexxt Gen. *See* ECF No. [63-2] at 6, 54–61.

Based on that evidence, the Court finds that Grant did not violate subsection (a) of the Joint Stipulation, as it modified subsection 8(c)(xiv) of the shareholder agreement.  As the plain language of subsection 8(c)(vi) of the shareholder agreement shows, it applies to the "**entry into** any service contract or other agreement for . . . services in the amount of $2000.00 or more." *See* ECF No. [28] at 48 (emphasis added).  Both Grant's testimony that he hired the accountant in March or April 2024 and Peyton's declaration averment that he confirmed in June 2024 the accountant had already been hired show that Nexxt Gen entered into the service contract with the accountant before the Joint Stipulation went into effect on July 2, 2024.  That means the initiation of the accountant's contract was not subject to a two-thirds vote.[9]

As a result, Martinez and Peyton have not carried their burden to show by clear and convincing evidence that Grant violated subsection (a) of the Joint Stipulation, as it modified subsection 8(c)(xiv) of the shareholder agreement. *See Ga. Power Co.*, 484 F.3d at 1291.  For that reason, the Court need not reach the other two steps of the contempt analysis.  Instead, the Court

---

[9] Continued payment of the accountant could have violated a different provision of the Joint Stipulation, specifically subsection (a) as it modified subsection 8(c)(vi) of the shareholder agreement, had any post-Joint Stipulation payment been for more than $5,000.  But the evidence does not demonstrate Nexxt Gen made any such payment. As the financial statements attached to Peyton's and Martinez's supplemental declarations demonstrate, all post-Joint Stipulation payments were less than $5,000 except one, *see* ECF No. [63-2] at 52, and Grant testified that transaction was money the accountant was holding as a retainer but that not yet been deemed an "expense" or been paid out, *see* Hr'g Tr. vol. 1, 94–95, Sept. 9, 2024

finds that Grant did not violate subsection (a) of the Joint Stipulation, as it modified subsection 8(c)(xiv) of the shareholder agreement, and is not in contempt as to that provision.

2.  **Joint Stipulation Provision (c) – Signatory Access to Financial Accounts**

Subsection (c) of the Joint Stipulation required Grant to add Martinez and Peyton "onto the Nexxt Gen financial accounts as signatories within three (3) days." *See* ECF No. [99-11] at 1. Martinez and Peyton assert in their briefs that Grant violated this provision by unilaterally removing their access to Nexxt Gen's "Chase bank account on July 19, 2024." *See* ECF No. [63] at 3. They reiterated that assertion at the Hearing. *See* Hr'g Tr., 86–87, 100–11, Sept. 6, 2024; Hr'g Tr. vol. 2, 5, Sept. 9, 2024.

In his own hearing testimony, Grant admitted Martinez and Peyton did not have signatory access to the Chase bank accounts. *See* Hr'g Tr. vol. 1, 105–07, 150–53, Sept. 9, 2024. Grant first explained that, when he attempted to give them that access, Chase told him that they were "already owners on the account" because "they added themselves" on July 3, 2024. *See* Hr'g Tr. vol. 1, 106, Sept. 9, 2024. He then testified that he gave them signatory access to the Chase credit card on July 8, 2024, which took longer than the mandated three days to do because he "received a new credit card from Chase, and the card had to be activated. So, as quick as" he "received the card, and activated it, and was able to add them to it," he did. *See* Hr'g Tr. vol. 1, 114, Sept. 9, 2024. Finally, he testified that he revoked their access to the Chase bank accounts on July 19, 2024 because he was "concerned that they were going to drain the bank account." *See* Hr'g Tr. vol. 1, 105–07, 150–51, Sept. 9, 2024. As of the Hearing on September 9, their signatory access to the Chase bank accounts had still not been restored. *See* Hr'g Tr. vol. 1, 153, Sept. 9, 2024; Hr'g Tr. vol. 2, 5, Sept. 9, 2024.

