UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-CV-21649-ELFENBEIN

**DAVID PEYTON**,
*Individually and as a Shareholder
of Nexxt Gen Corporation*,

    Plaintiff,

v.

**DAVID E. MARTINEZ**,
*Individually and as a Shareholder
of Nexxt Gen Corporation*,

    Intervenor Plaintiff,

v.

**ERIC K. GRANT**,

    Defendant,

v.

**DAVID PEYTON**, *et al.*,

    Intervenor Defendants.
_____/

## ORDER ON MOTION TO APPOINT RECEIVER

**THIS CAUSE** is before the Court on Defendant/Intervenor-Defendant Eric K. Grant's Verified Expedited Motion to Appoint a Receiver (the "Motion"), ECF No. [104]. On November 27, 2024, the Parties consented to magistrate judge jurisdiction to "conduct any and all further proceedings in the case (including the trial) and order the entry of judgment." ECF No. [135]. Based on that consent, on December 2, 2024, the Honorable Beth Bloom referred this matter to me in its entirety. *See* ECF No. [139]. For the reasons explained below, the Motion, **ECF No. [104]**, is **GRANTED**.

I.      BACKGROUND[1]

As the Court has previously explained, this action arises out of a business relationship between Eric Grant ("Grant"), David Martinez ("Martinez"), and David Peyton ("Peyton"). *See* ECF No. [112] at 2. That business relationship eventually turned sour, which resulted in a shareholder dispute between the three men, who each claim to be a shareholder of Nexxt Gen Corporation ("Nexxt Gen"). *See* ECF No. [112] at 2. The substance of the shareholder dispute is not relevant to the Motion. What remains relevant is the procedural history of the case, which in pertinent part is as follows.

Peyton initiated the action on April 29, 2024 by filing a Verified Complaint and Petition for Preliminary Injunction against Grant. *See* ECF No. [1]; ECF No. [4]. A week later, on May 6, Peyton filed an Expedited Motion for Preliminary Injunction seeking both the appointment of a receiver for Nexxt Gen and "to enjoin the Parties from making waste." *See* ECF No. [9] at 1. And on June 6, Peyton "individually and on behalf of Nexxt Gen Corporation, in his capacity as a shareholder," filed an Amended Verified Complaint and Petition for Preliminary Injunction against both Grant and Nexxt Gen Corporation ("Nexxt Gen"). *See* ECF No. [28] at 1. The injunctive relief Peyton sought included "appoint[ing] a receiver to Nexxt Gen" to "step into the role of Chief Financial Officer while Nexxt Gen" was "wound up" or until the "waste" Peyton alleged Grant was committing could be "rectified." *See* ECF No. [1] at 11, 19–22; ECF No. [1-3]; ECF No. [28] at 15–16, 25–27. Grant's Answer to Peyton's Amended Complaint asserted that "the appointment of a receiver would impose substantial harm to" Grant and "would be premature as

---

[1] The Court takes the details it provides in this Section from two sources. Where the detail is undisputed, it comes from the Parties' pleadings. Where the detail was disputed and required a factual finding, the Court made the required factual finding based on evidence presented at an evidentiary hearing held on David Martinez and David Peyton's Motion for Contempt. *See* ECF No. [94]; ECF No. [98]; ECF No [99]; ECF No. [101]; Hr'g Tr. Sept. 6, 2024; Hr'g Tr. vol. 1, Sept. 9, 2024 (testimony of Eric Grant); Hr'g Tr. vol. 2, Sept. 9, 2024 (closing arguments); ECF No. [112].

the issues can be worked out between the parties without the implementation of those remedies by the Court." ECF No. [42] at 25.

Martinez entered the action on June 6 by filing an Intervenor Complaint, "individually, and derivatively on behalf of" Nexxt Gen, against Nexxt Gen's "shareholders and current members" Peyton and Grant. *See* ECF No. [32] at 2. In his Intervenor Complaint, Martinez noted that he opposed Peyton's requests for the appointment of a receiver and the dissolution of Nexxt Gen. *See* ECF No. [32] at 3, 11–12. Even though Martinez's Intervenor Complaint opposed the appointment of a receiver, Grant's Answer to Martinez's Intervenor Complaint once again asserted that "the appointment of a receiver would impose substantial harm to" Grant and "would be premature as the issues can be worked out between the parties without the implementation of those remedies by the Court." ECF No. [43] at 12. Peyton's Answer to Martinez's Intervenor Complaint admitted that he "no longer seeks dissolution of Nexxt Gen" but did not retract his request for a receiver. *See* ECF No. [46] at 4.

