**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 24-CV-21649-ELFENBEIN

**DAVID PEYTON**,
*individually and as a shareholder*
*of Nexxt Gen Corporation*,

      Plaintiff,

  v.

**DAVID E. MARTINEZ**,
*individually and as a shareholder*
*of Nexxt Gen Corporation*,

      Intervenor Plaintiff,

  v.

**ERIC K. GRANT**, *et al.*,

      Defendants,

  v.

**DAVID PEYTON**, *et al.*,

      Intervenor Plaintiff,

  v.

**NEXXT GEN CORPORATION**, *et al.*,

      Counter Claimant,

  v.

**DAVID PEYTON**,
*individually and as a shareholder*
*of Nexxt Gen Corporation*,

      Counter Defendant.

_____/

**<u>ORDER AFTER BENCH TRIAL</u>**

    **THIS CAUSE** is before the Court following the presentation of law and disputed facts

during a six-day bench trial.  *See* ECF No. [261]; ECF No. [265]; ECF No. [266]; ECF No. [270];

ECF No. [272]; ECF No. [278]. The Parties have submitted proposed findings of fact and conclusions of law.  *See* ECF No [303]; ECF No. [304-1].  The Court has carefully considered the trial testimony, the exhibits admitted into evidence at trial, and the arguments of counsel.  For the reasons explained below, the Court finds that David Martinez ("Martinez") and David Peyton ("Peyton") have failed to prove by a preponderance of the evidence either that they and Eric Grant ("Grant") are each one-third owners of all the Nexxt Companies,[1] except for Nuraxis, LLC, NexxtGen LLC, and Skyaxis Communications LLC, or that they and Grant are equal one-third partners in a joint venture business of providing network, communications, engineering, and consulting services to the oil and gas industry.

## I.  BACKGROUND

This action arises out of a tumultuous business relationship between Grant, Martinez, and Peyton.  *See* ECF No [112] at 2.  As the Court has previously explained, "the action is based on a shareholder dispute between Grant, Martinez, and Peyton, who are the three alleged shareholders of" Nexxt Gen.  *See* ECF No. [112] at 2 (quotation marks omitted).  That dispute led Peyton to initiate this lawsuit in April 2024.  *See* ECF No. [1].

In his original Complaint, Peyton brought ten counts against Grant alleging both that Grant did not fulfill his obligations under a February 2019 contract that made Martinez, Grant, and Peyton equal partners in Nexxt Gen (the "Shareholder Agreement") and that Grant mismanaged Nexxt Gen's money by filing fraudulent tax returns and siphoning funds into his private pension accounts and other companies.  *See generally* ECF No. [1].  Peyton also filed a Motion for Preliminary Injunction asking the Court to appoint receivers for Nexxt Gen and Holliday Process

---

[1] The Nexxt Companies are: (1) Nexxt Gen Corporation ("Nexxt Gen"); (2) NexxtGen LLC ("Nexxt LLC"); (3) Nuraxis LLC ("Nuraxis"); (4) Skyaxis Communications LLC ("Skyaxis"); (5) NexxtGen Holdings LLC ("Nexxt Holdings"); (6) NexxtGen Canada Holdings LLC ("Nexxt Canada"); and (7) Millenix, LLC ("Millenix").

Solutions, LLC ("HPS"), a company Peyton and Grant co-own, to prevent the Parties from "making waste" in those companies.  *See* ECF No. [4] at 1; ECF No. [9].

In June 2024, Peyton filed an Amended Complaint asserting, in both his individual capacity and his capacity as a shareholder of Nexxt Gen, fourteen counts against Grant and Nexxt Gen.  *See generally* ECF No. [28].  Peyton's Amended Complaint continued to seek an injunction appointing a receiver for Nexxt Gen and also sought monetary relief for various torts, breaches of contract, and breaches of fiduciary duty.  *See generally* ECF No. [28].  Martinez, after seeking and obtaining leave to intervene, *see* ECF No. [16]; ECF No. [20], filed an Intervenor Complaint, *see generally* ECF No. [32].  Martinez's Intervenor Complaint asserted, in his individual capacity and derivatively as a shareholder of Nexxt Gen, seven counts against Peyton and Grant "for breaches of fiduciary duties and other violations of state law."  *See* ECF No. [32] at 2, 22.

During a hearing on Peyton's Motion for Preliminary Injunction, which the Honorable Beth Bloom denied, *see* ECF No. [30], the Parties "agree[d] to refer the case for a settlement conference" with me, *see* ECF No. [31].  After Judge Bloom's referral, *see* ECF No. [33], I held the settlement conference for six hours over two days, *see* ECF No. [35]; ECF No. [36].  The settlement conference resulted in an agreement between Grant, Martinez, and Peyton about how they would operate Nexxt Gen "while litigation is ongoing" (the "Joint Stipulation").  *See* ECF No. [36]; ECF No. [41]; ECF No. [47].  In the Joint Stipulation — which the Court has thoroughly described in a different writing, *see* ECF No. [112] at 13–28 — Grant, Martinez, and Peyton agreed to modify certain provisions of the Shareholder Agreement to require that they "make decisions based on a two-thirds (2/3rds) vote"; to give Martinez and Peyton certain access to Nexxt Gen's financial accounts, credit cards, and Quickbooks; and to make a third-party the "primary administrator" for Nexxt Gen's Quickbooks, Information Technology, and Google systems.  *See*

ECF No. [41] at 2.  The Court approved the Joint Stipulation in July 2024.  *See* ECF No. [47].

In August 2024, Martinez and Peyton filed a Joint Motion for Contempt and Sanctions against Grant, arguing that Grant failed to comply with the Joint Stipulation ("Motion for Contempt").  *See generally* ECF No. [52].  Around the same time, Martinez filed a separate Motion for Rule 11 Sanctions against Grant and his counsel, arguing that Grant's Answer to his Intervenor Complaint and Peyton's Amended Complaint "assert[ed] defenses that are not well grounded in law or fact . . . without having conducted a reasonable inquiry into the underlying facts" ("Motion for Rule 11 Sanctions").  *See* ECF No. [53] at 2.  Judge Bloom referred both motions to me, *see* ECF No. [54]; ECF No. [70], and I held an evidentiary hearing on the motions for eleven hours over two days in September 2024, *see* ECF No. [64]; ECF No. [94]; ECF No. [98].  After the evidentiary hearing, which included testimony from all three men, *see* ECF No. [94]; ECF No. [98], I issued a Report and Recommendation ("R&R") recommending that the Motion for Contempt be granted in part and denied in part and that the Motion for Rule 11 Sanctions be denied without prejudice, *see* ECF No. [112] at 31.[2]

In October 2024, Grant filed a Motion to Appoint a Receiver for Nexxt Gen to preserve its value and "and prevent further waste and/or mismanagement during the pendency of this litigation."  *See* ECF No. [104] at 1.  Despite having made his own request for a Receiver in the early months of this lawsuit, Peyton objected to Grant's request. *See generally* ECF No. [109].  Martinez, who had initially "support[ed] the appointment of a receiver to protect the shareholders,"

---

[2] Judge Bloom adopted the R&R, *see* ECF No. [118], but because Martinez had timely filed objections to the R&R just before that adoption, *see* ECF No. [117], he asked Judge Bloom to vacate her adoption order, *see* ECF No. [122].  Before Judge Bloom could act on Martinez's Motion to Vacate, the Parties consented to Magistrate Judge jurisdiction over the entirety of the case. *See* ECF No. [135]; ECF No. [139].  I granted the Motion to Vacate and, without objection from Martinez, converted it to a Motion for Reconsideration. *See* ECF No. [147].  The Parties then briefed the Motion for Reconsideration, *see* ECF No. [164]; ECF No. [169], which the Court will rule on in due course by separate order.

*see* ECF No. [32] at 11, joined Peyton in objecting, *see generally* ECF No. [109].  The Parties then consented to Magistrate Judge jurisdiction in full, *see* ECF No. [135], so Judge Bloom referred the entirety of the case to me, *see* ECF No. [139].  And because the Parties had "not been able to work together — or even separately with the same goal — to run the company" after the adoption of the Joint Stipulation, I appointed a Receiver in December 2024 to do it on their behalf.  *See* ECF No. [170] at 11, 18; ECF No. [204].  The Receiver continues to do so.  *See* ECF No. [326].

