# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 24-CV-21649-ELFENBEIN

**DAVID PEYTON**,

        Plaintiff,

v.

**ERIC K. GRANT**,

        Defendant.

_____/

## ORDER ON PLAINTIFF/COUNTER-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT/COUNTER-PLAINTIFF'S COUNTERCLAIMS

**THIS CAUSE** is before the Court on Plaintiff/Counter-Defendant David Peyton's

("Plaintiff") Motion for Summary Judgment on Defendant/Counter-Plaintiff Eric K. Grant's

("Defendant") Counterclaims, (the "Motion"), ECF No. [342].  Having reviewed the Motion, the

Response and Reply, as well as the record[1] and relevant law, Plaintiff's Motion, **ECF No. [342]**,

is **GRANTED**.

---

[1] The Court takes the information in this section from the full summary judgment record, including Plaintiff's Second Amended Complaint (the "Complaint"), Defendant's operative Answer and Affirmative Defenses and Counterclaim (the "Counterclaim"), Plaintiff's Answer to the Counterclaim, the Parties' motions for summary judgment and responses thereto, statements of material fact and responses thereto, and the documentary evidence on the docket.  *See, e.g.*, ECF No. [162]; ECF No. [282]; ECF No. [342]; ECF No. [343]; ECF No. [345]; ECF No. [345-1]; ECF No. [359]; ECF No. [360]; ECF No. [373]; ECF No. [373-1]; ECF No. [375]; ECF No. [375-1]; ECF No. [382]; ECF No. [383]; ECF No. [383-1]; *Zurich Am. Ins. Co. v. Nat'l Specialty Ins. Co.*, 246 F. Supp. 3d 1347, 1354–55 (S.D. Fla. 2017).  As required on summary judgment, the Court considers these "facts" in the light most favorable to the non-moving party, meaning Defendant on Plaintiff's Motion for Summary Judgment, and Plaintiff on Defendant's Motion for Summary Judgment.  *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006) ("Even though the facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case," a court's "analysis for purposes of summary judgment must begin with a description of the facts in the light most favorable to the" non-moving party. (citations and quotation marks omitted)).

## I.  INTRODUCTION

This business dispute arises from the Parties' relationship with Nexxt Gen Corporation ("Nexxt Gen"), including disagreements about their respective ownership and roles, and allegations of misuse of company resources.  Plaintiff originally brought this action individually and as a shareholder of Nexxt Gen against Defendant and Nexxt Gen.  *See* ECF No. [162].  The Second Amended Complaint, which is the operative pleading ("the Complaint"), alleges that Defendant used his control over Nexxt Gen's finances to make unauthorized transfers and expenditures, including moving Nexxt Gen money to another entity co-owned by the Parties, Holliday Process Solutions, LLC ("HPS"), and into Defendant's personal retirement accounts.  *See id*. at ¶¶67-77.  Plaintiff alleges that these actions violate Section 8 of the Shareholder Agreement that required specified approvals for spending or transfers.  *See id*.  In connection with these allegations, Plaintiff brings fourteen claims: (1) fraudulent transfers to HPS (Count I); (2) fraudulent transfers to TD Ameritrade (Count II); (3) conversion of funds to HPS (Count III); (4) conversion of funds to pension funds (Count IV); (5) breach of contract (Count V); (6) negligence (Count VI); (7) gross negligence (Count VII); (8) fraud in the inducement/fraudulent misrepresentation (Count VIII); (9) declaratory judgment (Count IX); (10) constructive trust on pension accounts (Count X); (11) breach of fiduciary duty (Count XI); (12) unjust enrichment (Count XII); (13) quantum meruit (Count XIII); and (14) false informational return in violation of 26 U.S.C. § 7430 (Count XIV).  *See id*. at 21-43.

On February 28, 2025, the Court dismissed Counts I, II, and III with prejudice.  *See* ECF No. [259] at 3.  On August 28, 2025, after the Court bifurcated the case to determine, *inter alia*, whether Plaintiff held any equity interest in Nexxt Gen as a shareholder under the Shareholder Agreement, and whether Plaintiff established the existence of a joint venture with Defendant, the

Court determined that Plaintiff never became an owner or shareholder of Nexxt Gen.  *See* ECF No. [331] at 25, 34; ECF No. [160].  Accordingly, the Court found in favor of Defendant and against Plaintiff on Count IX of the Complaint.  *See id*. at 25.  Plaintiff's remaining claims include Counts IV-VIII and X-XIII.

In Defendant's Answer and Counterclaim (the "Counterclaim"), Defendant asserts a different set of allegations.  *See* ECF No. [282].  Defendant alleges Plaintiff diverted Nexxt Gen business and customer relationships to NexxtGen Communications Holdings, LLC ("NGVSAT"), a corporation wholly owned by Plaintiff, "with the intent to personally capitalize on the profits and utilizing Nexxt Gen funds as overhead."  *See id*. at ¶18.  In connection with these allegations, Defendant brings six claims: (1) breach of fiduciary duty (Count I); (2) waste of corporate assets (Count II); (3) tortious interference with a contractual relationship (Count III); (4) tortious interference with a business relationship (Count IV); (5) conversion (Count V); and (6) unjust enrichment (Count VI).  *See id*. at 30-34.

On September 22, 2025, the Parties filed their respective Motions for Summary Judgment requesting the Court grant summary judgment on the opposing Party's claims.  *See* ECF No. [342]; ECF No. [345].  Plaintiff's Motion argues that Defendant's Counterclaims are merely different labels for the same core accusation — that Plaintiff diverted Nexxt Gen's business, money, or assets to NGVSAT — and that the accusation "never occurred."  *See* ECF No. [342] at 1.  Plaintiff's theme is that NGVSAT never conducted any business, never competed with Nexxt Gen, and its bank account records "clearly show that no business was ever conducted" and no benefit was obtained, so there is "no basis" for any of Defendant's Counterclaims.  *See id*. at 1-4.

Defendant thereafter filed his Response in Opposition to the Motion (the "Response"), ECF No. [359], wherein Defendant opposes Plaintiff's Motion on Counts I, II, V, and VI of the

Counterclaim and concedes that Counts III and IV for tortious interference do not survive summary judgment.  *See* ECF No. [359] at 3; ECF No. [373] at 8.  Defendant puts forth evidence of Nexxt Gen's relationship with Brookfield Power US Asset Management LLC ("Brookfield"), arguing that Brookfield is a Nexxt Gen customer and Plaintiff, on behalf of NGVSAT, performed Nexxt Gen's duties to Brookfield, thereby misappropriating Nexxt Gen's assets and diverting its expected revenues.  *See id*. at 7-8, 9-10.  On October 17, 2025, Plaintiff filed his Reply in Support of the Motion (the "Reply").  *See* ECF No. [373].  The Motion has been fully briefed and is ripe for review.