 Based on that testimony, the Court finds that Grant violated subsection (c) of the Joint

Stipulation. That provision required Grant to add Martinez and Peyton "onto the Nexxt Gen financial accounts as signatories within three (3) days." *See* ECF No. [99-11] at 1. Although Martinez and Peyton had signatory access to the Chase bank accounts within three days of the Joint Stipulation becoming effective,[10] Grant removed that access on July 19, 2024, and as of September 9, 2024, he had not restored it. Grant's removal of Martinez and Peyton as signatories to Nexxt Gen's Chase bank accounts and his failure to restore their access to such accounts is a violation of subsection (c) of the Joint Stipulation.

Because Martinez and Peyton produced clear and convincing evidence that Grant violated the Joint Stipulation as to subsection (c), Grant is in contempt unless he can show that he was unable to comply with that provision despite making all reasonable efforts. *See Ga. Power Co.*, 484 F.3d at 1291; *Wellington Precious Metals*, 950 F.2d at 1529. He has not done so. In fact, Grant's hearing testimony demonstrated that the opposite is true — that he could and did add Martinez and Peyton as signatories to those accounts. Grant's counsel conceded this point at the Hearing when asked what evidence was presented regarding Grant's inability to comply with subsection (c) of the Joint Stipulation, and he responded: "There was none, Judge." *See* Hr'g Tr. vol. 2, 43-44, Sept. 9, 2024. Accordingly, the Court finds that Grant is in contempt for violating subsection (c).

3. **Joint Stipulation Provision (d) – Viewing Access on Other Accounts**

Subsection (d) of the Joint Stipulation required Grant to add Martinez and Peyton "onto the Nexxt Gen Quickbooks, Chase credit card, and American Express card accounts with 'viewing'

---

[10] Martinez and Peyton argue that Grant had to comply with subsections (c)–(f) of the Joint Stipulation by June 29, 2024, *see* ECF No. [63] at 3, presumably because the Parties agreed to the Joint Stipulation on June 26, 2024. But the Joint Stipulation did not become effective until the Court approved it on July 2, 2024, *see* ECF No. [47], so Grant had until at least July 5, 2024 to comply. And because the Court was closed on July 5, 2024 due to a designated Court holiday, Grant effectively had until July 8, 2024.

CASE NO. 24-CV-21649-BLOOM/Elfenbein

access within three (3) days." *See* ECF No. [99-11] at 1.  Martinez and Peyton assert in their briefs that Grant violated this provision because, as of August 2, 2024, they were still "without viewing access to" Nexxt Gen's "credit cards and QuickBooks accounts." *See* ECF No. [52] at 3.  At the Hearing, they reiterated that assertion and attempted to demonstrate their lack of viewing access by pulling up various Nexxt Gen accounts in the courtroom and showing the Court what material they were and were not able to see. *See* Hr'g Tr., 76–91, Sept. 6, 2024.

In his hearing testimony, Grant testified that he gave Martinez and Peyton viewing access to Nexxt Gen's QuickBooks and "American Express credit card accounts" between July 2 and July 5, 2024. *See* Hr'g Tr. vol. 1, 113–14, Sept. 9, 2024.  He also testified that, as of September 9, 2024, they had "full viewing capacity" of Nexxt Gen's Chase bank accounts. *See* Hr'g Tr. vol. 1, 153, Sept. 9, 2024.

During closing arguments, the Court asked each party's counsel to define "viewing access" as that phrase was used in the Joint Stipulation. *See* Hr'g Tr. vol. 2, 24–27, 37, 45, Sept. 9, 2024. Counsel for Martinez and Peyton explained that their clients' testimony established "what the appropriate viewing access would be" and argued that "the access should be an access to get the information in realtime." *See* Hr'g Tr. vol. 2, 24–27, 37, 45, Sept. 9, 2024.  Their counsel also acknowledged that, if the Court found both sides' interpretations of "viewing access" to be reasonable, the Court would be justified in finding subsection (d) ambiguous. *See* Hr'g Tr. vol. 2, 26, Sept. 9, 2024.  Counsel nonetheless contended that Peyton's testimony "laid out what it was and why he needed greater access to be given." *See* Hr'g Tr. vol. 2, 26, Sept. 9, 2024.