Judge Bloom held a hearing on Peyton's Expedited Motion for Preliminary Injunction, including his request for a receiver, which Grant, Martinez, and Peyton attended. *See* ECF No. [10]; ECF No. [31]. At that hearing, Grant, Martinez, and Peyton "agree[d] to refer the case for a settlement conference." *See* ECF No. [31]. Judge Bloom referred the case to me for that purpose, *see* ECF No. [33], and I conducted the settlement conference on June 14 and 17, 2024, *see* ECF No. [35]; ECF No. [36].

The "Parties did not settle the case," during that conference, but they did "stipulate[] as to how Nexxt Gen Corporation will continue to operate while litigation is ongoing." *See* ECF No. [36]. "The terms of the stipulation were read into the record," and the "Parties were ordered to reduce the stipulation to written form by June 24, 2024" for my review. *See* ECF No. [36]. The

Parties complied with that Order, *see* ECF No. [40]; ECF No. [41], and I approved the written stipulation (the "Joint Stipulation") on July 2, 2024, *see* ECF No. [47].

At that time, I noted the Joint Stipulation "governs how Nexxt Gen Corporation will continue to operate while litigation is ongoing and is consistent with the Parties' agreement during the June 17, 2024 Settlement Conference." *See* ECF No. [47]. The Joint Stipulation does not appoint a receiver, but it explicitly notes that the "Parties are not waiving any rights to, and shall not be barred from, making application for a receivership in the future, such that this Stipulation is without prejudice to any application for a receivership." *See* ECF No. [41] at 2.

Three months later,[2] Grant filed the Motion. *See* ECF No. [104]. In the Motion, Grant asks the Court to appoint a receiver to preserve the value of Nexxt Gen and prevent further waste or mismanagement during this litigation. *See* ECF No. [104] at 1. Grant acknowledges that "the goal of entering into the Joint Stipulation was to avoid the appointment of a receiver," but he contends that "it has become clear that the appointment of a receiver on an expedited basis is necessary to preserve" Nexxt Gen's "value and ensure that it will be managed efficiently while the claims at issue in this matter are resolved." *See* ECF No. [104] at 3. He argues Peyton and Martinez "have attempted to weaponize the Joint Stipulation to take over" Nexxt Gen's "operations and exclude Grant," specifically by acting "as though it provides them with plenary authority-by-2/3-vote over" Nexxt Gen's "governance and daily operations." *See* ECF No. [104]

---

[2] In those months, the Parties filed many other substantive motions, including Martinez and Peyton's Motion for Contempt, ECF No. [52]; Martinez's Motion for Sanctions against Grant and his counsel, ECF No. [53]; and Grant's Motion to Strike Peyton's Answer to the Counterclaims, ECF No. [56]. I held a two-day evidentiary hearing on the Motion for Contempt and the Motion for Sanctions at which Grant, Martinez, and Peyton all testified. *See* ECF No. [94]; ECF No. [98]. I then issued a Report and Recommendation ("R&R"), ECF No. [112], which Judge Bloom adopted, ECF No. [118]. After the case was referred to me in its entirety, I vacated Judge Bloom's Order adopting my R&R so that Martinez's objections to the R&R could be considered as a Motion for Reconsideration. *See* ECF No. [147]. The Court recently ruled on Grant's Motion to Strike. *See* ECF No. [161]. The Court will address Martinez's Motion for Reconsideration in a separate order.

at 3. He asserts that they have used that authority to "unilaterally elect[] themselves as officers" of Nexxt Gen, give themselves "six-figure salaries," "direct[] hundreds of thousands of dollars in transfers to themselves and third parties," and "intentionally cast" Nexxt Gen "into disorder by countermanding Grant's operational decisions, directing employees and contractors to disregard Grant entirely, terminating at least five contractors that reported to Grant, and attempting to modify" Nexxt Gen's "existing reporting structure to ensure that any remaining contractors report exclusively to them." *See* ECF No. [104] at 3–4.