After the Parties consented to complete Magistrate Judge jurisdiction, they asked the Court "to bifurcate the issue of whether Peyton and Martinez are shareholders in" Nexxt Gen from "the remaining issues to be decided in the case."  *See* ECF No. [134]; ECF No. [138]; ECF No. [145].  Because the Parties stipulated to it (a rare occurrence in this case), and after concluding it would "simplify discovery, conserve resources of the Court and the Parties, and . . . facilitate a potential resolution of the claims," the Court agreed to conduct the trial of this lawsuit using a "two-phase approach."  *See* ECF No. [160] at 2.  Phase I consists of a bench trial to decide what the Parties have named the "Ownership Issue," which the Court will expand on below.  *See* ECF No. [160] at 2.  Phase II consists of a jury trial to decide any claims or issues that remain after Phase I.  *See* ECF No. [160] at 3.

With the Court's permission, *see* ECF No. [161], Peyton then filed a Second Amended Complaint, *see* ECF No. [162], and Martinez filed an Amended Intervenor Complaint, *see* ECF No. [163].  Peyton's Second Amended Complaint, which is the operative one, asserted in his individual capacity and in his capacity as a shareholder of Nexxt Gen fourteen claims against Grant and Nexxt Gen.  *See* ECF No. [162].  Those claims are: (1) Fraudulent Transfers to HPS; (2) Fraudulent Transfers to TD Ameritrade; (3) Conversion of Funds to HPS; (4) Conversion of Funds to Pension Funds; (5) Breach of Contract; (6) Negligence; (7) Gross Negligence; (8) Fraud in the

Inducement/Fraudulent Misrepresentation; (9) Declaratory Judgment – Peyton and Martinez are each one-third shareholders of Nexxt Gen and owners of a joint venture among the Parties; (10) Constructive Trust on Pension Accounts; (11) Breach of Fiduciary Duty; (12) Unjust Enrichment; (13) Quantum Meruit, and (14) False Informational Return under 26 U.S.C. § 7430.  *See* ECF No. [162].

Martinez's Amended Intervenor Complaint, which is his operative pleading, asserted in his individual capacity and derivatively on behalf of Nexxt Gen, Nexxt LLC, Nuraxis, and Skyaxis fifteen claims against Grant and Peyton in their roles as "owners, shareholders and current members and directors of" Nexxt Gen, Nexxt LLC, Nuraxis, and Skyaxis.  *See* ECF No. [163]. Those claims are: (1) Declaratory Judgment – Martinez is a shareholder and board member of Nexxt Gen; (2) Declaratory Judgment – Martinez is a shareholder and board member of the Nexxt Companies; (3) Declaratory Judgment – Martinez is a one-third partner of a joint venture among the Parties; (4) Specific Performance of the Shareholder Agreement; (5) Injunctive Relief – "enjoin Grant from, intentionally and willfully, continuing to disrupt the business operations of" Nexxt Gen; (6) Fraud in the Inducement; (7) Violation of Fla. Stat. § 607.0831; (8) Breach of Fiduciary Duty; (9) Unjust Enrichment; (10) Fraud or Defalcation; (11) Waste of Corporate Assets; (12) Accounting; (13) Conversion; (14) Constructive Trust; and (15) Breach of Implied Covenant of Good Faith and Fair Dealing.  *See* ECF No. [163].  Martinez brings Counts 4, 5, and 6 against only Grant.  *See* ECF No. [163] at 30–36.

Grant moved to dismiss Counts 1, 2, 3, 4, and 8 of Peyton's Second Amended Complaint, *see* ECF No. [171], and Counts 6, 9, 10, and 13 of Martinez's Amended Intervenor Complaint, *see* ECF No. [180].  He also asserted that both Peyton's Second Amended Complaint and Martinez's Amended Intervenor Complaint were improper shotgun pleadings as they each "incorporate[] into

each count all preceding allegations." *See* ECF No. [171] at 4; ECF No. [180] at 4. At a pretrial conference ahead of the Phase I bench trial, the Court ruled on both Motions to Dismiss, granting them in part and denying them in part. *See* ECF No. [259]; ECF No. [260]. First, the Court granted Peyton's and Martinez's oral motions to amend their complaints by interlineation to fix their improper incorporations by reference, which Grant did not oppose. *See* ECF No. [259] at 2. Second, the Court dismissed Counts 1, 2, and 3 of Peyton's Second Amended Complaint with prejudice but allowed Counts 4–14 to proceed. *See* ECF No. [259] at 3. Finally, the Court dismissed Count 10 of Martinez's Amended Intervenor Complaint with prejudice but allowed Counts 1–9 and Counts 11–15 to proceed. *See* ECF No. [259] at 3.

Having finalized what Counts remained to be tried, the Court conducted the six-day, Phase I bench trial in March 2025.[3] *See* ECF No. [261]; ECF No. [265]; ECF No. [266]; ECF No. [270]; ECF No. [272]; ECF No. [278]. The focus of the Phase I bench trial was the Ownership Issue, which as the Parties have defined it includes two questions: (1) "Whether Martinez, Peyton and Grant are each a one third member, shareholder, or owner of" Nexxt Gen and related companies "NexxtGen LLC, Nuraxis LLC, Skyaxis Communications LLC, NexxtGen Holdings LLC, Millenix, LLC, and NexxtGen Canada Holdings LLC"; and (2) "Whether Martinez, Peyton and Grant are equal one third partners in the joint venture business of providing network, communications, engineering, and consulting services to the oil and gas industry." *See* ECF No. [160] at 2–3; ECF No. [184]. The Ownership Issue encompasses Count 9 of Peyton's Second Amended Complaint and Counts 1, 2, and 3 of Martinez's Amended Intervenor Complaint. *See* ECF No. [303] at 2; ECF No. [304-1] at 3.

---

[3] Trial began on Monday, March 3, continued through Friday, March 7, then resumed and concluded on Wednesday, March 12. *See* ECF No. [261]; ECF No. [265]; ECF No. [266]; ECF No. [270]; ECF No. [272]; ECF No. [278]. The trial occurred on non-consecutive days because the Parties estimated it would take them two to three days to complete the trial, not six. *See* ECF No. [160] at 2 & n.1.

During the bench trial, the Court heard from five witnesses: Martinez, Grant, Peyton, Michael Wayne Thompson ("Thompson"), and Barry Mukamal ("Mukamal").  *See* ECF No. [296]; ECF No. [297]; ECF No. [298]; ECF No. [299]; ECF No. [300]; ECF No. [301].  Thompson and Mukamal testified as experts in "tax and business valuations;" Thompson testified for Martinez and Peyton and Mukamal testified for Grant.  *See* ECF No. [301] at 76–77.  The Court also heard the arguments of counsel and, after trial, received proposed findings of fact and conclusions of law from each side.  *See* ECF No [303]; ECF No. [304-1].  The Court thereafter ordered the Parties to provide supplemental briefing, which the Parties promptly submitted.  *See* ECF No. [328]; ECF No. [329]; ECF No. [330].

## II.  CONCLUSIONS OF LAW[4]

As a preliminary matter, all Parties agree that Florida law governs the questions at issue here.  *See* ECF No. [303] at 23 & n.7; ECF No. [304-1] at 28 n.34.  The Shareholder Agreement itself supports the application of Florida law.  *See* ECF No. [280-1] at 13 ("This Agreement shall be governed by and construed under the laws of the State of Florida without giving effect to the principles of conflicts of laws.").  So does the general law regarding the relationship between a corporation and its members, which under the "internal affairs doctrine" is "governed by the laws of the state of incorporation" — here, Florida.  *See, e.g.*, *Freedman v. magicJack Vocaltec Ltd.*, 963 F.3d 1125, 1133 (11th Cir. 2020) ("The internal affairs doctrine instructs that the extent and nature of the relationship between corporation and stockholder, corporate officer or director and stockholder, and stockholders inter sese should be governed by the laws of the state of incorporation." (alterations adopted, quotation marks omitted)); *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983) ("As a general matter, the law of

---

[4] Bench trial orders typically present findings of fact first, but the Court begins with its conclusions of law to best frame the legal issues it must decide and the facts relevant to those issues.

the state of incorporation normally determines issues relating to the internal affairs of a corporation.").  For those reasons, the Court applies the Florida law set out below.