## II.  FACTUAL BACKGROUND[2]

It is undisputed that Plaintiff formed NGVSAT on May 23, 2023 and that he is its majority member.  *See* ECF No. [373-1] at ¶¶1-2.[3]  The Parties agree that NGVSAT is referred to as such in this litigation, and generally outside of it, but dispute whether NGVSAT is also referred to as NGC, NGC Holdings, NGC Communications, and/or NGC Comms.  *See id*.  It is undisputed that NGVSAT banked only with Wells Fargo.  *See id*. at ¶¶5–7.  Plaintiff asserts, and Defendant disputes through his own additional facts, that Plaintiff never stole business from Nexxt Gen generally or routed it to NGVSAT, Plaintiff never diverted customers from Nexxt Gen to

---

[2] "All material facts in any Party's Statement of Material Facts may be deemed admitted unless controverted by the other Party's Statement of Material Facts, provided that: (i) the Court finds that the material fact at issue is supported by properly cited record evidence; and (ii) any exception under Fed. R. Civ. P. 56 does not apply."  S.D. Fla. L.R. 56.1(c).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may… consider the fact undisputed for purposes of the motion…"  Fed. R. Civ. P. 56(e).  Anything not expressly disputed is, therefore, deemed admitted.  The Court also noted this Rule in the Order Granting Motions to Bifurcate and Setting Trial and Pretrial Schedule.  *See* ECF No. [160] at 5.

[3] For efficiency, the Court cites Plaintiff's Reply Statement of Material Facts ("SMF"), ECF No. [373-1], which consolidates and references the assertions and positions from Plaintiff's SMF, Defendant's Response SMF, and Plaintiff's Reply SMF.

NGVSAT, or any other company, and that Plaintiff has never used Nexxt Gen resources for the benefit of NGVSAT.  *See id*. at ¶¶8–11.

Plaintiff also asserts, but Defendant failed to dispute, the following facts.[4]  NGVSAT never operated, received any benefit from any source, nor had any debt.  *See id*. at ¶¶12–13, 18.  Plaintiff has never allowed anyone to steal business from Nexxt Gen or to divert customers from Nexxt Gen to NGVSAT, and Plaintiff has never used Nexxt Gen resources for NGVSAT's benefit.  *See id*. at ¶¶14–16, 22.  Plaintiff never paid commissions to route business to NGVSAT, nor directed Nexxt Gen clients to pay NGVSAT.  *See id*. at ¶¶19–22.  Plaintiff has never been enriched by Nexxt Gen through any process involving NGVSAT.  *See id*. at ¶24.  Plaintiff has never paid or moved Nexxt Gen funds to, or otherwise enriched, DLL Enterprises or Sagenet outside the regular course of business as Nexxt Gen's agent and subject to contracts and invoices from Sagenet.  *See id*. at ¶23.  Plaintiff has never secured any debt for NGVSAT using Nexxt Gen's name or credit.[5] *See id*. at ¶¶17–18.

Also undisputed, on February 14, 2025, Plaintiff provided the Receiver's partner, Hernan Serrano, full access to NGVSAT's Wells Fargo accounts; nevertheless, Serrano never accessed the accounts.  *See id*. at ¶¶26–28.  Despite conducting a months-long investigation that included depositions, production of thousands of emails, and entire banking records, Serrano ultimately discovered no diversion of Nexxt Gen business to NGVSAT.  *See id*. at ¶¶29–31.

---

[4] Defendant failed to respond to paragraphs 12 through 32 of Plaintiff's SMF.  *See generally* ECF No. [360]. Accordingly, the Court treats these facts as undisputed if supported by Plaintiff's asserted evidence.  *See* S.D. Fla. L.R. 56.1(c); Fed. R. Civ. P. 56(e).

[5] Plaintiff, however, admits to using Nexxt Gen's credit information for the purpose of obtaining credit for NGVSAT; although Plaintiff disputes that this application was consummated and any credit was ever acquired.  *See id*. at ¶20.

Defendant's Additional Material Facts describe Nexxt Gen's relationship with Brookfield and the Parties' disputes arising from Starlink-related activity. *See* ECF No. [360] at ¶¶12–25. Defendant contends Brookfield has been Nexxt Gen's satellite internet service and telecommunications equipment customer since August 22, 2019, relying on an Internet Access Service and Equipment Purchase Agreement (the "IAS Agreement"). *See id*. at ¶13. Plaintiff disputes Defendant's characterization of Brookfield as a Nexxt Gen "customer," contending instead that Brookfield is (and has always been) a SageNet customer and that Nexxt Gen merely served as a billing passthrough for SageNet. *See* ECF No. [373-1] at p. 7-8, ¶¶13-14.[6] Plaintiff does not, however, dispute the existence or validity of the IAS Agreement and cites it in support of the dispute. *See id*. Because Plaintiff's dispute is directed at the IAS Agreement's interpretation, the Court looks to the contract's plain language.[7] The IAS Agreement is, on its face, "by and between" Nexxt Gen and Brookfield, and sets out payment terms between those parties, and contains no provision stating that Nexxt Gen is acting as a billing agent for SageNet or that Brookfield is a party to a separate SageNet contract. *See* ECF No. [360] at 110. It references SageNet only in describing certain Network Operations Center ("NOC") access and related monitoring services within the Nexxt Gen–Brookfield contractual framework. *See id*. at 111.

---

[6] Because Defendant failed to respond to all of Plaintiff's material facts, Plaintiff's Reply SMF contains duplicative paragraph numbers from 12 to 32; accordingly, the Court will omit page pin cites when citing to paragraph numbers 1 through 32 from Plaintiff's Reply SMF, but will include page pin cites when citing to Plaintiff's responses to Defendant's Additional Material Facts.

[7] "Contract interpretation is a matter of law to be determined by the Court." *Stevens v. Penn Nat'l Gaming Inc.*, No. 11-CV-20214, 2011 WL 13223519, at *3 (S.D. Fla. Oct. 17, 2011) (citing *Technical Coating Apps., Inc. v. U.S. Fid. & Guar. Co.*, 157 F.3d 843 (11th Cir. 1998)). "When the language of a contract is clear and unambiguous, its interpretation or construction is a matter of law." *Id*. (quoting *Action Nissan, Inc. v. Hyundai Motor Am.*, 617 F. Supp. 2d 1177, 1187 (M.D. Fla. 2008)) (internal quotation marks omitted).