Grant's counsel did not define "viewing access"; instead, he argued that all three men testified that Grant had given Martinez and Peyton all the access the Joint Stipulation required. *See* Hr'g Tr. vol. 2, 37, 45, Sept. 9, 2024.  He noted that the in-court demonstration proved Peyton

and Martinez "have access to QuickBooks, Chase, American Express" but that they had "decided they wanted more, and allegedly voted to give themselves more access -- which apparently, was not . . . provided to their liking -- but, that's not what the joint stipulation provides." *See* Hr'g Tr. vol. 2, 37, Sept. 9, 2024.

Based on that testimony, and looking at the plain language of subsection (d), the Court finds that Grant did not violate the Joint Stipulation.  The text of the Joint Stipulation requires only that Grant add Martinez and Peyton "onto the Nexxt Gen Quickbooks, Chase credit card, and American Express card accounts with 'viewing' access within three (3) days." *See* ECF No. [99-11] at 1. Grant, Martinez, and Peyton all testified that Grant did so.

Where the Parties' testimony diverged was with respect to what the phrase "viewing access" means.  Martinez and Peyton's position is that viewing access means whatever level of access would allow them to see account information in real time. *See* Hr'g Tr. vol. 2, 24–27, Sept. 9, 2024.  Grant's view is that he has given Martinez and Peyton all the access the Joint Stipulation requires. *See* Hr'g Tr. vol. 2, 37, 45, Sept. 9, 2024.

While the Court expresses no opinion on what "viewing access" actually means, based on the Parties' diverging definitions of the phrase, the Court finds subsection (d) of the Joint Stipulation to be ambiguous.  Significantly, the Parties did not define the phrase "viewing access" in the Joint Stipulation and have taken contrary positions on its definition since entering into the Joint Stipulation.  And the law in this Circuit is clear that courts must "construe any ambiguities or uncertainties" in "a light favorable to the person charged with contempt." *Ga. Power Co.*, 484 F.3d at 1291; *see also Wellington Precious Metals*, 950 F.2d at 1529.  Because subsection (d) of the Joint Stipulation is ambiguous, Martinez and Peyton have not carried their burden to show by clear and convincing evidence that Grant violated a valid, lawful, clear, and unambiguous order.

*See Ga. Power Co.*, 484 F.3d at 1291.  As a result, the Court need not address the other two steps of the contempt analysis.  Instead, the Court finds that Grant did not violate subsection (d) of the Joint Stipulation and is not in contempt of that provision.

### 4.  Joint Stipulation Provisions (e) and (f) – Primary Administrator of Nexxt Gen Quickbooks Accounts and Certain Systems

Subsection (e) of the Joint Stipulation required Grant to make Samantha Dominguez "the 'primary administrator' of the Nexxt Gen Quickbooks accounts within three (3) days."  *See* ECF No. [99-11] at 1.  Similarly, subsection (f) of the Joint Stipulation required Grant to make Dominguez "the 'primary administrator' of all Nexxt Gen Information Technology and Google systems, including, but not necessarily limited to, email, Salesforce, Google Drive, web site, phone system and Google suites within three (3) days."  *See* ECF No. [99-11] at 1–2.  It also noted that if Dominguez "steps down or resigns from this function, and those identified in Section (e), the Parties will work together in good faith to adopt an alternative administrator."  *See* ECF No. [99-11] at 2.  Because Martinez and Peyton make the same arguments about both provisions, the Court evaluates them together.

Martinez and Peyton assert in their briefs that Grant violated these provisions by "instruct[ing] Samantha Dominguez, the agreed 'primary administrator' of Nexxt" Gen, "to deny Martinez and Peyton access to" Nexxt Gen's "accounts despite the terms of the Joint Stipulation."  *See* ECF No. [52] at 3.  They argue that "Dominguez must abide by the 2/3rds voting without interference from" Grant but that she has not attended meetings during which Martinez and Peyton intended to have her "share her screen and make updates based on a 2/3rds vote," nor has she made the requested updates.  *See* ECF No. [52-3] at 3.