In their joint Response to the Motion (the "Response"), Martinez and Peyton contend that appointing a receiver now[3] will harm Nexxt Gen and that the "only difficulties in managing" Nexxt Gen's "daily operations and governance have arisen from Grant's own misconduct." *See* ECF No. [109] at 2. They argue that "there is no exigency justifying the 'extreme remedy' of receivership" and that "none of the factors that courts consider when evaluating a motion to appoint a receiver justify appointing a receiver in this case." *See* ECF No. [109] at 3. More specifically, they argue that they "have not wasted or mismanaged" Nexxt Gen's "property or acted in any fraudulent manner"; "Grant has not met his burden to demonstrate a threat of immediate harm" to Nexxt Gen "to justify a receiver"; there are other, less severe remedies available; a receiver will deplete Nexxt Gen's resources, "not significantly improve the situation compared to the current management of the company"; and it is Grant who is "causing the disruption in the general operations" of Nexxt Gen "by interfering and disrupting the business without any basis." *See* ECF No. [109] at 13.

In his Reply to Martinez and Peyton's Response (the "Reply"), Grant reiterates his

---

[3] As noted above, Peyton originally supported — and, in fact, requested — the appointment of a receiver. *See* ECF No. [1] at 11, 19–22; ECF No. [1-3]; ECF No. [9] at 1; ECF No. [28] at 15–16, 25–27. It is clear from the Response that Peyton's position has now changed, *see generally* ECF No. [109], and his Second Amended Complaint confirms that change by no longer requesting an injunction or a receiver, *see generally* ECF No. [144-4]. Martinez's position opposing a receiver has not changed. *See generally* ECF No. [109]; ECF No. [136-1].

argument that Martinez and Peyton have gone "well beyond the authority provided by the Joint Stipulation" to cause "extreme discord in the operations of" Nexxt Gen.  *See* ECF No. [114] at 2–3.  He further argues that "each of the applicable factors supports the appointment of a receiver" because Nexxt Gen "has more than enough liquidity to pay the reasonable expenses associated with a receiver," the Response "fails to identify any less drastic legal remedy that would resolve" Nexxt Gen's problems, harm to Nexxt Gen is imminent because of employment decisions and customer representations Martinez and Peyton are making, and the record shows that Grant's underlying claims against Peyton are valid.  *See* ECF No. [114] at 3–11.

At a status conference held after Grant submitted the Reply, the Court ordered the Parties to "provide supplemental briefing on (1) whether the shareholder agreement addresses the hiring and firing of employees, vendors, or independent contractors and (2) if the shareholder agreement is silent on this issue, what law should the Court consider in deciding this issue raised in the Parties' briefs to determine who, within the company, has the power to make such decisions." ECF No. [123].  The Court also ordered Martinez and Peyton to "provide their version(s) of any proposed order on the appointment of a receiver."  ECF No. [123].  Finally, the Court permitted the Parties to "add any briefing on whether an evidentiary hearing is required to resolve the issues in" the Motion and ordered the Parties to file the supplemental briefing and proposed orders by November 15, 2024. ECF No. [123].

The Parties submitted supplemental briefing as ordered. As to the shareholder agreement, Grant notes it "does not directly address the power to hire and fire employees and contractors." *See* ECF No. [127] at 2.  Instead, it reserves to "the unanimous consent of the shareholders certain explicitly enumerated decisions" and requires Nexxt Gen's Board to meet "periodically" to conduct "regular business" such as reviewing the company's financial condition and approving its

operating budget.  See ECF No. [127] at 2–5.

Martinez and Peyton agree that the shareholder agreement "does not specify who decides the hiring and firing of" Nexxt Gen's "employees, or the firing of independent contractors and vendors."  See ECF No. [125] at 2–10; ECF No. [128] at 2.  They argue, however, that section 8(c)(xiv) of the agreement, which was modified by the Joint Stipulation, "governs the hiring of independent contractors and vendor contracts for debted services or goods for $2,000 or more."  See ECF No. [125] at 2–10; ECF No. [128] at 2.  For that reason, they argue "the hiring of" Nexxt Gen's "independent contractors and other vendor contracts for debted goods and services for more than $2,000" must be "decided by majority vote of shareholders" as the Joint Stipulation requires.  See ECF No. [125] at 2–10; ECF No. [128] at 2.

Because they (mostly) agree the shareholder agreement is silent about who decides hiring and firing at Nexxt Gen, the Parties' supplemental briefs addressed what law the Court should consider to determine who at the company has the power to make such decisions.  On this issue, the Parties agree that Florida substantive law governs Nexxt Gen's internal affairs, which includes employment decisions.  See ECF No. [125] at 7; ECF No. [127] at 2–4; ECF No. [128] at 2; accord First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 621 (1983) ("As a general matter, the law of the state of incorporation normally determines issues relating to the *internal* affairs of a corporation."); Mukamal v. Bakes, 383 B.R. 798, 817 (S.D. Fla. 2007); Fla. Stat. §§ 607.0101–607.613.