The Parties also agree, as does the Court, that Martinez and Peyton have the burden to prove their cases by a preponderance of the evidence.  *See, e.g.*, *Am. Marine Tech., Inc. v. M/Y Alchemist*, 526 F. Supp. 3d 1236, 1245 (S.D. Fla. 2021).  Indeed, the "burden of proof in civil cases is the same regardless of whether the finder of fact is a judge in a bench trial or a jury.  That is, the parties have the burden to prove every element of their claim by a preponderance of the evidence."  *Id.* (citation omitted).  "A preponderance of the evidence means such evidence as, when considered with that opposed to it, has more convincing force, and demonstrates that what is sought to be proved is more likely true than not true."  *Id.* at 1245–46 (quotation marks omitted).  And in "bench trials, the judge serves as the sole fact-finder and, thus, assumes the role of the jury.  In this capacity, the judge's function includes weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact, as well as issues of law."  *Id.* at 1246; *see also Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993) (holding "it is the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony").

### A.  Shareholder Status

"Corporations come into existence and are accorded their characteristics because of formal acts."  *In re Daly*, 655 B.R. 255, 274 (Bankr. S.D. Fla. 2023) (quoting *Sackett v. Shahid*, 722 So. 2d 273, 276 (Fla. 1st DCA 1998)).  As a whole, "corporate law is an area of law where formalities are important, as they are the method by which sophisticated businessmen make their contractual rights definite and limit the authority of courts to undo their deal."  *Id.* (quotation marks omitted).  Indeed, "large parts of the field of corporate law have to do with requirements which may appear to be mere formalities."  *See Sackett*, 722 So. 2d at 276.  But "where a party controls a closely held

corporation and desires to establish important rights and interests through the corporation, the following of" those "so-called 'corporate formalities' is important." *In re Daly*, 655 B.R. at 274 (quoting *Sackett*, 722 So. 2d at 276). "As a result, a person acting through a corporation disregards these formalities at his or her risk." *Id.* at 275–76 (quoting *Sackett*, 722 So. 2d at 276).

To form a corporation in Florida, a person must file Articles of Incorporation ("Articles") with the Florida Department of State. *See* Fla. Stat. § 607.0203 ("[T]he corporate existence begins when the articles of incorporation are filed."); *id.* § 607.0201 ("One or more persons may act as the incorporator or incorporators of a corporation by delivering articles of incorporation to the department for filing."); *id.* § 607.01401(16) ("'Department' means the Florida Department of State."). Those Articles "must set forth" the "number of shares the corporation is authorized to issue," *id.* § 607.0202(1)(c), along with "any classes of shares and series of shares within a class, and the number of shares of each class and series, that the corporation is authorized to issue," *id.* § 607.0601(1); *see generally id.* § 607.01401(68) ("'Shares' means the units into which the proprietary interests in a corporation are divided."). And the Articles "must authorize . . . [o]ne or more classes or series of shares that together have unlimited voting rights, and . . . [o]ne or more classes or series of shares (which may be the same class or series or classes or series as those with voting rights) that together are entitled to receive the net assets of the corporation upon dissolution." *Id.* § 607.0601(2).

To issue any shares its Articles have authorized, the corporation's Board of Directors must act.[5] *See In re Daly*, 655 B.R. at 272–74; Fla. Stat. § 607.0621(2)–(3). "The board of directors

---

[5] There are, however, exceptions to this rule. First, the "power" to issue shares can be "reserved to the shareholders in the articles of incorporation." *See* Fla. Stat. § 607.0621(1); *In re Daly*, 655 B.R. at 272. Second, shareholders can agree in writing to dispense with many of the corporate formalities the Florida Business Corporation Act ("FBCA") requires, including having a board of directors at all. *See* Fla. Stat. § 607.0732(1) ("An agreement among the shareholders of a corporation that complies with this section is effective among the shareholders and the corporation, even though it is inconsistent with one or more other

may authorize shares to be issued for consideration consisting of any tangible or intangible property or benefit to the corporation, including cash, promissory notes, services performed, promises to perform services evidenced by a written contract, or other securities of the corporation." Fla. Stat. § 607.0621(2). But "[b]efore the corporation issues shares, the board of directors must determine that the consideration received or to be received for shares to be issued is adequate." *Id.* § 607.0621(3). "When the corporation receives the consideration for which the board of directors authorized the issuance of shares, the shares issued therefor are fully paid and nonassessable. Consideration in the form of a promise to pay money or a promise to perform services is received by the corporation at the time of the making of the promise, unless the agreement specifically provides otherwise." *Id.* § 607.0621(4).

"Shares may but need not be represented by certificates," and "the rights and obligations of shareholders are" generally "identical, regardless of whether their shares are represented by certificates." *See id.* § 607.0625(1). Indeed, "[u]nless the articles of incorporation or bylaws provide otherwise, the board of directors of a corporation may authorize the issuance of some or all of the shares of any or all of its classes or series without certificates." *Id.* § 607.0626(1). If the corporation issues shares without certificates, however, it must "[w]ithin a reasonable time after the issuance or transfer of shares without certificates, . . . deliver to the shareholder a written statement of the information required on certificates by s. 607.0625(2) and (3), and, if applicable, s. 607.0627." *Id.* § 607.0626(2).

That required information includes, at a "minimum": (1) the "name of the corporation"; (2)

---

provisions of this chapter."); *id.* § 607.0732(1)(a) (noting such an agreement can "[e]liminate[] the board of directors or limit[] or restrict[] the discretion or powers of the board of directors"); *In re Daly*, 655 B.R. at 273 (noting shareholders can agree "in the articles of incorporation, the bylaws, or other writing, to various provisions of corporate governance otherwise inconsistent with the FBCA – including waiving many corporate formalities that otherwise would have to be followed").

the fact "that the corporation is organized under the laws of" Florida; (3) the "name of the person to whom [the shares are] issued"; and (4) the "number and class of shares and the designation of the series, if any." *Id.* § 607.0625(2). And if applicable, it must also include: (1) either a summary of "the designations, relative rights, preferences, and limitations applicable to each class," the "variations in rights, preferences, and limitations determined for each series," and "the authority of the board of directors to determine variations for future series" or a conspicuous statement "that the corporation will furnish the shareholder a full statement of this information on request and without charge," *see id.* § 607.0625(3); and (2) any "restrictions on the transfer or registration of transfer of shares," *see id.* § 607.0627(1). For shares without certificates, any restrictions must be "contained in the [post-issuance] information statement." *See id.* § 607.0627(2) (instructing also that, for certificated shares, any restrictions must be "noted conspicuously on the front or back of the certificate").

### B. Joint Venture

"Under Florida law, a joint venture is a form of partnership, and both types of entities are generally governed by the same rules of law." *Williams v. Obstfeld*, 314 F.3d 1270, 1275 (11th Cir. 2002); *see also Kislak v. Kreedian*, 95 So. 2d 510, 514 (Fla. 1957); *Pinnacle Port Cmty. Ass'n., Inc. v. Orenstein*, 872 F.2d 1536, 1539 n.3 (11th Cir. 1989) ("[I]n general, the law governing partnerships is applicable to joint ventures."). "A partnership is created only where both parties contribute to the labor or capital of the enterprise, have a mutuality of interest in both profits and losses, and agree to share in the assets and liabilities of the business." *Williams*, 314 F.3d at 1275 (quotation marks omitted). "A joint venture, like a partnership, may be created by express or implied contract, and the contractual relationship must consist of the following elements: (1) a common purpose; (2) a joint proprietary interest in the subject matter; (3) the right to share profits

CASE NO. 24-CV-21649-ELFENBEIN

and duty to share losses, and (4) joint control or right of control." *Id.* at 1275–76; *see also Browning v. Peyton*, 918 F.2d 1516, 1521 (11th Cir. 1990) ("[T]he existence of a contract is the first essential element of a joint venture agreement.").   "Florida courts have interpreted these requirements to preclude a finding that a partnership or joint venture exists where any factor is missing." *Williams*, 314 F.3d at 1276.