Accordingly, the IAS Agreement does not support Plaintiff's proposed interpretation, and there is no genuine dispute of material fact that Brookfield is a Nexxt Gen customer under the IAS Agreement.[8]

The Parties agree that, separate from Nexxt Gen's "hub" business, Nexxt Gen has offered Starlink-related services, including selling Starlink equipment, installing Starlink kits, and reselling Starlink satellite internet service. *See* ECF No. [373-1] at 7, ¶15. Plaintiff disputes that Nexxt Gen was an authorized Starlink reseller and characterizes Starlink-related services as unlawful, but does not otherwise dispute that Nexxt Gen engaged in Starlink-related activity. *See id.* In February 2024, Plaintiff admits that he prepared an installation guide bearing NGVSAT branding and had it sent from an "@ngvsat.com" email address with instructions to deliver it to Brookfield and that Brookfield received the guide. *See id.* at 7-8, ¶16. Plaintiff characterizes the guide as a self-installation brochure prepared to demonstrate project complexity in hopes of being hired. *See id.*

It is undisputed that, at least by March 2024, Plaintiff created a Starlink account bearing the name "NGC Comms" and used it to purchase Starlink subscription services for, among others, Brookfield; after the Receiver took control of that account, Plaintiff demanded it be returned and stated it was paid for using his personal credit card. *See id.* at 8, ¶¶17–18. It is also undisputed that that the Receiver discovered that Plaintiff "never caused Nexxt Gen to invoice" Brookfield for the more than a year of Starlink subscription services paid for by Nexxt Gen. *See id.* at 9, ¶22. Additionally, Defendant contends that the Receiver discovered that Plaintiff ordered dozens of Starlink kits "on behalf of NGVSAT," had the kits delivered directly to Brookfield, and had Nexxt

---

[8] The Court notes Plaintiff's inconsistent statements relating to Brookfield's status as a client but needs not address this as the Court can find based on the IAS Agreement that Nexxt Gen and Brookfield had a contractual relationship. *See id.* at ¶¶23-24.

Gen pay for them; Plaintiff disputes that characterization and contends the kits were purchased on behalf of Nexxt Gen, Plaintiff and Martinez approved the purchase, the kits were purchased through Plaintiff's personal Best Buy account solely to obtain military discounts, and were ultimately paid for by Brookfield Power. *See id.* at 9-10, ¶¶19, 21.

Against that backdrop, the Parties agree that, on July 3, 2025, the Receiver authorized Nexxt Gen to invoice Brookfield for Starlink kits and for the Starlink subscription services and Nexxt Gen sent those invoices. *See id.* at 9, ¶¶21-22. The Parties dispute who paid for the subscriptions in the first instance — Defendant contends Nexxt Gen paid for more than a year of subscriptions without Brookfield being invoiced, while Plaintiff contends he paid those charges on his personal credit card and has not been reimbursed. *See id.* at 9, ¶22.

Finally, the Parties agree that in connection with this litigation, the Parties entered a Joint Stipulation governing authorization of certain Nexxt Gen expenditures, including transactions in excess of $5,000 by majority vote among Grant, Plaintiff, and Martinez.[9] *See id.* at 10, ¶¶27–28. Pursuant to that authority, Plaintiff and Martinez approved and caused Nexxt Gen to make payments to DLL Enterprises totaling $1.2 million. *See id.* at 10-11, ¶29. The Parties further agree there was no contract obligating Nexxt Gen to make those payments to DLL Enterprises, but dispute whether Nexxt Gen received consideration in exchange. *See id.* at 11, ¶¶30-31. Defendant contends no consideration was received, while Plaintiff contends DLL Enterprises provided substantial services to Nexxt Gen, including managing and handling billing for hub customers and bringing hub customers to Nexxt Gen. *See id.* at ¶31.

---

[9] The Parties agree that, under the Joint Stipulation, Plaintiff and Martinez had authority to approve transactions from Nexxt Gen's bank accounts exceeding $5,000 based on a majority vote among Defendant, Plaintiff, and Martinez. Because the Parties do not dispute this interpretation — or how the Joint Stipulation modified the Shareholder Agreement it references — the Court need not, and does not, address whether the Joint Stipulation independently compels or authorizes that outcome as a matter of contract interpretation.

## III.   LEGAL STANDARDS

### A.   Summary Judgment Standard

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008).  And a fact is material if it "would affect the outcome of the suit under the governing law." *Id.*  "The mere existence of a scintilla of evidence in support of" the non-moving party's "position will be insufficient; there must be evidence on which the jury could reasonably find for the" non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *See Davis*, 451 F.3d at 763.  "Even when the parties agree on the basic facts, summary judgment is inappropriate if reasonable minds might differ on the inferences to be drawn from those facts." *Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986).  The Court "may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Id.*; *see also Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact.  *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  If the movant satisfies this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the non-moving party must "make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To do that, the non-moving party "must present evidence beyond the pleadings showing that a reasonable jury could find in its favor." *See Shiver*, 549 F.3d at 1343. This evidence can include the party's "own affidavits," along with "depositions, answers to interrogatories, and admissions on file." *See Zurich Am. Ins. Co.*, 246 F. Supp. 3d at 1355; *see also* Fed. R. Civ. P. 56(c)(1)(A).

Still, the court "cannot base the entry of summary judgment on the mere fact that" the non-moving party fails to respond to a fact or argument made by the movant "but, rather, must consider the merits of the motion." *See United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). Even where the non-moving party does not properly put any alleged material facts in controversy, the Court cannot grant summary judgment unless it "review[s] the full record on summary judgment," *Reese v. Herbert*, 527 F.3d 1253, 1271 (11th Cir. 2008), and is satisfied that the record "supports the uncontroverted material facts that the movant has proposed," *Zurich Am. Ins. Co.*, 246 F. Supp. 3d at 1355.

## B.  Substantive Law of the Florida Tort Claims

### 1.  Breach of Fiduciary Duty

The Florida Supreme Court lists "[t]he elements of a claim for breach of fiduciary duty [as]: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002). The Florida Supreme Court further explains that "[o]fficers and directors of a corporation are liable for damages to the corporation which result from a breach of their trust, a violation of their authority or neglect of duty." *Flight Equip & Eng'g Corp. v. Shelton*, 103 So. 2d 615, 627 (Fla. 1958). These duties are codified in Florida statute § 607.08411(1), which requires that "[a]n officer, when

performing in such capacity, shall act: (a) [i]n good faith; and (b) [i]n a manner the officer reasonably believes to be in the best interests of the corporation."  *See* Fla. Stat. § 607.08411(1). Florida law also requires that "[a]n officer, when becoming informed in connection with a decisionmaking function, shall discharge his or her duties with the care that an ordinary prudent person in a like position would reasonably believe appropriate under similar circumstances."  Fla. Stat. § 607.08411(2).  Florida and Federal courts often refer to these principles as the duty of care and duty of loyalty.