At the Hearing, they reiterated the argument that Dominguez has "not served" as primary administrator as contemplated in the Joint Stipulation because she has not given Martinez and

Peyton "full access" to "conduct the business of the company." *See* Hr'g Tr. vol. 2, 13–14, Sept. 9, 2024. They testified that, while Dominguez was given the title of primary administrator, she has not actually performed that role because "the purpose of the primary administrator was to ensure no more shenanigans and accounts being locked out. Emails, turned off access to systems being restricted," but they still "do not have access to those systems." *See* Hr'g Tr., 69–70, Sept. 6, 2024. They also testified that, about two weeks after she became Nexxt Gen's primary administrator, Dominguez stopped responding to their communications. *See* Hr'g Tr., 41–42, 118–19, Sept. 6, 2024. Finally, they testified that, because of Dominguez's lack of responsiveness, they voted to terminate her as primary administrator. *See* Hr'g Tr., 41–42, 118–19, Sept. 6, 2024.

In his own hearing testimony, Grant testified that he made Dominguez the primary administrator on Nexxt Gen's QuickBooks accounts on July 5, 2024. *See* Hr'g Tr. vol. 1, 115, Sept. 9, 2024. He testified that he made Dominguez the primary administrator of Nexxt Gen's "information technology"; "technology systems"; "Google systems," which included email; "sales force accounts"; and "website" sometime between July 2 and July 5, 2024. *See* Hr'g Tr. vol. 1, 115–16, Sept. 9, 2024. And he testified that, though Dominguez "conveyed" to him that she was "not comfortable with the hostile nature of the calls" she had with Martinez and Peyton, he did not instruct her not to speak with them. *See* Hr'g Tr. vol. 1, 36–37, Sept. 9, 2024. He told her only "to follow the stipulation." *See* Hr'g Tr. vol. 1, 37, Sept. 9, 2024.

Based on that testimony, and looking at the plain language of subsections (e) and (f), the Court finds that Grant did not violate the Joint Stipulation. The text of the Joint Stipulation requires only that Grant "cause Samantha Dominguez to become the 'primary administrator' of" certain facets of Nexxt Gen within three days of it becoming effective. *See* ECF No. [99-11] at 1–2. Grant, Martinez, and Peyton all testified that Grant did so.

Where the Parties' testimony diverged was with respect to what Dominguez was required to do after she became primary administrator. In Grant's view, Dominguez was required "to follow the stipulation," about which "she can make her own decisions." *See* Hr'g Tr. vol. 1, 37, Sept. 9, 2024. In Martinez and Peyton's view, Dominguez was required to give them "full access" to "conduct the business of the company" so that "they can run the company and do the job they want." *See* Hr'g Tr. vol. 2, 13–14, Sept. 9, 2024. The problem with Martinez and Peyton's view, however, is that the plain text of the Joint Stipulation does not support it.

During closing arguments, the Court asked Martinez and Peyton to point to language in the Joint Stipulation requiring Grant to do more than simply make Dominguez the primary administrator of certain facets of Nexxt Gen — specifically, language that required the "additional step" of them receiving access after Dominguez became the primary administrator. *See* Hr'g Tr. vol. 2, 13–17, Sept. 9, 2024. They could not. Given that lack of language, it seems clear that what Martinez and Peyton are asking the Court to do is "expand the scope of the stipulation," which is not something the Court can do in the context of a contempt hearing and, in any event, not something the Court is inclined to do with an agreement the Parties "negotiated among themselves" and confirmed on the record contained all the terms of their agreement. *See* Hr'g Tr. vol. 2, 13–17, Sept. 9, 2024; *Ga. Power Co.*, 484 F.3d at 1291.