Grant, Martinez, and Peyton also agree that neither the Federal Rules of Civil Procedure nor case law requires the Court to hold a hearing to resolve the Motion.[4]  See ECF No. [125] at 2–4, 10–11; ECF No. [127] at 2–4; ECF No. [128] at 1–3. Grant and Peyton argue that a hearing is

---

[4] Martinez notes that Florida law requires Florida state trial courts to hold a hearing before appointing a receiver, but he acknowledges that Rule 66 contains no such requirement. See ECF No. [125] at 11 n.11.

7

not necessary. *See* ECF No. [127] at 2–4; ECF No. [128] at 1–3. Martinez, on the other hand, asks the Court to hold a "limited hearing" to take evidence about "the significant and detrimental harm" Nexxt Gen will suffer if a receiver is appointed. *See* ECF No. [125] at 4 & n.4. Specifically, Martinez argues that, "upon the appointment of a receiver, a substantial majority" of Nexxt Gen's customers "will provide termination notices" and "migrate to other companies." *See* ECF No. [125] at 4. The Motion is now ripe for review.

## II.     LEGAL STANDARDS

"[F]ederal law governs the appointment of a receiver by a federal court exercising diversity jurisdiction." *Nat'l P'ship Inv. Corp. v. Nat'l Hous. Dev. Corp.*, 153 F.3d 1289, 1292 (11th Cir. 1998); *see also* Fed. R. Civ. P. 66 ("These rules govern an action in which the appointment of a receiver is sought. . . ."). "[T]here is no general requirement of a hearing in Rule 66, and the court may approve of the appointment of a receiver without a hearing where the record discloses sufficient facts to warrant it." *Citronelle-Mobile Gathering, Inc. v. Watkins*, 934 F.2d 1180, 1189 (11th Cir. 1991). "The appointment of a receiver . . . is not a matter of strict right, but rests in the sound judicial discretion of the court." *Atl. Tr. Co. v. Chapman*, 208 U.S. 360, 377 (1908).

Even so, a "district court's appointment of a receiver . . . is 'an extraordinary equitable remedy'" that is available "only when there is no remedy at law or the remedy is inadequate." *United States v. Bradley*, 644 F.3d 1213, 1310 (11th Cir. 2011) (quoting 13 Moore's Federal Practice, § 66.04[2][a] (3d ed. 2010)). Such action may be warranted "'to avert further loss of assets through waste and mismanagement.'" *Hawes v. Madison Ave. Media, Inc.*, No. 11-CV-81025, 2012 WL 12861096, at *2 (S.D. Fla. June 26, 2012) (quoting *Tanzer v. Huffines*, 408 F.2d 42, 43 (3d Cir. 1969)). But "the imposition of a receivership on a corporation is a drastic measure, the detrimental business effects of which should be carefully considered." *SEC v. Spence & Green*

*Chem. Co.*, 612 F.2d 896, 904 (5th Cir. 1980); *see also id.* ("A receivership once imposed on a corporation should be terminated and control returned to those who own the business as soon as the reason for its imposition ceases.").

Although the Eleventh Circuit has not enumerated the precise test for determining whether the appointment of a receiver is appropriate, the former Fifth Circuit identified some factors courts can consider. *See Bookout v. First Nat. Mortg. & Disc. Co.*, 514 F.2d 757, 758 (5th Cir. 1975). Those factors include "the probability of success on the merits, the appearance of fraudulent conduct, the imminent danger of further injury to the collateral, and the balance of the equities." *Id.* at 758 & n.1 (citing 12 Wright & Miller, Federal Practice and Procedure § 2983, at 22-24); *see also Consol. Rail Corp. v. Fore River Ry. Co.*, 861 F.2d 322, 326–27 (1st Cir. 1988) (examining "the plaintiff's probable success in the action," whether there is "fraudulent conduct on the part of the defendant," whether there is "imminent danger that property will be lost or squandered," and the "probability that harm to the plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment"). Other federal courts have added such factors as the "inadequacy of available legal remedies," "the possibility of irreparable injury to [the plaintiff's] interests in the property," "whether the interests of the plaintiff and others sought to be protected will in fact be well served by the receivership," *Consol. Rail Corp.*, 861 F.2d at 327, *cited in Nat'l P'ship Inv. Corp.*, 153 F.3d at 1291, and whether there is a "contractual receivership provision" in effect between the parties, *see Comerica Bank v. Everglades Dressage, LLC*, No. 20-CIV-81360-RAR, 2021 WL 911065, at *2 (S.D. Fla. Feb. 28, 2021).