Although joint ventures and partnerships are similar, they have differences.  *See Wachovia Bank, N.A. v. Tien*, 534 F. Supp. 2d 1267, 1286 (S.D. Fla. 2007) ("Florida law certainly recognizes that there is a distinction between a joint venture and a partnership." (citation omitted)).   "The critical difference is that with joint ventures, the scope of the business relationship is limited to a single purpose or object."  *Id.* at 1287 (citation omitted); *see also Kislak*, 95 So. 2d at 514–15 ("The outstanding difference between a joint adventure and a partnership is that the former relates to a single transaction, although it may comprehend a business to be continued over several years, while the latter relates to a general and continuing business of a particular kind, although there may be a partnership for a single transaction." (quotation marks omitted)).   In fact, the Florida Supreme Court recognized almost 70 years ago that a joint venture is "an association of persons or legal entities to carry out a single business enterprise for profit" or, in other words, "the legal relationship resulting from an agreement between two or more persons to engage in an enterprise of limited scope and duration."  *See Kislak*, 95 So. 2d at 514.   "It is a partnership of limited scope ordinarily terminating when the objects of its creation have been accomplished."  *Id.*   And "[b]ecause of the limited scope of the relationship between joint adventurers, it is generally more informal than the relationship between partners."  *Id.* at 514–15 (quotation marks omitted).

Because a joint venture can be created by implied contract, "creation of such a venture can be inferred from the parties' conduct."  *See Adams v. Carnival Corp.*, 482 F. Supp. 3d 1256, 1271

(S.D. Fla. 2020); *Miami-Dade Cnty. v. United States*, 345 F. Supp. 2d 1319, 1351 (S.D. Fla. 2004) ("Joint ventures, like partnerships, are created by an actual contract or agreement, either express (written or oral), or implied from the conduct of the parties.").  Indeed, parties can create a joint venture even when they have an earlier written contract that "specifically states that it does not constitute a joint venture," as their "subsequent course of conduct may" nonetheless "have created such a joint venture agreement." *See Adams*, 482 F. Supp. 3d at 1271 (recognizing that a joint venture can exist "notwithstanding a prior written contract foreclosing such a possibility").  But the "heavy and difficult burden to establish the joint venture absent an express agreement lies with the party alleging the joint venture." *Slaihem v. Sea Tow Bahamas Ltd.*, 148 F. Supp. 2d 1343, 1348 (S.D. Fla. 2001); *see also Miami-Dade Cnty.*, 345 F. Supp. 2d at 1351 (noting that when "the events and transactions which form the basis of the alleged relationship are not in writing, the burden of establishing the existence of such a contract is indeed, as it should be, a heavy and difficult one, because business relationships are not customarily entered into in a casual manner" (alterations adopted, quotation marks omitted)).  And "the very fact that the agreement was not reduced to writing is evidence, however slight, that no such agreement actually existed." *See, e.g.*, *Browning*, 918 F.2d at 1520 (quoting *Kislak*, 95 So. 2d at 515).

## III.    ANALYSIS AND FINDINGS OF FACT[6]

As outlined in the Court's Order granting bifurcation, the Court must answer two questions as part of Phase I: (1) whether Grant, Martinez, and Peyton are each a one-third member, shareholder, or owner of the Nexxt Companies; and (2) whether Grant, Martinez, and Peyton are equal one-third partners in a joint venture business of providing network, communications, engineering, and consulting services to the oil and gas industry.  *See* ECF No. [160] at 2–3; ECF No. [184].  These questions address Count 9 of Peyton's Second Amended Complaint and Counts 1, 2, and 3 of Martinez's Amended Intervenor Complaint.  *See* ECF No. [303] at 2; ECF No. [304-1] at 3.  The Court analyzes each in turn.

### A.  Are Grant, Martinez, and Peyton each a one-third member, shareholder, or owner of the Nexxt Companies?

Peyton, in Count 9 of his Second Amended Complaint, asks the Court to declare that he and Martinez are each "equal one third (1/3) shareholders in Nexxt Gen."  *See* ECF No. [162] at 37.  Martinez, in Count 1 of his Amended Intervenor Complaint, asks the Court to declare, among other things, that he is a shareholder and board member of Nexxt Gen.[7]  *See* ECF No. [163] at 24.

To prove their entitlement to that relief, Peyton and Martinez must show by a

---

[6] While bench trial orders often set out findings of fact in a separate section, because of the narrow scope of the legal questions involved here, a thorough recitation of the trial testimony and evidence would be unhelpful.  This is particularly true because much of the trial testimony was rambling, nonsensical, irrelevant to the core issues to be decided, or not credible.  Accordingly, instead of cataloguing the testimony separately, the Court will include its factual findings within its analysis, highlighting credibility issues as appropriate.  "To the extent any of" the Court's "findings of fact are determined to constitute conclusions of law, they are adopted as such." *In re Daly*, 655 B.R. at 264 n.45. "And to the extent any . . . findings of fact are determined to constitute mixed questions of law and fact, an appellate court should" evaluate them as such. *See id.*; *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Village at Lakeridge, LLC*, 583 U.S. 387, 396 (2018) ("[T]he standard of review for a mixed question all depends—on whether answering it entails primarily legal or factual work.").

[7] In Count 2, Martinez asks the Court to declare, again among other things, that he is a shareholder and board member of all the Nexxt Companies.  *See* ECF No. [163] at 26.  The Court will further address Count 2 later in this Order.

preponderance of the evidence that Nexxt Gen at some point issued them shares of stock.  *See In re Daly*, 655 B.R. at 258 (noting "corporate formation, organization, and governance rules . . . provide, among other things, that ownership of a corporation is evidenced solely by shares of stock in the corporation"); *Am. Marine Tech.*, 526 F. Supp. 3d at 1245.  And as the Court explained in its conclusions of law, with limited exceptions, Florida corporations can issue shares only through their Board of Directors.  *See In re Daly*, 655 B.R. at 272–74; Fla. Stat. § 607.0621(2)–(3).  So unless one of the exceptions applies here, Peyton and Martinez must demonstrate that Nexxt Gen's Board of Directors issued them shares.  They have not done so.

Much of the testimony and evidence and at trial focused on the validity of the Shareholder Agreement.  The thinking seems to have been: if the Shareholder Agreement is a valid contract, its provision defining "Shareholder" to include Grant, Martinez, and Peyton, *see* ECF No. [280-1] at 1, 14, and its provision stating that the "relative ownership" of each of them is "33 1/3%," *see* ECF No. [280-1] at 8, definitively establish that all three are one-third shareholders of Nexxt Gen.  While that thought is enticing, it is also legally incorrect.

The problem with focusing on the Shareholder Agreement's provisions is that it skips several important steps, none of which were addressed during the bench trial in Peyton and Martinez's cases in chief.  Those important steps are the foundational corporate formalities that incorporators must follow if they wish to properly establish a corporation under Florida law.  "The first step to establish a corporation under" Florida law "is for the incorporator to deliver articles of incorporation to the Florida Department of State."  *In re Daly*, 655 B.R. at 271; Fla. Stat. § 607.01401(16); *id.* § 607.0201; *id.* § 607.0203.  It is undisputed that Grant's father, Ronald Grant ("Ronald"), did that when he formed Nexxt Gen in 2012.  *See* ECF No. [280-20] at 5–6.

"After incorporation, though, there are still several organizational steps a corporation must

take before it can have a functioning board of directors and issue stock. . . . The next step required

after incorporation is to hold an organizational meeting" to "either elect directors and complete the

corporation's organization" or "to elect a board of directors who will complete the organization."

*In re Daly*, 655 B.R. at 271; *see also* Fla. Stat. § 607.0205.  Only the incorporator can hold the

organizational meeting.  *See In re Daly*, 655 B.R. at 271.  When Ronald created Nexxt Gen in

2012, he listed himself in its Articles as its sole incorporator.  *See* ECF No. [280-20] at 5–6.

"[B]ecause [Ronald] was the only incorporator, only he could hold the organizational meeting."

*See In re Daly*, 655 B.R. at 271.  At trial, no evidence was presented to show that he ever held the

required organizational meeting, either in the traditional sense or, as Florida law permits, by

written consent.  *See In re Daly*, 655 B.R. at 271; Fla. Stat. § 607.0205(2).

 Nor was there any evidence Ronald appointed directors of Nexxt Gen any other way.

While he listed himself as the "initial officer[] and/or director[] of the corporation" in the Articles

and indicated that his title was President, because of the joint conjunction, it is unclear whether he

named himself only Nexxt Gen's President or gave himself the dual roles of President and director.

*See* ECF No. [280-20] at 5–6.  There was no evidence introduced at trial to clear up that ambiguity.

And there were no other incorporators, officers, or directors included in Nexxt Gen's Articles.  *See*

ECF No. [280-20] at 5–6.