An officer breaches the duty of loyalty when he or she acts adversely to the corporation's interests — such as by diverting corporate opportunities, misusing corporate resources, or profiting at the corporation's expense.  *See Cohen v. Hattaway*, 595 So. 2d 105, 108 (Fla. 5th DCA 1992); *Flight Equip.*, 103 So. 2d at 621.  Florida courts have interpreted the duty of loyalty as prohibiting fiduciaries from profiting or personally benefiting — directly or indirectly — from transactions involving their beneficiary's interests unless the beneficiary also shares in the benefit; otherwise, they may be required to disgorge the gain.  *See id.* at 107 (citing *Seestedt v. Southern Laundry, Inc.,* 149 Fla. 402 (1942); *Tinwood, N.V. v. Sun Banks, Inc.,* 570 So. 2d 955 (Fla. 5th DCA 1990)). In sum, disloyal conduct — such as fraud, self-dealing, usurping corporate opportunities, diverting revenues, or other betrayal of trust — constitutes a breach of fiduciary duty under Florida law.

Additionally, corporate fiduciaries owe a duty of care requiring them to act with the degree of care an ordinarily prudent person would use under similar circumstances.  *See* § 607.08411(2). In matters disputing decisions and actions of directors and officers, the Eleventh Circuit recognizes Florida's business judgment rule stating that it "is a policy of judicial restraint born of the recognition that directors are, in most cases, more qualified to make business decisions than are judges."  *See Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 (11th Cir. 1989).  The Eleventh Circuit

recognizes that corporate fiduciaries "are protected by the [business judgment rule under Florida law], no matter how poor their business judgment, unless they acted fraudulently, illegally, oppressively, or in bad faith.  Said differently, so long as due care was exercised, the [rule] protects a 'good director' (one who did not act fraudulently, illegally, oppressively, or in bad faith) who made an honest error or mistake in judgment, but not a 'bad director' (one who acted fraudulently, illegally, oppressively, or in bad faith) who made a bad decision." *In re Bal Harbour Club, Inc.*, 316 F.3d 1192, 1195 (11th Cir. 2003) (quoting *FDIC v. Stahl,* 89 F.3d 1510, 1517 (11th Cir. 1996)) (internal quotations and citation omitted).  "'In this light, the [rule] may be viewed as a method of preventing a factfinder, in hindsight, from second guessing the decisions of directors.'" *Id.* at 1194–95 (quoting *Stahl,* 89 F.3d at 1517).  "'Under the business judgment rule, courts *presume* that directors have acted in good faith.'" *Id*. at 1195 (quoting *Int'l Ins.*, 874 F.2d at 1461 (citing *Cottle v. Storer Communication Inc.,* 849 F.2d 570, 574 (11th Cir. 1988)).  "A court will not call upon a director to account for his action in the absence of a showing of abuse of discretion, fraud, bad faith, or illegality." *Id.* (quoting *Int'l Ins.*, 874 F.2d at 1461) (internal quotations, citations, and footnote omitted)).

### 2.   Waste of Corporate Assets

Florida case law indicates that corporate waste is treated as a subset or theory of breach of fiduciary duty, rather than a distinct cause of action.  *See Orlinsky v. Patraka*, 971 So. 2d 796 (Fla. 3d DCA 2007); *Fritz v. Fritz*, 219 So. 3d 234, 237 (Fla. 3d DCA 2017) (discussing mismanagement and corporate waste in the context of a breach of fiduciary duty); *Karten v. Woltin*, 23 So. 3d 839 (Fla. 4th DCA 2009) (same); *Taubenfeld v. Lasko*, 324 So. 3d 529, 539 (Fla. 4th DCA 2021) (same).  Similarly, federal courts interpreting Florida law have combined waste with fiduciary duty counts.  *See Lindquist v. Linxian*, No. 11-CV-23876, 2012 WL 3811800, at *4 (S.D. Fla. Sept. 4,

CASE NO. 24-CV-21649-ELFENBEIN

2012) ("Although Plaintiffs state a separate claim for corporate waste, allegations of corporate waste are normally couched in terms of a breach of fiduciary duty.") (citing *Garner v. Pearson*, 374 F. Supp. 580, 585 (M.D. Fla. 1973) (allegations of corporate waste "seemingly create a claim for relief . . . for breach of fiduciary duties.")). The Eleventh Circuit has also considered corporate waste in the fiduciary duty context and applies the business judgment rule equally to corporate waste and fiduciary duties. *See Int'l Ins.*, 874 F.2d at 1461. "Corporate waste exists when the payment is afforded without 'adequate' consideration." *Id.* (citing *Michelson v. Duncan,* 407 A.2d 211, 217 (Del. 1979)). Because a "corporate waste" claim in Florida is essentially a breach of fiduciary duty claim, its elements overlap with those for breach of fiduciary duty.

### 3. Conversion

"Under Florida law, a conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time." *BluestarExpo, Inc. v. Enis*, 568 F. Supp. 3d 1332, 1348 (S.D. Fla. 2021); *see also Seven Seas Int'l, LLC v. Frigopesca, C.A.*, 616 F. Supp. 3d 1323, 1329 (S.D. Fla. 2022) ("Florida law defines the tort of conversion as the wrongful exercise of dominion or control over property to the detriment of the rights of one entitled to possession." (quotation marks omitted)); *Frayman v. Douglas Elliman Realty, LLC*, 515 F. Supp. 3d 1262, 1285 (S.D. Fla. 2021) ("Conversion is defined as an act of dominion wrongfully asserted over, and inconsistent with, another's possessory rights in personal property.") (quotation marks omitted). "Accordingly, in order to state a claim of conversion, one must allege facts sufficient to show ownership of the subject property and facts that the other party wrongfully asserted dominion over that property." *Enis*, 568 F. Supp. 3d at 1349 (quotation marks omitted). "Florida courts have divided this description into three elements: (1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein." *Special Purpose Accts.*

*Receivable Co-op Corp. v. Prime One Cap. Co.*, 125 F. Supp. 2d 1093, 1099 (S.D. Fla. 2000).

"The essence of the tort is not the acquisition of the property; rather, it is the wrongful deprivation." *Nat'l Union Fire Ins. Co. of Pennsylvania v. Carib Aviation, Inc.*, 759 F.2d 873, 878 (11th Cir. 1985); *see also Star Fruit Co. v. Eagle Lake Growers, Inc.*, 33 So. 2d 858 (Fla. 1948). "Where a person having a right to possession of property makes demand for its return and the property is not relinquished, a conversion has occurred." *Batista v. Rodriguez*, 388 So. 3d 1098, 1101 (Fla. 3d DCA 2024) (quotation marks omitted). A conversion has also occurred when there is the "wrongful sale of another's property." *Bove v. PBW Stock Exch., Inc.*, 382 So. 2d 450, 452 (Fla. 2d DCA 1980). In that situation, an "equitable owner can maintain the action." *Id.*

### 4. Unjust Enrichment

"Under Florida law, a claim for unjust enrichment is to prevent the wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity." *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1101 (11th Cir. 2021) (quotation marks omitted). The Eleventh Circuit, applying Florida law, states that "[a] claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." *Virgilio v. Ryland Group, Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012) (citing *Fla. Power Corp. v. City of Winter Park,* 887 So. 2d 1237, 1241 n.4 (Fla. 2004) (quoting *Ruck Bros. Brick, Inc. v. Kellogg & Kimsey, Inc.,* 668 So. 2d 205, 207 (Fla. 2d DCA 1995)); *Marrache*, 17 F.4th at 1101.