As a result, Martinez and Peyton have not carried their burden to show by clear and convincing evidence that Grant violated subsections (e) and (f) of the Joint Stipulation. *See Ga. Power Co.*, 484 F.3d at 1291. For that reason, the Court need not reach the other two steps of the contempt analysis. Instead, the Court finds that Grant did not violate subsections (e) and (f) of the Joint Stipulation and is not in contempt as to those provisions.

After considering the Parties' briefs and the evidence presented at the Hearing, the

undersigned **RECOMMENDS that Grant be found in contempt of**: (1) subsection (a) of the Joint Stipulation, as it modified subsection 8(c)(ii) of the shareholder agreement, and (2) subsection (c) of the Joint Stipulation. The Court **RECOMMENDS that Grant not be found in contempt of**: (1) subsection (a) of the Joint Stipulation, as it modified subsection 8(c)(vi) of the shareholder agreement; (2) subsection (a) of the Joint Stipulation, as it modified subsection 8(c)(xiv) of the shareholder agreement; (3) subsection (d) of the Joint Stipulation; (4) subsection (e) of the Joint Stipulation; and (5) subsection (f) of the Joint Stipulation. Accordingly, the undersigned **RECOMMENDS** that the Motion for Contempt, **ECF No. [52]**, be **GRANTED in part and DENIED in part**.

### B. Motion for Sanctions

In the Motion for Sanctions, Martinez contends that the Court should "impose Rule 11 sanctions" on Grant and his counsel because Grant's Answers to Martinez's Intervenor Complaint and Peyton's Amended Complaint "assert defenses that are not well grounded in law or fact" and "without having conducted a reasonable inquiry into the underlying facts of this case." ECF No. [53]. Specifically, Martinez argues that Grant's Answers "contain factual allegations that lack any evidentiary support, including" that "there is no executed shareholder agreement between the parties"; "contain arguments that are frivolous because they have either been previously admitted openly by Grant before this Court" or "waived by him pursuant to applicable law"; and "are made for the improper purpose of delay and to deny Martinez and Nexxt" Gen the "relief sought in" Martinez's Interpleader Complaint. ECF No. [53] at 2.

In his Response to the Motion for Sanctions, Grant notes that, while he admits to signing the shareholder agreement, he "questions the validity of" it and puts that question to the Court for "judicial interpretation." *See* ECF No. [75] at 2. Grant highlights that this case "is in the infancy

stages of discovery," which means the Court is "still without sufficient facts" to "determine the alleged frivolity of" that "affirmative defense." *See* ECF No. [75] at 2. He contends he "must be given an opportunity to develop his claim through the normal use of discovery" because "Rule 11 cannot be used as a tool to prematurely rule on the merits of the case." *See* ECF No. [75] at 6. And he argues that Martinez has not shown that Grant displayed blatant indifference to any obvious facts and that his "assertions are grounded in law." *See* ECF No. [75] at 5–9.

In his Reply in support of the Motion for Sanctions, Martinez contends that Grant failed to plead with specificity his legal validity defense, so it is waived. *See* ECF No. [96] at 2–3 & n.1. He argues that Grant's "factual contentions have no evidentiary support," his "legal defenses and legal contentions are not warranted by existing law," and his new legal theory about why the shareholder agreement was not properly executed is both "recently manufactured" and "fabricated." *See* ECF No. [96] at 4–6. Specifically, Martinez points to Grant's statement in his Answer to Peyton's Amended Complaint that he "den[ies] the validity of the signature" on the shareholder agreement, *see* ECF No. [42] at 2, as being contradicted by his response to the Motion for Sanctions, in which he "admits to the signing" of the agreement, *see* ECF No. [75] at 2. *See* ECF No. [96] at 5–7.