### III. DISCUSSION

As the authorities above explain, courts consider a variety of factors when evaluating whether to appoint a receiver. In sum, they are: (1) the requesting party's probability of success

on the merits of his claims; (2) whether there has been fraudulent conduct by the party or parties opposing a receiver; (3) whether there is imminent danger that the business will be injured, squandered, or lost without a receiver; (4) the probability that the harm to the requesting party if a receiver is not appointed would be greater than the injury to the opposing party or parties if a receiver is appointed; (5) whether available legal remedies would adequately address the problem without necessitating a receiver; (6) the possibility of irreparable injury to the requesting party's interests in the business if a receiver is not appointed; (7) whether the interests of the requesting party and others sought to be protected will, in fact, be well served by the receivership; and (8) whether there is a contractual receivership provision in effect between the parties. *See Bookout*, 514 F.2d at 758 & n.1; *Consol. Rail Corp.*, 861 F.2d at 326–27; *Nat'l P'ship Inv. Corp.*, 153 F.3d at 1291; *Comerica Bank*, 2021 WL 911065, at *2. On balance, the Court finds that these factors weigh in favor of appointing a receiver.

As an initial matter, the Court notes there is no contractual provision in effect between the Parties here that requires or prohibits a receiver. The shareholder agreement is silent about if, when, or under what circumstances Nexxt Gen or its shareholders would appoint a receiver, *see* ECF No. [28] at 39–57, and the Joint Stipulation says only that the Parties reserve the right to request a receiver in the future and that the agreement "is without prejudice to any application for a receivership," *see* ECF. No. [41] at 2. So that factor does not play a role in the analysis.

Several of the remaining factors assess the possible harm to the requesting party, the opposing parties, or the company itself, so the Court evaluates those factors together. Grant argues that both Nexxt Gen and his interests in it will be harmed if Martinez and Peyton are allowed to continue running the company under the authority they believe the Joint Stipulation gave them. *See* ECF No. [104]; ECF No. [114]. Martinez and Peyton argue that both Nexxt Gen and their

interests in it will be harmed if Grant is allowed to continue running the company, which he is doing in a way they believe contravenes the Joint Stipulation. *See generally* ECF No. [109]. This difference of opinion persisted even after the Court made clear its own interpretation of the Joint Stipulation.[5]

The Parties disagree about who is causing the disruption in operating Nexxt Gen, but there is a common thread in their arguments: Grant, Martinez, and Peyton agree that all three of them are concurrently taking actions on behalf of Nexxt Gen, and they agree that the impact of those concurrent actions is detrimental to the company.[6] *See* ECF No. [104]; ECF No. [109]; ECF No. [114]. They also all agree that the intent of the Joint Stipulation was to make it possible for Nexxt Gen to continue operating during this lawsuit because, without the Court's intervention, they could not come to an agreement about how that could happen. *See* ECF No. [104] at 18; ECF No. [109] at 2; ECF No. [114] at 4. What those shared perspectives show is that, regardless of who is correct about the source of Nexxt Gen's inability to function smoothly while the lawsuit continues, the Parties have not been able to work together — or even separately with the same goal — to run the company as things now stand.

As long as Grant, Martinez, and Peyton each continue to act on behalf of Nexxt Gen while holding divergent beliefs about the power the shareholder agreement and the Joint Stipulation give them, Nexxt Gen will be at least in danger of being harmed, if not certain to be harmed. All three men assert that Nexxt Gen's customers, employees, and vendors have for months been given

---

[5] The Court interpreted the Joint Stipulation in the context of Martinez and Peyton's Motion for Contempt. *See* ECF No. [112]. The Court has since vacated the Order adopting that interpretation to consider Martinez's objections as a Motion for Reconsideration, but the Court's interpretation was known to the Parties and in effect for almost two months, from October 18 (two days after the Response was filed) until December 9. *See* ECF No. [147].