Grant's trial testimony supports a conclusion that Ronald did not appoint any directors of

Nexxt Gen after filing the Articles, either.  His testimony established only that Ronald was

originally the "sole shareholder" of Nexxt Gen, that Ronald "transferred ownership" of Nexxt Gen

to Grant in 2014, and that he made the transfer "informally" — father and son "discussed it," and

Grant "became the owner."  *See* ECF No. [297] at 136–37.  No one asked Grant whether his father

made him a director of Nexxt Gen at the time of the transfer or anytime thereafter.  Instead, Grant

was asked whether he paid his father anything for the transfer, which he could not recall. *See* ECF No. [297] at 138.   However, during discovery, Grant admitted in response to a Request for Admissions that he did not pay his father for his interest in Nexxt Gen.  *See* ECF No. [299] at 30. Grant was also asked to confirm (and did confirm) that "no share certificates exist" to demonstrate his ownership of Nexxt Gen before February 2019, which he had also admitted in discovery.  *See* ECF No. [299] at 30–31.

All of that adds up to this: Ronald was the sole incorporator of Nexxt Gen when he founded it in 2012; there is no evidence Ronald ever appointed anyone, even himself, to be a director of Nexxt Gen[8]; and without a director (or a Board of Directors), Nexxt Gen could not issue shares. *See In re Daly*, 655 B.R. at 272–74; Fla. Stat. § 607.0621(2)–(3). While that syllogism may appear to elevate "form over substance," *see* ECF No. [296] at 25, "where a party controls a closely held corporation and desires to establish important rights and interests through the corporation," following corporate formalities "is important."  *In re Daly*, 655 B.R. at 274 (quoting *Sackett*, 722 So. 2d at 276).   Accordingly, no matter what rights to Nexxt Gen the Shareholder Agreement purports to distribute, Ronald's failure to complete Nexxt Gen's organization precluded the company from being capable of lawfully issuing shares to anyone.  *See id.* at 271 (noting that "[w]ithout completing the organization" and "without electing directors to complete the organization," under "Florida Statutes section 607.0621" a company "could not yet issue any shares of stock").

But what about the exceptions?  It is true, of course, that a corporation can give the power to issue shares to its shareholders instead of to its Board of Directors.  *See* Fla. Stat. § 607.0621(1); *In re Daly*, 655 B.R. at 272.  The corporation must do so, however, in its Articles, *see* Fla. Stat.

---

[8] This includes Grant, who received his interest in Nexxt Gen informally, and (because he used the ambiguous "and/or") Ronald himself.

§ 607.0621(1); *In re Daly*, 655 B.R. at 272, and Nexxt Gen's Articles do not give its shareholders the power to issue shares directly, *see* ECF No. [280-20]. So even assuming Ronald attempted to issue his shares to Grant when he "transferred" Nexxt Gen, because it is not clear that Ronald was a director, the Court cannot conclude he had the power to do so. Similarly, even assuming Grant now holds Ronald's shares of Nexxt Gen, because it is not clear that Grant ever became a director, the Court cannot conclude he had (or has) the power to issue shares to Peyton and Martinez. So the first exception does not apply.

It is also true that shareholders can agree in writing to dispense with many of the corporate formalities Florida law requires, including having a board of directors at all. *See* Fla. Stat. § 607.0732(1)(a); *In re Daly*, 655 B.R. at 273. But there is no evidence that Nexxt Gen's shareholders did so. Nothing was presented at trial to suggest that Ronald, the only confirmed shareholder in Nexxt Gen, created such a writing. Grant's testimony established he never received share certificates from Ronald and did not pay Ronald for any uncertificated shares Ronald may have intended to give him, so it is unclear whether he ever became a shareholder who had the authority to create such a writing. *See* ECF No. [297] at 136–37; Fla. Stat. § 607.0621(3) ("Before the corporation issues shares, the board of directors must determine that the consideration received or to be received for shares to be issued is adequate."). Even assuming Grant, Martinez, and Peyton became equal shareholders of Nexxt Gen as of February 2019 (which, as the Court has already explained, they did not), the Shareholder Agreement itself makes clear that the three men intended for Nexxt Gen to *adhere* to corporate formalities, not ignore them. *See* ECF No. [280-1] at 2 (requiring share certificates to contain a conspicuous statement restricting transfer). So the second exception also does not apply.

Still, if Peyton and Martinez could somehow overcome that failure of corporate formality,

it is not the only one.  Assuming for argument's sake that Ronald did make Grant a director of Nexxt Gen, which Peyton and Martinez did not prove at trial, several other things had to happen before Grant could issue legally recognizable shares to Peyton and Martinez — through the Shareholder Agreement or otherwise.  First, Grant as director would have had to "authorize shares to be issued for consideration." *See* Fla. Stat. § 607.0621(2).  While some of the documentary evidence, like the Parties' March 2018 Letter of Understanding[9] and the Shareholder Agreement, contemplates Peyton and Martinez receiving shares, nothing in those documents indicates Grant made any kind of corporate resolution authorizing the issuance of shares. *See* ECF No. [280-1]; ECF No. [280-2]. Nor do those documents set out the consideration Peyton and Martinez would have paid for any shares. *See* ECF No. [280-1]; ECF No. [280-2].

Second, Grant as director would have had to "determine that the consideration received or to be received for shares to be issued is adequate." *Id.* § 607.0621(3).  It is true that the consideration does not have to be money or other tangible property and can instead be any "benefit to the corporation," even "services performed" or "promises to perform services evidenced by a written contract." *See* Fla. Stat. § 607.0621(2).  It is also true that other trial evidence established Peyton was offering his sales skills, Martinez was offering his field knowledge, and both men were offering their industry contacts.  *See* ECF No. [296] at 48.  But there is no indication that, as it relates to Nexxt Gen, Grant made any kind of determination that those offerings were adequate consideration for a one-third ownership interest in a multimillion-dollar business before any shares were issued.  The only assessment of the value of Peyton and Martinez's offerings that came into evidence was when the three men were in the process of forming Nuraxis, which was well after

---

[9] Grant, Martinez, and Peyton signed the Letter of Understanding, which preceded the Shareholder Agreement by almost a year, in March 2018.  *See* ECF No. [280-2].  It did not create any enforceable obligations on them but instead simply set the "foundation for what [they] were going to try and accomplish."  *See* ECF No. [296] at 188.

Nexxt Gen shares would have been issued. *See* ECF No. [281-16] at 1–2.

Third, to the extent Grant as director authorized the issuance of shares without certificates, *id.* § 607.0626(1), Nexxt Gen would have had to deliver to Peyton and Martinez within a "reasonable time after the issuance" a "written statement" that included at least Nexxt Gen's name, its status as a Florida corporation, the recipient's name, and the number and class of shares, *id.* § 607.0625(2); *id.* § 607.0626(2). The written statement would also have had to include details about the share class, if relevant, *see id.* § 607.0625(3), and any transfer restrictions, *see id.* § 607.0627(1)–(2). Although the Shareholder Agreement itself contains most of these details, it was not created *after* the issuance of any shares. *See* ECF No. [280-1]. In fact, the Shareholder Agreement assumes that Grant, Martinez, and Peyton are already shareholders who each hold a third of Nexxt Gen's shares. *See* ECF No. [280-1] at 1, 14 (defining "Shareholder" to include Grant, Martinez, and Peyton); ECF No. [280-1] at 8 (stating the "relative ownership" of each man is "33 1/3%").

Giving Peyton and Martinez every benefit of the doubt, even if all the above corporate formalities had been satisfied — if Nexxt Gen had a properly appointed Board of Directors (presumably Grant) and the Board authorized the Shareholder Agreement — the Board still would have had to issue the shares to them. The terms of the Shareholder Agreement require Grant, Martinez, and Peyton to vote "to elect each" of them "to the Board of Directors." *See* ECF No. [280-1] at 7. Assuming they complied with that directive, the Shareholder Agreement finally created a Board of Directors sometime between February 2019 (when it was signed) and August 2019 (when the first board meeting occurred). *See* ECF No. [296] at 97–105; ECF No. [280-16]; ECF No. [280-17]; *cf. In re Daly*, 655 B.R. at 271 (noting that the incorporator did not take the "next steps" required to issue stock "until nearly six years" after incorporation). Grant, Martinez,

and Peyton could have voted, as a Board, to issue shares to themselves at that first board meeting in August 2019, but they did not.  *See* ECF No. [280-16]; ECF No. [280-17].  Nor did they vote to issue shares at any subsequent board meeting.  *See* ECF No. [280-18].