Moreover, the Florida Supreme Court states that "to prevail on an unjust enrichment claim, the plaintiff must directly confer a benefit to the defendant." *Kopel v. Kopel*, 229 So. 3d 812, 818

(Fla. 2017) (citing *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla. N.A.*, 667 So. 2d 876, 879 (Fla. 3d DCA 1996)); *see also Ritchie v. Dolman*, No. 20-CV-61047, 2020 WL 8812834, at *15 (S.D. Fla. Dec. 10, 2020); *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. 3d DCA 2018); *cf. Hull & Co., Inc. v. Thomas*, 834 So. 2d 904, 907 (Fla. 4th DCA 2003). "This proposition is well-settled in Florida law." *Chiquita Fresh N. Am., L.L.C. v. Port Everglades Terminal, LLC*, 372 So. 3d 277, 281 (Fla. 4th DCA 2023) (collecting cases); *see also Johnson v. Catamaran Health Sols., LLC*, 687 F. App'x 825, 830 (11th Cir. 2017) (recognizing that to bring an unjust enrichment claim in Florida, the plaintiff must have conferred a "direct benefit" on the defendant); *Steven L. Steward & Assocs., P.A. v. Truist Bank*, No. 20-CV-1083-Orl-40-GJK, 2020 WL 5939150, at *2 (M.D. Fla. Oct. 6, 2020) (following *Kopel* and *Peoples Nat'l Bank*).

## IV.   DISCUSSION

As noted above, Plaintiff moves for summary judgment on all six counts within the Counterclaim: (1) breach of fiduciary duty (Count I); (2) waste of corporate assets (Count II); (3) tortious interference with a contractual relationship (Count III); (4) tortious interference with a business relationship (Count IV); (5) conversion (Count V); and (6) unjust enrichment (Count VI). *See* ECF No. [342] at 6-13. Plaintiff shoulders the initial burden to demonstrate the absence of a genuine issue of material fact, and if satisfied, Defendant "must present evidence beyond the pleadings showing that a reasonable jury could find in its favor." *See Shiver*, 549 F.3d at 1343; *Special Purpose*, 125 F. Supp. 2d at 1098; *Matsushita*, 475 U.S. at 586.

As to Counts III and IV for tortious interference, Defendant concedes that these counts do not survive summary judgment by failing to oppose Plaintiff's Motion as to those counts, so the Court need not address them on the merits. *See* ECF No. [359] at 3; ECF No. [373] at 8.

Accordingly, the Court **GRANTS** summary judgment in Plaintiff's favor on **Counts III and IV** of Defendant's Counterclaims.  The Court will address the remainder of the counts within the Counterclaim in turn.

### A. Breach of Fiduciary Duty (Count I)

Count I for breach of fiduciary duty alleges that Plaintiff planned to steal business from Nexxt Gen for NGVSAT, moved Nexxt Gen's money to unrelated entities, diverted customers from Nexxt Gen to NGVSAT, and used Nexxt Gen's labor and resources for NGVSAT's benefit. *See* ECF No. [282] at ¶31.  The Parties' breach of fiduciary duty dispute turns on whether Plaintiff breached his acknowledged duty to Nexxt Gen and whether there is proof of resulting damages. More specifically, Defendant narrows his theory to a set of facts surrounding the delivery of Starlink kits and services to Brookfield.

Under Florida law, a claim for breach of fiduciary duty requires (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) damages proximately caused by the breach.  *See Gracey*, 837 So. 2d at 353.  Corporate officers, including Plaintiff, owe duties of care and loyalty to their corporation.  *See Flight Equip.*, 103 So. 2d at 627; *Cohen*, 595 So. 2d at 108.  Florida law codifies those duties, requiring officers to act in good faith, in the corporation's best interests, and with the care a reasonably prudent person would use under similar circumstances.  *See* Fla. Stat. § 607.08411.  When analyzing an officer's decisions, courts apply Florida's business judgment rule, which protects officers from liability — even for poor decisions — absent proof of fraud, bad faith, illegality, or gross negligence.  *See In re Bal Harbour*, 316 F.3d at 1195.

Here, the Parties do not dispute that Plaintiff owed fiduciary duties to Nexxt Gen. Accordingly, the Court focuses on the second and third elements — whether there is a genuine dispute of material fact regarding: (1) breach of duty and (2) resulting damages.  For organizational

clarity, the Court first addresses whether the alleged conduct breached the duty of loyalty or care, and then turns to whether Defendant has shown triable evidence of resulting harm.

      a.  <u>Breach of Duty</u>

Plaintiff argues that Defendant offers no competent evidence of misconduct. *See* ECF No. [373] at 4-5. Plaintiff denies that he ever diverted business, customers, or funds from Nexxt Gen and maintains NGVSAT never operated, received revenue, paid commissions, or transacted with Nexxt Gen's clients. *See* ECF No. [373-1] at ¶¶12–22. These assertions, which Defendant failed to dispute, are deemed admitted. *See* S.D. Fla. L.R. 56.1(c); Fed. R. Civ. P. 56(e). Plaintiff also points to the fact that he gave Serrano access to NGVSAT's bank accounts and that the investigation found no diversion of funds. *See id.* at ¶¶26–31.

In his Response, Defendant narrows the alleged breach to three events involving Brookfield: (1) Plaintiff sending a Starlink installation guide to Brookfield bearing NGVSAT branding; (2) Plaintiff delivering Starlink kits to Brookfield where Nexxt Gen allegedly bore the cost because Plaintiff failed to invoice Brookfield; and (3) Plaintiff creating a Starlink account in NGVSAT's name (using the alias "NexxtGen Comms") to resell Starlink services to Brookfield but again failed to invoice Brookfield. *See* ECF No. [359] at 7. Defendant argues that, through this conduct, Plaintiff diverted revenues away from Nexxt Gen and this amounted to misappropriation of corporate resources. *See id.* But these arguments do not raise a triable issue as to disloyalty or bad faith.