As noted above, "Rule 11 sanctions are proper (1) when a party files a pleading that has no reasonable factual basis; (2) when the party files a pleading that is based on legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; or (3) when the party files a pleading in bad faith for an improper purpose." *Almeida*, 335 F.R.D. at 465 (quotation marks omitted). Evaluating a motion for Rule 11 sanctions requires the Court to determine first "whether the party's claims are objectively frivolous — in view of the facts or law." *McGreal*, 87 F.3d at 1254. If they are, the Court then determines "whether the

person who signed the pleadings should have been aware that they were frivolous; that is, whether he would have been aware had he made a reasonable inquiry." *Id.*  The Court's evaluation uses an objective standard that tests the signer's conduct by inquiring what was reasonable to believe when the pleading was submitted. *See Donaldson*, 819 F.2d at 1556.

Like many of the courts to have considered a pre-trial motion for Rule 11 sanctions, this Court finds that Martinez's Motion for Sanctions is premature. *See, e.g.*, *Almeida*, 335 F.R.D. at 466–67; *Doe*, 2019 WL 1316041, at *2; *Bigford*, 2012 WL 12886184, at *2; *Thomas*, 880 F.2d 1243 n.11; *Wheeler*, 2021 WL 3501097, at *1; *Rodriguez*, 2022 WL 1222671, at *1.  The Motion for Sanctions is based on the asserted waiver or inapplicability of the legal defenses Grant raises in his Answers to the Amended Complaint and the Interpleader Complaint.  But a motion for sanctions is not the appropriate vehicle for a party to test the "legal sufficiency" of a defense, whether based on waiver, inapplicability, or differing interpretations of the pleadings — those types of arguments must first be raised and determined in a dispositive motion or at trial.  *See Bigford*, 2012 WL 12886184, at *2.  Particularly in a case like this one, where the Parties have until the end of December 2024 to finish discovery and until mid-January 2025 to file dispositive motions, *id.*; *see also Didie*, 988 F.2d at 1105, "the Court cannot say conclusively at this point that" Grant's affirmative defenses are "frivolous," *see Doe*, 2019 WL 1316041, at *2.

Because Martinez "is pursuing sanctions based upon" Grant's pleadings, the undersigned finds it appropriate to reserve determination of the Motion for Sanctions until the end of this litigation — or at least until the Court has been presented with and adjudicated Grant's asserted legal defenses in a dispositive motion.  *See Bigford*, 2012 WL 12886184, at *2.  Accordingly, I respectfully **RECOMMEND** that the Motion for Sanctions, **ECF No. [53]**, be **DENIED WITHOUT PREJUDICE.**

## IV.    CONCLUSION

For those reasons, I respectfully **RECOMMEND** that:

1.  The Motion for Contempt, **ECF No. [52]**, be **GRANTED in part and DENIED in part.**

    a.  I recommend the Motion for Contempt be **GRANTED** as to

        i.   subsection (a) of the Joint Stipulation, as it modified subsection 8(c)(ii) of the shareholder agreement; and

        ii.  subsection (c) of the Joint Stipulation.

    b.  I recommend the Motion for Contempt be **DENIED** as to

        i.   subsection (a) of the Joint Stipulation, as it modified subsection 8(c)(vi) of the shareholder agreement;

        ii.  subsection (a) of the Joint Stipulation, as it modified subsection 8(c)(xiv) of the shareholder agreement;

        iii. subsection (d) of the Joint Stipulation;

        iv.  subsection (e) of the Joint Stipulation; and

        v.   subsection (f) of the Joint Stipulation.

2.  To coerce Grant into compliance with the Joint Stipulation, I recommend that

    a.  Grant be **ORDERED** to comply with subsection (a) of the Joint Stipulation, as it modified subsection 8(c)(ii) of the shareholder agreement and subsection (c) of the Joint Stipulation; and

    b.  Grant be fined $500 per day he is not in compliance.  *See Watkins*, 943 F.2d at 1304.

3.  The Motion for Sanctions, **ECF No. [53]**, be **DENIED WITHOUT PREJUDICE**.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Beth Bloom, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE and ORDERED** in Chambers in Miami, Florida on October 18, 2024.

**MARTY FULGUEIRA ELFENBEIN**
**UNITED STATES MAGISTRATE JUDGE**

cc:  All Counsel of Record