[6] Indeed, the Parties cannot even agree on basic, but necessary, information needed to run the company, such as who is a shareholder, which also appears to impact who is a board member, and who has the power to hire or fire Nexxt Gen employees. *See generally* ECF Nos. [125] and [127].

confusing and conflicting information and instructions because Grant tells them one thing and then Martinez and Peyton tell them another. *See* ECF No. [104] at 18–19; ECF No. [109] at 2, 18–19; ECF No. [114] at 4–5. Even without considering the monetary waste the Parties accuse each other of committing, a company that cannot communicate a consistent message to its customers, employees, and vendors will not survive long.

In contrast to the disarray that has developed while three people who do not (and seemingly cannot) agree have led Nexxt Gen, a receiver will, at minimum, take a unified course of action and deliver a consistent message to Nexxt Gen's stakeholders. So the two factors that touch on harm to Nexxt Gen — whether there is imminent danger that the business will be injured without a receiver and whether the interests of others sought to be protected (that is, Nexxt Gen) will in fact be well served by the receivership — support appointing a receiver. *See Bookout*, 514 F.2d at 758 & n.1; *Consol. Rail Corp.*, 861 F.2d at 326–27; *Nat'l P'ship Inv. Corp.*, 153 F.3d at 1291.

The same is true of the factors that consider harm to Grant, Martinez, and Peyton. If the internal and external confusion the Parties' infighting seems to be causing harms Nexxt Gen, all three men's interests in Nexxt Gen will also be harmed. If Nexxt Gen fails, none of the men will benefit. And the potential for failure is much greater without a disinterested third party making ultimate decisions on the company's behalf. This means that there is a significant possibility of irreparable injury to Grant, Martinez, and Peyton's interests in Nexxt Gen if a receiver is not appointed and that the receivership will indeed serve the interests of all three men.

On the other side of the scale, the only sure cost to Martinez, Peyton, Grant, and Nexxt Gen that would flow from appointing a receiver is the money Nexxt Gen will have to pay the receiver to manage the company. That is not an insignificant consideration, particularly given the suggestion that Nexxt Gen has been under financial strain — a suggestion that at one point or

another all three Parties have made.  *See* ECF [42] at 25; ECF [43] at 12; ECF No. [109] at 15–16.  But from the Parties' representations in the Motion, Response, and Reply, it appears Nexxt Gen is currently financially healthy enough to bear the cost of a receiver.  *See* ECF No. [104] at 20; ECF No. [109] at 10 ("As of the date of filing this Response, Nexxt is a company in good standing and by all accounts profitable."); ECF No. [114] at 3–4 ("NexxtGen is a profitable company in good standing with its employees and vendors, and it has more than enough liquidity to pay the reasonable expenses associated with a receiver. (citation and quotation marks omitted)).

Martinez and Peyton contend there would be a second consequence to appointing a receiver: that Nexxt Gen's "main customer" will let its contract with Nexxt Gen lapse, which they argue would be "devastating to the company" and would make it "effectively have to shut down."  *See* ECF No. [109] at 14.  If that contention is correct, it would of course add substantial weight to the anti-receiver side of the scale.  In affidavits supporting the Response, Martinez and Peyton aver that they received this information from Daniel Levi, a consultant who works with (and has received consulting payments from) Nexxt Gen.  *See* ECF No. [109] at 5, 14; ECF No. [113-1] at 7; ECF No. [113-2] at 10.  According to Martinez's and Peyton's averments, Levi — in his capacity as "the broker of the contract" — told them that "if a receiver was appointed to manage" Nexxt Gen's "affairs," Nexxt Gen's main client "Sagenet would likely let the contract with" Nexxt Gen "lapse and not renew it for the next term."  *See* ECF No. [113-1] at 7; ECF No. [113-2] at 10.

While the Court does not doubt that Martinez and Peyton truthfully averred what they heard from Levi, for at least three reasons their averments are too attenuated to add substantial support against the appointment of a receiver.  First, the averments are double hearsay: Martinez and Peyton are not swearing to an action they will take or even an action Levi will take — they are swearing to an action Levi says Sagenet will take.  It is reasonable to assume that Levi, as the

13

middleman between Nexxt Gen and Sagenet, has some knowledge of Sagenet's intentions. But intentions are not actions, and without an averment from Sagenet itself, there is no guarantee that it will go through with letting its contract with Nexxt Gen lapse if the Court appoints a receiver, despite what Sagenet might have indicated to Levi or what Levi indicated to Martinez and Peyton.