There was ample evidence at trial about why they did not: because despite initially wanting to be issued shares of Nexxt Gen, Peyton and Martinez learned from Grant around the time of the first board meeting that "issuance of the shares of stock could be a taxable event to each of them."[10] *See* ECF No. [299] at 53.  In Peyton's words, they learned that if they filed their taxes as shareholders of Nexxt Gen, "the IRS was going to come" and "slap [them] with a million dollar tax bill."  *See* ECF No. [299] at 236.  And Martinez agreed that, according to the advice of a lawyer they consulted in October 2018, if they got shares of Nexxt Gen "without contributing something," they would have income tax consequences.  *See* ECF No. [297] at 52; ECF No. [280-6].  He confirmed that, despite that advice, the February 2019 Shareholder Agreement did not call for Peyton and Martinez to contribute anything but instead "called for [them] to accept those liabilities" without having any knowledge of what they might be.  *See* ECF No. [296] at 66; ECF No. [297] at 52.

Not wanting to incur the significant tax liabilities they were warned about, Grant, Martinez, and Peyton began exploring the idea of setting up a new company, Nuraxis, that would be structured to reflect each of their contributions at the outset.  *See* ECF No. [297] at 51; ECF No. [280-48] at 1.  In many email messages explaining this decision, including some to a former state appellate court judge, Peyton admitted that shares of Nexxt Gen "were never issued due to the tax implications."  *See* ECF No. [280-48] at 2.  According to Peyton, the choice not to have Nexxt Gen issue shares to him and Martinez was "purposeful[]."  *See* ECF No. [280-47] at 1 ("Key point:

---

[10] The Court need not decide whether this would indeed create a taxable event, only that Martinez and Peyton believed this to be true and, for that reason, decided not to receive shares.

Shares were never issued – purposefully due to the taxable event.").

When Peyton was asked at trial about his email messages admitting in 2021 that the decision not to issue shares of Nexxt Gen was purposeful and made to avoid unfavorable tax consequences, his explanation was: he lied. *See* ECF No. [300] at 22–24; ECF No. [257-1] at 181 (admitting that his emails to the former state appellate court judge giving them legal advice were "written to get rid of" Martinez and grab "any potential leverage point" he "could possibly find to solidify" his case, "[w]hether true, not, supposition, assumptions, whatever"). Peyton testified that Grant "asked" him "to be a 1099 contractor for the purposes of screwing over" Martinez "and trying to take his shares away." *See* ECF No. [300] at 23. He explained that he was playing "hardball" and was willing to "fall on [his] sword and essentially say" he and Martinez were both "just 1099 contractors" so that he and Grant would be "aligned." *See* ECF No. [300] at 22. He admitted that he sent those messages, which he now claims are inaccurate, because he and Grant "were seeking a favorable opinion" from the former state appellate court judge giving them legal advice "with respect to" Martinez's "shareholder status." *See* ECF No. [300] at 24. Specifically, they wanted a lawyer to advise them that Martinez "was not going to be a shareholder." *See* ECF No. [300] at 24.

The plan worked. The lawyer who received those messages did advise them to tell Martinez that "it appears under Florida law, neither Martinez nor" Peyton "has an ownership interest in" Nexxt Gen because "no shares issued" and both are "1099 contractors." *See* ECF No. [281-6] at 1; ECF No. [257-1] at 232–33 (admitting that, if Martinez is not a shareholder, Peyton would not be a shareholder for the same reason). The lawyer also advised them to tell Martinez that, if somehow either he or Peyton did have an ownership interest in Nexxt Gen, "the company will have to issue shares and everyone will bear the tax consequences of that event." *See* ECF No.

[281-6] at 1.  The result of that advice appears to be that, after Grant and Peyton booted Martinez

from Nexxt Gen in 2021, they did not hear from him again until Peyton contacted him about this

lawsuit.  *See* ECF No. [296] at 172; ECF No. [257-1] at 240–41.

Finally, even if the Court could forgive the multiple failures to follow the corporate

formalities required to properly issue shares of stock from a Florida corporation, there is one last

reason Peyton and Martinez have not carried their burden to show that they are shareholders of

Nexxt Gen.  While there is some evidence in the terms of the Shareholder Agreement that the

document was attempting to issue shares to Peyton and Martinez such that it may, if viewed

generously, be able to substantially satisfy § 607.0626's requirements for the writing that must

accompany shares issued without certificates, there is just as much evidence contradicting that

view.  In addition to much of the evidence already described above, including Peyton's repeated

assertions to a lawyer that he and Martinez were merely 1099 contractors (false though he now

claims those statements to be), there are the Parties' own tax filings.  For the relevant tax years,

Grant is identified as the 100% owner of Nexxt Gen, *see* ECF No. [281-17] at 14; *see* ECF No.

[281-18] at 18, while Martinez never reported himself to the IRS to be a shareholder, *see* ECF No.

[281-20], ECF No. [281-21], ECF No. [281-22]; ECF No. [297] at 57–66.  Instead, Martinez

claimed all the income he received from Nexxt Gen as regular business income through his

personal consulting business.  *See* ECF No. [281-20], ECF No. [281-21], ECF No. [281-22]; ECF

No. [297] at 57–66.

Ultimately, the sum of the evidence demonstrates that Nexxt Gen did not complete its

organization until, at the earliest, sometime in 2019.  *See In re Daly*, 655 B.R. at 275.  And Nexxt

Gen's Board of Directors, once it was properly established (assuming one was established), never

properly issued shares to Peyton and Martinez.  Because corporate formalities are "the method by

which sophisticated businessmen make their contractual rights definite and limit the authority of courts to undo their deal," *id.* at 274 (quotation marks omitted), "a person acting through a corporation disregards these formalities at his or her risk," *id.* at 275–76. But as the Court's multi-tiered, "even if" analysis shows, relaxing those corporate formalities would not save Peyton and Martinez here because the evidence shows, at best, contradictory messages about whether they ever became shareholders in Nexxt Gen and, at worst, that the decision not to issue shares was purposeful and (at least in their opinion at the relevant time) beneficial to them.

For all those reasons, the Court **FINDS** that Peyton and Martinez **ARE NOT** shareholders of Nexxt Gen.[11] Accordingly, the Court **FINDS** in favor of Grant and against Peyton on Count 9 of Peyton's Second Amended Complaint as it relates to the shareholder issue. The Court also **FINDS** in favor of Grant and against Martinez on Count 1 of Martinez's Amended Intervenor Complaint. As to Count 2 of Martinez's Amended Intervenor Complaint, which asks the Court to declare that he is a shareholder and board member of all the Nexxt Companies, the Court **FINDS** in favor of Grant and against Martinez as to all the included companies except for Nuraxis, LLC, NextGen LLC, and Skyaxis Communications, LLC as the Parties do not dispute[12] — and the evidence supports — that all three individuals are co-equal members of Nuraxis, LLC, which owns NextGen LLC and Skyaxis Communications LLC. *See* ECF No. [296] at 132; ECF No. [280-24] at 1.

---

[11] Because the Court finds that Peyton and Martinez failed to carry the burden of proof to establish their *prima facie* case, the burden has not shifted to Grant to prove his affirmative defenses. For that reason, the Court does not address Grant's affirmative defenses of waiver and estoppel.

[12] In his Proposed Findings of Fact and Conclusions of Law, Grant agrees that "it is undisputed that Grant, Peyton, and Martinez are co-equal members of Nuraxis, LLC, which in turn owns Next Gen LLC and Skyaxis." *See* ECF No [304-1] at 37.

**B. Are Grant, Martinez, and Peyton equal one-third partners in a joint venture business of providing network, communications, engineering, and consulting services to the oil and gas industry?**

In Count 9 of his Second Amended Complaint, Peyton asks the Court to declare that he and Martinez are each "equal one third (1/3) . . . owners of" a "joint venture business of providing network, communications, engineering and consulting services to the oil and gas industry." *See* ECF No. [162] at 3, 37. And in Count 3 of his Amended Intervenor Complaint, Martinez asks the Court to declare, among other things, that he "is an equal one third partner in the Joint Business Venture (namely providing network, communications, engineering and consulting services to the oil and gas industries) by virtue of their common interest in the business conducted by" Nexxt Gen and the Nexxt Companies. *See* ECF No. [163] at 30.