On the current summary judgment record, the undisputed facts show that Brookfield was Nexxt Gen's customer, but nothing in the record supports that Brookfield directed payment to NGVSAT or recognized NGVSAT as its provider. *See* ECF No. [373-1] at ¶¶12–22. Defendant cites the use of the name "NGC Comms" but offers no evidence that NGVSAT received any funds

or that Brookfield was even aware of NGVSAT's existence. The record contains no invoices, payments, or communications showing any funds or business were redirected to NGVSAT. Additionally, Defendant also alleges the kits and subscriptions were delivered "on behalf of NGVSAT." Importantly, nothing in the record shows Brookfield believed NGVSAT was its service provider or directed any payment to NGVSAT. There is no record of Brookfield remitting payment to NGVSAT, or of NGVSAT issuing invoices, contracts, or receiving funds for the services at issue. The mere use of the "NGC Comms" label does not establish that NGVSAT operated or that Brookfield recognized it as a service provider.

To the extent Defendant argues that Plaintiff's failure to invoice Brookfield constitutes a breach of duty of care, that theory is also unavailing. Florida law holds that errors in judgment — even significant ones — do not support liability unless made in bad faith or with gross negligence. *See Bal Harbour*, 316 F.3d at 1195 ("[T]he [business judgment rule] protects a 'good director' who made an honest error or mistake in judgment, but not a 'bad director' who acted fraudulently, illegally, oppressively, or in bad faith."). Defendant alleges that Plaintiff failed to invoice Brookfield for Starlink-related services and kits — conduct that he claims diverted revenue or caused financial harm to Nexxt Gen. But the record reflects that, on July 3, 2025, the Receiver sent Brookfield invoices for both the Starlink kits and subscriptions. *See* ECF No. [360] at ¶¶21–22. Defendant does not submit evidence showing that Brookfield failed to pay those invoices, or that Nexxt Gen suffered any actual financial loss. Nor does the record show that Plaintiff personally benefited from the delayed invoicing, or that his conduct rose to the level of disloyalty, bad faith, or gross negligence under the business judgment rule. These assertions, which are unrebutted by any evidence to the contrary, undercut any inference of wrongdoing.

    b.  <u>Damages</u>

Even if Defendant could raise a triable issue as to breach, the counterclaim still fails for lack of evidence of damages.  Defendant speculates that Nexxt Gen lost revenue due to Plaintiff's failure to invoice Brookfield, but offers no documentation — such as unpaid invoices, revenue shortfalls, or expert analysis — to support that conclusion.  Courts require more than speculation or inference to survive summary judgment.  *See Anderson*, 477 U.S. at 252 (non-movant must offer evidence "on which the jury could reasonably find" for them); *Shiver*, 549 F.3d at 1343.  The undisputed facts show no breach of fiduciary duty, Defendant has failed to present competent evidence of damages, and Plaintiff has demonstrated the absence of a triable issue.  Accordingly, Plaintiff is entitled to summary judgment on the fiduciary duty claim.  As a result, the Court **GRANTS** summary judgment in Plaintiff's favor on **Count I**.

## B. Waste of Corporate Assets (Count II)

Defendant's corporate-waste counterclaim largely mirrors his breach of fiduciary duty theory.  Defendant's second counterclaim alleges that Plaintiff wasted Nexxt Gen's corporate assets by, *inter alia*, misusing company funds and diverting labor and services to unrelated entities like NGVSAT.  *See* ECF No. [282] at ¶¶36-37.  The Court begins by clarifying the applicable legal framework under Florida law, then evaluates whether the summary judgment record raises a genuine dispute of material fact as to any wasteful conduct.

Florida law does not recognize corporate waste as an independent tort; instead, courts treat it as a subset or theory of breach of fiduciary duty.  *See Orlinsky*, 971 So. 2d at 802 ("[T]he proper course of action would be for [the shareholder] to file a shareholder derivative suit . . . alleging corporate waste."); *Lindquist*, 2012 WL 3811800, at *4.  Because Florida law treats "corporate

waste" as a theory of fiduciary breach rather than an independent tort, the Court analyzes Count II through the same fiduciary-duty framework addressed Section IV.A *supra*.

Substantively, Defendant's waste theory differs from his fiduciary-duty theory only in emphasis. In Count I, Defendant argues Plaintiff's conduct was disloyal and improper because it diverted Nexxt Gen's resources and expected revenues. In Count II, Defendant reframes the same conduct as "waste" by asserting that Nexxt Gen's assets were expended without adequate consideration or corporate purpose — particularly with respect to Starlink kits and subscriptions provided to Brookfield without timely invoicing. *See* ECF No. [359] at 8. Under Florida law, corporate waste exists when corporate assets are used for no corporate purpose or without adequate consideration. *See Int'l Ins. Co. v. Johns*, 874 F.2d at 1461 ("Corporate waste exists when the payment is afforded without adequate consideration."). Courts apply the business judgment rule to waste claims, which protects officers and directors from liability unless the transaction involved bad faith, gross mismanagement, or lacked any rational business purpose. *See In re Bal Harbour Club*, 316 F.3d at 1195; *Int'l Ins.*, 874 F.2d at 1461. Thus, as with Count I, the dispositive questions are whether the record supports a triable inference that: (1) Nexxt Gen assets were expended for no rational business purpose or without consideration; and (2) the challenged conduct overcomes the business judgment presumption by showing fraud, bad faith, illegality, or gross mismanagement. *See Int'l Ins.*, 874 F.2d at 1461; *Bal Harbour*, 316 F.3d at 1195.

For the same reasons discussed in the fiduciary-duty analysis, the summary judgment record does not support those inferences. Virtually identical to his breach of fiduciary duty argument, Defendant's corporate waste theory is based on: (1) Plaintiff delivering Starlink kits to Brookfield using Nexxt Gen funds without invoicing Brookfield; and (2) Plaintiff creating a Starlink account labeled "NGC Comms" to purchase subscriptions for Brookfield, which

Defendant says also went uninvoiced.  *See* ECF No. [359] at 8.  The undisputed invoicing events undermine the failure-to-invoice premise because the Parties agree the Receiver authorized Nexxt Gen to invoice Brookfield for both the kits and the subscription services and Nexxt Gen sent those invoices.  *See* ECF No. [360] at ¶¶21–22.  Defendant identifies no evidence that the invoices remain unpaid or that Nexxt Gen suffered an unreimbursed loss attributable to the timing of invoicing.  Absent evidence of nonpayment or other quantifiable loss, Defendant's contention that Nexxt Gen expended assets "without adequate consideration" remains speculative.  *See Anderson*, 477 U.S. at 252.