Second, the averments come from Martinez and Peyton (and to a lesser degree Levi), who oppose the appointment of a receiver. Their interest in preventing the appointment of a receiver may be entirely unconnected to the averments, but the possibility of bias does exist, and it slightly lessens the weight of those averments in the balancing process. Finally, and most importantly, the averments do not state definitively that Sagenet will not renew its contract with Nexxt Gen if the Court appoints a receiver. Instead, they state that "Sagenet would likely let the contract with" Nexxt Gen "lapse and not renew it for the next term." *See* ECF No. [113-1] at 7; ECF No. [113-2] at 10. So even the averments themselves do not guarantee that the appointment of a receiver would cost Nexxt Gen its main customer. For those reasons, the Court finds that the probability of harm to Nexxt Gen and Grant (not to mention Martinez and Peyton) if a receiver is not appointed would be greater than the injury to Martinez and Peyton (and Nexxt and Grant) if a receiver is appointed. *See Bookout*, 514 F.2d at 758 & n.1; *Consol. Rail Corp.*, 861 F.2d at 326–27; *Nat'l P'ship Inv. Corp.*, 153 F.3d at 1291.

Next, the Court considers Grant's probability of success on the merits of his claims and whether Martinez and Peyton engaged in fraudulent conduct. The Court considers these two factors together because, at this early stage of the proceedings, the evidence in the record does not make clear one way or the other whose claims are valid and whose actions are fraudulent (or, at least, in contravention of the Parties' agreements). As noted at the outset, the basis of this lawsuit is a shareholder dispute between Grant, Martinez, and Peyton. *See* ECF No. [112] at 2. Although

the precise issues of that dispute are not relevant to the Motion, the resolution of the dispute and of this lawsuit will determine who is a shareholder of Nexxt Gen, whose actions on behalf of Nexxt Gen were consistent with the Parties' agreements about the company, and if any Party is liable for damages to any other Party.  For that reason, the Court cannot definitively determine at this stage Grant's probability of success on the merits of his claims or whether Martinez and Peyton engaged in any fraudulent conduct.  The Court therefore finds these two factors to be neutral and to not add any weight to either side of the scale.  *See Bookout*, 514 F.2d at 758 & n.1; *Consol. Rail Corp.*, 861 F.2d at 326–27; *Nat'l P'ship Inv. Corp.*, 153 F.3d at 1291.

Finally, the Court considers whether there are any available legal remedies that would adequately address the problem of running Nexxt Gen without necessitating a receiver.  Peyton and Martinez argue that "the company can continue to be operated with Martinez and Peyton with the assistance of other" Nexxt Gen "personnel, without the need of a receiver."  *See* ECF No. [109] at 17.  In their view, the "only thing" Nexxt Gen "needs is that Grant complies with his duties and the obligations imposed by" the Joint Stipulation and Order, specifically that he "agree to run the company's daily operations by a 2/3rd vote as it was intended in the Joint Stipulation."  *See* ECF No. [109] at 17.  In their supplemental briefing, Martinez and Peyton reiterate their belief that a "less severe remedy" would be "an order from this Court which provides that the daily business affairs of" Nexxt Gen "be conducted pursuant to the majority vote of the shareholders and/or members of the Board of Directors, except as to those items in which the Shareholders Agreement, as amended by the Joint Stipulation, require unanimous vote of the shareholders."  *See* ECF No. [125] at 3–4.

The problem with those suggestions is that, as the Court explained more thoroughly in a

previous ruling,[7] the Joint Stipulation does not require the Parties to run all of Nexxt Gen's daily operations "by a 2/3rd vote." *See generally* ECF No. [112]. Instead, the Joint Stipulation requires only that the Parties "make decisions based on a two-thirds (2/3rds) vote of the shareholders for those decisions which impact the daily operations of the company defined in subsections (ii), (vi), (ix), (x), (xi), (xii) and (xiv)" of the shareholder agreement. *See* ECF No. [41] at 2. Regardless of Martinez's and Peyton's views about the intention behind the Joint Stipulation, what matters is the words of the Joint Stipulation. And the words of the Joint Stipulation require a two-thirds vote for a far narrower subset of business decisions than Martinez and Peyton acknowledge. *See* ECF No. [41] at 2; ECF No. [112]. As a result, many of Nexxt Gen's business affairs continue to require the agreement of all three men, *see* ECF No. [28] at 48; ECF No. [41] at 2, something that does not appear likely to occur based on the Court's historical understanding of this case.