To prove their entitlement to that relief, Peyton and Martinez must show by a preponderance of the evidence all six elements of a Florida joint venture: (1) an express or implied contractual relationship; (2) a common purpose; (3) a joint proprietary interest in the subject matter; (4) the right to share profits; (5) the duty to share losses, and (6) joint control or right of control. *Williams*, 314 F.3d at 1275–76; *see also Browning*, 918 F.2d at 1521. This test is conjunctive, which means the absence of any element defeats a party's claim that a joint venture existed. *See Williams*, 314 F.3d at 1276. Peyton and Martinez have failed to establish at least two of them.

First, the baseline requirement for a joint venture in Florida, as with any partnership, is a contract. *See id.* at 1275–76. And "for a contract to be binding and enforceable, there must be a meeting of the minds." *See Browning*, 918 F.2d at 1521 ("Beyond the law of joint ventures, it is a fundamental principle of contracts that in order for a contract to be binding and enforceable,

26

there must be a meeting of the minds on all essential terms and obligations of the contract."). Here, although Peyton and Martinez each allege that a three-way joint venture existed between the Parties since "at least February 2016," *see* ECF No. [162] at 4; ECF No. [163] at 27, the evidence does not support such a finding. Instead, the trial evidence demonstrates, at best, inconsistent recollections and, at worst, deliberate lack of candor.

For example, Martinez testified that he met Peyton in 2011 or 2012 through their work at IBM and that he met Grant in 2014 through Peyton. *See* ECF No. [296] at 45–46. But he also said, in response to questions about what he and Peyton were doing for Nexxt Gen as of October 2018, that he had been doing everything he "had been doing since 2012" and Peyton was doing the "same thing he's been doing since . . . 2011." *See* ECF No. [296] at 62–63. He testified that, as far as he was aware, Nexxt Gen was doing "nothing" in 2015 and 2016 and that he was not "receiving any money at that time" from Nexxt Gen. *See* ECF No. [296] at 47–48. But he also said that the Parties "moved [their] subcontractors over to" Nexxt Gen in "late 2014, maybe '15" and that a large company became Nexxt Gen's customer in 2016. *See* ECF No. [296] at 194, 196. He explained that, at some point, though he did not say exactly when, he, Peyton, and Grant decided they "would go ahead and look at a partnership that" would allow them "to utilize all of [their] aspects of what [they] had and contributions." *See* ECF No. [296] at 48. But he also said the Parties' "ultimate goal was always to be a shareholder, get a shareholder agreement signed," which was frustrated by "excuses, delays," and "unwillingness to really commit to anything." *See* ECF No. [296] at 59.

Later, he testified that "Peyton and [he] have been and Grant have been operating as a partnership since 2016." *See* ECF No. [296] at 50. He added that he and Peyton had been "after" Grant to get their partnership "formalized" but that, because of Grant's "delays and excuses," they

did not get any formal documents until March 2018, when they signed the Letter of Understanding. *See* ECF No. [296] at 50.  And, by that point in 2018, the business was "developed" enough to be "delivering services" to customers and having customers signing contracts or purchase orders with Nexxt Gen.  *See* ECF No. [296] at 50.  Literally seconds after that testimony, however, Martinez said that Nexxt Gen "was just a shell of a name at that point, really," and that "any type of business coming into it from [the] joint venture was brought in by" him and Peyton through their "business relations customers since 2012, 2016 through 2018 of this letter."  *See* ECF No. [296] at 51.

As that recitation demonstrates, Martinez was likely telling the truth when he testified that he has "trouble remembering . . . some things," particularly when "it's so long ago."  *See* ECF No. [296] at 201.  Indeed, during the same day of testimony, Martinez testified both that he and Peyton were doing for Nexxt Gen in 2018 the same things they had been doing since 2012 and 2011 respectively and also that he did not even meet Grant, who owned Nexxt Gen, until 2014.  He testified that Nexxt Gen was doing nothing in 2015 and 2016 but also that the Parties moved subcontractors to Nexxt Gen in late 2014 or 2015 and a large company became Nexxt Gen's customer in 2016.  He testified that the Parties decided to develop a partnership but also that their ultimate goal was always to get a shareholder agreement signed.  And he testified that Nexxt Gen was developed enough in 2018 to be signing and servicing customers but also that it was just, at that point, a shell of a name.  Given those discrepancies, the Court views Martinez as an unreliable historian[13] and, accordingly, affords his testimony little weight.

Peyton, on the other hand, is more than an unreliable historian.  By his own admission, he lies to suit his agenda *du jour*.  As already discussed in Section III.A, if Peyton is to be believed

---

[13] The Court notes, however, that Martinez is not entirely innocent of bad behavior.  As he admitted in a text message to Peyton during this lawsuit, he "love[s] poking" Grant "every chance [he] get[s]."  *See* ECF No. [281-33] at 8.

now, he deliberately and repeatedly lied to a former state appellate court judge who had been hired to advise Nexxt Gen about how to handle Martinez after he was fired in 2021.  *See* ECF No. [300] at 22–24; ECF No. [257-1] at 181, 232–33.  Peyton told the former judge in 2021 that he and Martinez were Nexxt Gen's contractors, not its shareholders, which he testified at trial is the real truth (conveniently for his position in this lawsuit).  *See* ECF No. [300] at 23.  Peyton told the former judge what he needed to hear to get from him the favorable legal opinion Peyton wanted — that Martinez was not a shareholder.  *See* ECF No. [300] at 24.  It is hard not to wonder if Peyton is telling this judge what she needs to hear to get from her the favorable legal ruling he wants now — that he and Martinez are shareholders and joint venturers.  Put bluntly, either Peyton was lying to that former judge then, as he testified, or he is lying to this judge now.

Although there is no way to know for sure, there is evidence suggesting it is the latter. Among that evidence, once again, are Peyton's own words.  In a text message to Martinez days after the hearing on their joint Motion for Contempt, Peyton declared himself "still decent at making up bullshit on the fly."  *See* ECF No. [281-34].  While the message does not necessarily mean that Peyton lied to the Court at that hearing, it certainly acknowledges that he views quick-thinking deception as a virtue.

Additional trial evidence supports that idea.  There was the October 2019 email from Peyton to Grant revealing that Peyton had "doctored" a federal tax form to make it appear that his wife had worked for Nexxt Gen so that she herself could misrepresent her work history to a potential employer, *see* ECF No. [281-24], with the actual forged form attached, ECF No. [281-25].  And there were Peyton's text messages to Martinez asking him to lie to Daniel Levi, a frequent creditor and collaborator of Nexxt Gen, about whether Peyton and Martinez knew Grant was going to pay Martinez back a $330,000 loan Martinez had made to Nexxt Gen using money

from an account connected to Levi.  *See* ECF No. [281-33] at 5–7.  (They knew.) Even though Martinez at first tried to push back, arguing that they "should just tell" Levi the truth, he eventually gave in to Peyton's request that he "play fucking stupid" so that Peyton would not "look real bad" for lying already.  *See* ECF No. [281-33] at 5–7; ECF No. [256-1] at 119–20.

Given those instances of admitted dishonesty, the Court views Peyton's testimony as not credible and, accordingly, affords his testimony even less weight than it does that of Martinez.  But even if Peyton were wholly credible, his testimony would not add any support to their argument that there was a meeting of the minds about the creation of a joint venture since at least 2016.  That is because Peyton testified not that he, Martinez, and Grant orally formed a three-way partnership in 2016 but instead that he, Martinez, Grant, and Levi "essentially forged a four-way partnership." *See* ECF No. [299] at 172, 194.  There can be little doubt that a meeting of the minds on essential terms includes the identity of all contracting parties.  *See Browning*, 918 F.2d at 1521.  Here, the testimony of Martinez and Peyton is inconsistent regarding the members of the joint venture at the time it was allegedly formed.

Because Martinez's testimony was generally unreliable on dates and offered no real details about when exactly any alleged joint venture began, and because Peyton's testimony was broadly dubious and offered details that revealed the alleged 2016 joint venture was not the same three-way partnership his claims now assert, the Court **FINDS** that the preponderance of the evidence does not show that there was ever a meeting of the minds sufficient to create an implied contract. *See id; see also Browning*, 918 F.2d at 1520 (quoting *Kislak*, 95 So. 2d at 515) ("the very fact that the agreement was not reduced to writing is evidence, however slight, that no such agreement actually existed.").  And because the baseline requirement for a joint venture in Florida is a contract, the Court also **FIND**S that Peyton and Martinez have not proved by a preponderance of

the evidence each element of their alleged joint venture.  *See Williams*, 314 F.3d at 1275–76. Finally, because the absence of any element defeats a party's claim that a joint venture existed, the Court **FINDS** that Peyton and Martinez have not established the existence of a joint venture between them and Grant beginning in 2016.  *See id.* at 1276.