Nor does Defendant identify facts showing that Plaintiff's conduct lacked any rational corporate purpose so as to overcome the business judgment rule.  The kits and subscriptions were provided to Brookfield — a Nexxt Gen customer — and Defendant does not cite record evidence that Brookfield paid NGVSAT, believed NGVSAT was the contracting party, or was even aware NGVSAT was involved.  *See* ECF No. [360] at ¶¶13, 19.  The Starlink account's label as "NGC Comms" likewise does not establish diversion or waste; Defendant does not connect the account name to any payments received by NGVSAT or to any customer confusion that redirected funds away from Nexxt Gen.  On this record, the "NGC Comms" label is, at most, ambiguous nomenclature — not evidence that Nexxt Gen assets were expended for no corporate purpose or that consideration was diverted to NGVSAT.  *See id*. at ¶¶17–18.  Defendant offers no documentary evidence contradicting these points or showing that Nexxt Gen received no value from the transactions.

And much like its breach of fiduciary duty theory, the claim for corporate waste also fails for lack of evidence of damages.  Mere failure to invoice, without more, is not enough to show waste — particularly where the corporation ultimately did invoice the customer and there is no

evidence of unreimbursed loss.  As a result, the Court **GRANTS** summary judgment in Plaintiff's favor on **Count II**.

### C. Conversion (Count V)

Defendant's conversion counterclaim alleges Plaintiff "transfer[red] large amounts of funds to . . . DLL Enterprises and Sagenet" without authorization, thereby depriving Nexxt Gen of its property.  *See* ECF No. [282] at ¶54.  Although the pleadings reference multiple transfers, Defendant's Response narrows his conversion theory arguing that the $1.2 million authorized by Plaintiff to be paid to DLL Enterprises was an unauthorized, wrongful exercise of dominion over Nexxt Gen's property.  *See* ECF No. [359] at 8-9.  Defendant's position is that Plaintiff caused Nexxt Gen to transfer this substantial sum to DLL Enterprises over Defendant's objection and without any contract requiring payment or consideration returned to Nexxt Gen.  *See id*.

The Parties do not dispute that the challenged transfers occurred.  *See* ECF No. [373-1] at ¶29.  The dispute is legal and turns on whether the transfers can satisfy the "unauthorized, wrongful dominion" element of conversion.  For organizational clarity, the Court proceeds in three steps. First, because the Parties agree the payments were approved through the Joint Stipulation voting mechanism, the Court addresses whether that undisputed authorization defeats conversion as a matter of law.  Second, the Court considers Defendant's argument that, even if procedurally authorized, the transfers were nevertheless "wrongful" because Nexxt Gen had no contractual obligation to pay DLL Enterprises and allegedly received no consideration.  Third, the Court explains why, on this record, those objections sound in fiduciary-duty or corporate-governance theories rather than conversion.

a.   Undisputed Authorization Under the Joint Stipulation

It is undisputed that, under the Joint Stipulation, Plaintiff and Martinez "had the authority to approve transactions from Nexxt Gen's bank accounts in excess of $5,000" based on a majority vote among Defendant, Plaintiff, and Martinez.  *See* ECF No. [373-1] at p. 10, ¶¶27–28.  It is also undisputed that "[o]ver Grant's objection, and pursuant to the authority granted by the Joint Stipulation, [Plaintiff] and Martinez approved and caused Nexxt Gen to make [the $1.2 million in payments] to DLL Enterprises. . . ."  *See id*. at ¶29.  Because the Parties agree on this operative interpretation of the Joint Stipulation and its effect on Nexxt Gen's approval process, the Court does not separately opine on whether the Joint Stipulation amended any other agreement referenced therein beyond the Parties' shared construction.

Under Florida law, conversion is an *unauthorized* act that deprives another of its property permanently or for an indefinite period, and it is commonly described as the wrongful exercise of dominion or control over property inconsistent with the rights of the person entitled to possession. *See BluestarExpo*, 568 F. Supp. 3d at 1348–49 (conversion as an "unauthorized act" and requiring wrongful dominion over another's property); *Seven Seas*, 616 F. Supp. 3d at 1329 (conversion as wrongful dominion to the detriment of the one entitled to possession); *Frayman*, 515 F. Supp. 3d at 1285 (same).  In applying that standard, Florida authorities focus on whether the defendant's dominion over the property was unauthorized — *i.e.*, exercised in derogation of the owner's possessory rights — rather than whether the transaction was prudent or supported by adequate consideration.  *See Senfeld v. Bank of Nova Scotia Trust Co. (Cayman)*, 450 So. 2d 1157, 1160– 61 (Fla. 3d DCA 1984) (citing *Star Fruit Co. v. Eagle Lake Growers, Inc.,* 160 Fla. 130 (1948)); *Nat'l Union*, 759 F.2d at 878.  Here, Defendant's conversion theory is that the DLL transfers were substantively improper for lack of contractual obligation and consideration, and that Defendant

objected to these payments.  But the "unauthorized act" inquiry for conversion is not the same as whether the transaction was a bad bargain, corporate waste, or a fiduciary breach.

On the Parties' own cited facts, the mechanics of the transfers are framed as authorized under the Joint Stipulation's approval process even if Defendant objected.  *See* ECF No. [41] at ¶(a).  Pursuant to the Joint Stipulation, Nexxt Gen authorized the disbursement so Defendant must point to record evidence creating a genuine dispute that the transfers were *outside* the scope of that authority, or otherwise unauthorized as a matter of law, to satisfy conversion's "unauthorized act" element.  On this record, Defendant has not identified evidence that the disbursements were not approved per the stipulated process or that Plaintiff lacked the authority to approve them.  On this basis, Defendant has failed to show a genuine dispute that Plaintiff lacked the authority to pay DLL.

    b.  <u>The Lack of a Contract or Consideration Is Irrelevant to a Conversion Claim</u>

Defendant's Response argues the DLL payments were "wrongful" because Nexxt Gen allegedly had no contractual obligation to pay DLL Enterprises and allegedly received no consideration, and because Defendant objected to the transfers.  *See* ECF No. [359] at 8–9.  The record supports one part of that contention: there is no dispute that Nexxt Gen had no contract requiring it to pay DLL Enterprises the $1.2 million.  *See* ECF No. [373-1] at ¶30.  But Plaintiff disputes the "no consideration" premise and contends DLL Enterprises provided services to Nexxt Gen.  *See id.* at ¶31.

Even assuming Defendant's view of the consideration evidence is correct, that dispute does not supply the missing conversion element.  On this summary judgment record, the transfers were approved through the undisputed Court-approved voting mechanism and therefore were not "unauthorized" in the conversion sense.  *See* ECF No. [373-1] at ¶¶27–29.  Defendant does not

identify evidence that Plaintiff lacked authority under the Joint Stipulation, that the stipulated approval process was not followed, or that the payments fell outside the scope of the Joint Stipulation's transaction-approval framework.  Put differently, Defendant's objection to the transfers and his contention that they were substantively improper does not create a genuine dispute that Plaintiff exercised dominion through an unauthorized act.  Those arguments may be relevant to whether the transfers were imprudent, wasteful, or breached fiduciary duties, but they do not — on this record — establish conversion.  *See BluestarExpo*, 568 F. Supp. 3d at 1348–49.  As a result, the Court **GRANTS** summary judgment in Plaintiff's favor on **Count V**.