For that reason, the Court does not agree that all Nexxt Gen needs is for Martinez and Peyton to run the business without Grant. The Joint Stipulation was the Parties' attempt to find a path forward for Nexxt Gen during this lawsuit that would leave room for all three men to walk it. Despite the good intentions behind the Joint Stipulation, its provisions have not produced peace for Nexxt Gen while the lawsuit proceeds. So what Martinez and Peyton suggest is, essentially, to maintain the status quo, but as the Court has already explained, the status quo is likely to harm Nexxt Gen and, with it, the interests of all three Parties.

The Parties have not suggested any other legal remedy that could adequately address the

---

[7] The Court again notes that the Order adopting the R&R in which the Court interpreted the Joint Stipulation has been vacated and that the Court is currently evaluating Martinez's objections to the R&R as a Motion for Reconsideration. *See* ECF No. [147]. But those objections pertain to four discreet issues involving the application of the Court's interpretation of the Joint Stipulation to the facts of this case. *See* ECF No. [117] at 5–9. They do not pertain to the Court's overall interpretation of the Joint Stipulation. *See* ECF No. [117] at 5–9. For that reason, the Court's interpretation of the Joint Stipulation as requiring a two-thirds vote for only a narrow subset of business decisions will not change no matter the outcome of the Motion for Reconsideration. *See generally* ECF No. [112].

problem of running Nexxt Gen without necessitating a receiver, and the Court does not discern any on its own. The Court therefore finds that this factor weighs in favor of appointing a receiver. *See Bookout*, 514 F.2d at 758 & n.1; *Consol. Rail Corp.*, 861 F.2d at 326–27; *Nat'l P'ship Inv. Corp.*, 153 F.3d at 1291.

To sum up, the Court finds that five of the eight factors that courts have used to evaluate whether to appoint a receiver support such an appointment.[8] The Court also finds that three of the factors either are not applicable here or are neutral.[9] On balance, the Court finds that the factors weigh in favor of appointing a receiver, and for that reason, the Court will exercise its discretion to appoint a receiver to run Nexxt Gen during this lawsuit. *See Chapman*, 208 U.S. at 377.

The Court acknowledges the appointment of a receiver is an extraordinary equitable remedy. *See Bradley*, 644 F.3d at 1310. Still, the Court finds the remedy is warranted here to avert further loss of assets through the mismanagement that has resulted from the Parties trying to run Nexxt Gen together but with conflicting perspectives and directions. *See Hawes*, 2012 WL 12861096, at *2. The Court is mindful, however, that a "receivership once imposed on a corporation should be terminated and control returned to those who own the business as soon as the reason for its imposition ceases." *See Spence & Green*, 612 F.2d at 904. Accordingly, if the Parties come to a joint agreement during the pendency of this lawsuit that a receiver is no longer necessary, the Court will consider terminating the receivership early. Otherwise, the receiver will

---

[8] Those five factors are: (1) whether there is imminent danger that the business will be injured, squandered, or lost without a receiver; (2) the probability that the harm to the requesting party if a receiver is not appointed would be greater than the injury to the opposing party or parties if a receiver is appointed; (3) whether available legal remedies would adequately address the problem without necessitating a receiver; (4) the possibility of irreparable injury to the requesting party's interests in the business if a receiver is not appointed; and (5) whether the interests of the requesting party and others sought to be protected will in fact be well served by the receivership.

[9] Those three factors are: (1) the requesting party's probability of success on the merits of his claims; (2) whether there has been fraudulent conduct by the party or parties opposing a receiver; and (3) whether there is a contractual receivership provision in effect between the parties.

remain in place until the Parties' claims are finally adjudicated and this lawsuit concludes.

IV.   **CONCLUSION**

For those reasons, the Motion, **ECF No. [104]**, is **GRANTED**. As the Parties have not identified any particular receiver(s) for the Court's consideration, the Parties **SHALL** confer with one another and provide the Court with the name(s) of either an agreed-upon receiver or their respective proposed receivers, if no agreement is reached, along with any resumes or curriculum vitae **no later than January 8, 2025**. The Court will thereafter issue an order appointing a receiver.

**DONE and ORDERED** in Chambers in Miami, Florida on December 31, 2024.

_____
**MARTY FULGUEIRA ELFENBEIN**
**UNITED STATES MAGISTRATE JUDGE**

cc:  All Counsel of Record