Even if the testimony supported the existence of an implied contract, however, Peyton and Martinez would still not have satisfied their burden because they fail on another element: the duty to share in the alleged joint venture's losses.  In support of that element, Martinez testified that he and Peyton agreed in August <u>2019</u> to take on Nexxt Gen's tax and workmanship liabilities for 2016 through 2018.  *See* ECF No. [296] at 70–71, 97, 102, 111.  Peyton testified to roughly the same thing, though he added that they agreed to take on those liabilities because they thought it was "fair" and because Grant wanted them to do so before he would sign the Shareholder Agreement.  *See* ECF No. [299] at 236–37.  And in an email to the lawyer Peyton hired to help them draft the Shareholder Agreement, Grant did, in fact, insist on Peyton and Martinez taking on those liabilities because the three men had been sharing the benefits of the business for "several years," but he alone bore "100% of the risk" and continued "to warranty the services."  *See* ECF No. [280-5] at 1.  The reason Grant insisted, however, was because Peyton originally tasked the lawyer with creating a "safe harbor" provision that would leave "any issues, responsibilities or problems of the company prior to the 2018 tax year," including "liability," with Grant.  *See* ECF No. [280-4] at 5.

Peyton also testified that, when the four-way partnership was formed in 2016, "all" of them agreed to take on the liabilities, but "primarily" him.  *See* ECF No. [299] at 172.  He then clarified that the "liability" he was referring to is that he "put about $400,000 on [his] credit cards and essentially funded the entire operation" to win a large client contract around 2017.  *See* ECF No.

[299] at 172.  He also noted that Martinez "put money in the company and use[d] his credit cards" to help fund it, including personal guarantees of about $100,000, but that Grant did not.  *See* ECF No. [299] at 173–74.  Although Peyton testified that the three (or four) men agreed to share the alleged joint venture's losses and that Martinez and Peyton "picked up the entire tab on [their] personal cards" to cover expenses in the early years, *see* ECF No. [299] at 175, that testimony is uncorroborated, and as the Court has already explained, Peyton's testimony, standing alone, is not credible.

Even giving Martinez and Peyton the benefit of the doubt, their testimony tends to show that they contributed capital and loans to the business in the years before the February 2019 Shareholder Agreement.  And capital contributions and business loans are not the same as taking on an equal share of the losses of the business itself.  As to their assumption of the business's tax and workmanship liabilities for 2016 through 2018 in the Shareholder Agreement, the reality is that the assumption — and Peyton's initial insistence on a safe harbor provision — actually shows there was no agreement in 2016 to share in the losses.  If the three men had really agreed at the outset of the alleged joint venture in 2016 to share the business's losses equally, there would have been no need in 2018 for either Peyton's safe harbor provision or Grant's demand to remove that provision and add one in which they all agreed to assume the losses.  And in any event, Peyton and Martinez's 2018 decision to absorb their share of the losses is not probative of whether they agreed to share in the liabilities in 2016 when the joint venture was allegedly formed, which is the relevant timeframe.  The same is true of Martinez's 2021 personal guaranty of a $100,000 credit application, which occurred five years after the alleged formation of the joint venture.

Accordingly, the Court **FINDS** that the preponderance of the evidence does not show that there was an agreement in 2016 to share the losses of the business equally. And because Florida

joint ventures require that component, the Court also **FINDS** that Peyton and Martinez have not proven by a preponderance of the evidence each element of their alleged joint venture.  *See Williams*, 314 F.3d at 1275–76.  Finally, because the absence of any element defeats a party's claim that a joint venture existed, the Court **FINDS** that Peyton and Martinez have not established the existence of a joint venture between them and Grant beginning in 2016.[14]  *See id.* at 1276.

---

[14] The Court notes there was some evidence at trial tending to show that, around the time of the Shareholder Agreement in 2019, the Parties may have finally reached a meeting of the minds about forming a three-person joint venture in which they shared losses equally.  Specifically, the Shareholder Agreement itself evidences a contract between the Parties that includes the assumption of liabilities provision Grant requested and Martinez and Peyton accepted.  *See* ECF No. [280-1].  But even read broadly, Peyton and Martinez did not allege in their operative complaints that the Parties formed a joint venture in 2019, even as an alternative to the shareholder status they did allege.  *See generally* ECF No. [162]; ECF No. [163].  Instead, they alleged that the joint venture was formed in at least 2016 and then memorialized in 2019.  *See* ECF No. [163] at 27–28.  But the Court has found that Peyton and Martinez have not carried their "heavy and difficult burden to establish" a 2016 "joint venture absent an express agreement," *Slaihem*, 148 F. Supp. 2d at 1348; *see also Miami-Dade Cnty.*, 345 F. Supp. 2d at 1351, and the Parties cannot memorialize something that did not exist in the first place. And because the "plaintiff is the master of the complaint," who "selects the claims that will be alleged," the Court cannot and will not reform their pleadings to assert this potential claim for them.  *See, e.g.*, *United States v. Jones*, 125 F.3d 1418, 1428–29 (11th Cir. 1997).

Similarly, in the course of its own research into the legal issues relevant here, the Court uncovered case law suggesting that the Statute of Frauds might operate to prohibit Peyton and Martinez's joint venture claims because the Parties clearly intended for any joint venture to last longer than one year.  *See, e.g.*, *Taxinet, Corp. v. Leon*, No. 16-CV-24266-, 2020 WL 4501938, at *6–7 (S.D. Fla. May 28, 2020), *R.&R. adopted*, No. 16-CV-24266, 2020 WL 6882205 (S.D. Fla. Nov. 24, 2020), *aff'd*, 114 F.4th 1212 (11th Cir. 2024); *Hughes v. Priderock Cap. Partners, LLC*, No. 18-CV-80110, 2018 WL 3699348, at *2–3 (S.D. Fla. May 31, 2018), *R.&R. adopted*, No. 18-CV-80110, 2018 WL 3699309 (S.D. Fla. June 18, 2018); *Browning v. Poirier*, 165 So. 3d 663, 664–66 (Fla. 2015).  The Court directed the Parties to submit supplemental briefing on the issue, which they did.  *See* ECF No. [329]; ECF No. [330].  Having reviewed those briefs, the Court **FINDS** that, because Peyton and Martinez did not have notice that the Statute of Frauds could be an issue in time to make their arguments about it during the bench trial, Grant has waived the defense. *See, e.g.*, *Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263–64 (11th Cir. 1988) (noting the general rule that, when a party fails to raise an affirmative defense in the pleadings, the party waives its right to raise the issue at trial but explaining that the "purpose of [Federal Rule of Civil Procedure] 8(c) is simply to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that he or she is prepared to properly litigate it," but when "a plaintiff has notice that an affirmative defense will be raised at trial, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice").

## IV.     CONCLUSION

For the reasons explained above, the Court finds that Martinez and Peyton have failed to prove by a preponderance of the evidence either that Martinez, Peyton, and Grant are each one-third owners of all the Nexxt Companies, except for Nuraxis, LLC, which owns NextGen LLC and Skyaxis Communications, LLC, or that Martinez, Peyton, and Grant are equal one-third partners in a joint venture business of providing network, communications, engineering, and consulting services to the oil and gas industry.  As a result, Martinez and Peyton have not met their burden of proof.  *See Am. Marine Tech.*, 526 F. Supp. 3d at 1245.  Accordingly, on the Ownership Issue, the Court finds **IN FAVOR** of Grant and **AGAINST** Martinez and Peyton except as it relates to the ownership of Nuraxis LLC.  These findings, the Court's legal conclusions in Section II.A, and the Court's factual findings in Section II.B.2 are now the law of the case, and the Parties **SHALL** abide by them as this litigation continues.  *See State Farm Mut. Auto. Ins. Co. v. Williams*, 824 F.3d 1311, 1314 (11th Cir. 2014) ("Under the law-of-the-case doctrine, when a court decides an issue of law, that decision is generally binding in subsequent proceedings.").

**DONE** and **ORDERED** in Chambers in Miami, Florida on August 28, 2025.

**MARTY FULGUEIRA ELFENBEIN**
**UNITED STATES MAGISTRATE JUDGE**

Cc: All Counsel of Record

34