### D. Unjust Enrichment (Count VI)

Defendant alleges that Plaintiff "benefitted financially from the improper conduct or received an in-kind benefit from Nexxt Gen when its personnel and resources were used to work and/or perform services for the benefit of NGVSAT."  *See* ECF No. [282] at ¶58.  In the summary judgment briefing, Defendant again centers his theory on the Starlink kits and subscription services provided to Brookfield, arguing those services "generated monthly recurring revenue from Brookfield that was never delivered to Nexxt Gen."  *See* ECF No. [359] at 10.  Defendant also argues that Plaintiff remains liable even if the revenue did not land in NGVSAT's bank account because the benefit was conferred "upon NGVSAT in the form of equipment and paid-for services" allegedly resold to Brookfield."  *See id*.

The Parties do not dispute the governing legal framework; rather, their dispute turns on whether the summary judgment record satisfies the core elements of unjust enrichment.  The Court's analysis proceeds in two steps.  First, the Court identifies the required elements — particularly Florida's "direct benefit" requirement and whether Defendant has produced evidence that Nexxt Gen directly conferred a benefit on Plaintiff or NGVSAT.  Second, the Court addresses

Defendant's alternative theory that the "benefit" was conferred on NGVSAT in the form of equipment and paid-for services even if Plaintiff did not personally retain revenue and explains why the undisputed record forecloses that theory as well.

### a.   Failure to Satisfy the Unjust Enrichment Elements

Under Florida law, unjust enrichment requires proof that: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) it would be inequitable for the defendant to retain the benefit without paying its value. *See Virgilio*, 680 F.3d at 1337.  Florida law further requires that the plaintiff directly confer the benefit on the defendant.  *See Kopel*, 229 So. 3d at 818.  This "direct benefit" requirement is repeatedly enforced in Florida and Federal courts applying Florida law.  *See Chiquita*, 372 So. 3d at 281; *Johnson*, 687 F. App'x at 830.

Defendant's theory depends on establishing that Nexxt Gen conferred a benefit on Plaintiff or NGVSAT — either as money or an in-kind advantage.  But the record does not contain evidence that Plaintiff or NGVSAT received payments from Brookfield or that he retained Starlink revenue owed to Nexxt Gen.  Defendant asserts Brookfield generated recurring revenue "never delivered to Nexxt Gen," yet he does not cite record evidence showing Brookfield paid Plaintiff, paid NGVSAT, or paid into any account controlled by Plaintiff rather than Nexxt Gen.  *See* ECF No. [359] at 10.  By contrast, Plaintiff relies on undisputed facts establishing that NGVSAT never operated, never received any benefit from any source, and never received diverted assets.  *See* ECF No. [373-1] at ¶¶12–13.  Defendant did not dispute those facts, and they are treated as undisputed. *See* S.D. Fla. L.R. 56.1(c); Fed. R. Civ. P. 56(e).  Plaintiff also relies on undisputed facts that he did not divert Nexxt Gen customers to NGVSAT, did not direct Nexxt Gen clients to pay NGVSAT, and did not route payments away from Nexxt Gen to NGVSAT.  *See* ECF No. [373-1]

at ¶¶14–16, 19–22.  Those admissions undercut Defendant's contention that Plaintiff accepted and retained a benefit traceable to Nexxt Gen.

Defendant also points to the "NGC Comms" Starlink account label as circumstantial proof of diversion.  But the account name alone does not demonstrate that Plaintiff retained any benefit — especially where Defendant does not link that label to any payment stream, any Brookfield remittance to NGVSAT, or any evidence that Brookfield believed it was paying NGVSAT rather than Nexxt Gen.  Without evidence of actual retention of a benefit by Plaintiff (money or otherwise), Defendant cannot satisfy the first two elements of unjust enrichment.  *See Virgilio*, 680 F.3d at 1337; *Kopel*, 229 So. 3d at 818.

Even if Nexxt Gen suffered harm (a point that remains speculative and unsupported), the third element of unjust enrichment requires that Plaintiff's retention of the benefit be inequitable. There is no evidence Plaintiff acted in bad faith, obtained funds under false pretenses, or refused to compensate Nexxt Gen.  *See Fla. Power Corp.,* 887 So.2d at 1241-42.  Plaintiff did not deny that invoices were required; rather, he claims the delay was due to Nexxt Gen not yet being a registered Starlink reseller.  The fact that the Receiver ultimately corrected the invoicing also undermines any inference that Plaintiff retained a benefit inequitably.

b. <u>Benefits in the Form of Equipment and Paid-For Services</u>

Defendant alternatively argues that Plaintiff is liable, even if revenue did not go to NGVSAT's bank account, because the benefit was conferred "upon NGVSAT in the form of equipment and paid-for services" allegedly resold to Brookfield.  *See* ECF No. [359] at 10.  But this theory still fails for two independent reasons.

First, it does not satisfy Florida's requirement that Nexxt Gen directly conferred a benefit on NGVSAT that NGVSAT then retained.  The record reflects that the kits and services were

CASE NO. 24-CV-21649-ELFENBEIN

provided to Brookfield — a Nexxt Gen customer — and Defendant cites no evidence that NGVSAT received payment, retained assets, or otherwise realized a measurable enrichment. Second, the undisputed facts foreclose the premise that NGVSAT functioned as a revenue-generating conduit: it is undisputed NGVSAT never operated and never received any benefit. *See* ECF No. [373-1] at ¶¶12–13. On this record, Defendant's "in-kind benefit to NGVSAT" theory is speculative and insufficient to create a triable unjust enrichment claim. *See Anderson*, 477 U.S. at 252. Accordingly, because Defendant has not shown that Nexxt Gen directly conferred a benefit on Plaintiff or NGVSAT that was accepted and retained, and because the undisputed record negates Defendant's core enrichment premise, Plaintiff is entitled to summary judgment on Count VI. As a result, the Court **GRANTS** summary judgment in Plaintiff's favor on **Count VI**.

## V.    CONCLUSION

For the reasons explained above, it is **ORDERED AND ADJUDGED** that Plaintiff's Motion for Summary Judgment, **ECF No. [342]**, is **GRANTED** in Plaintiff's favor as to all counts in Defendant's Counterclaim.

**DONE and ORDERED** in Chambers in Miami, Florida on February 6, 2026.

**MARTY FULGUEIRA ELFENBEIN**
**UNITED STATES MAGISTRATE JUDGE**

cc:  All Counsel of Record